# Table of Contents

I.      INTRODUCTION ........................................................................................................... 1

II.     SUMMARY OF THE EVIDENCE ............................................................................... 3

  A.  Background of the Investigation ................................................................................ 3

  B.  Drugs, Firearms, and Money Seizures ...................................................................... 6

    1.  Drug and Gun Seizure after R. WILLIAMS Meets with K. DRAYTON, Who Obtains Drugs from HART via MORRISSEY .................................................................. 6

    2.  Guns, Ammunition, and Drug Seizure from Hassan MONROE and Kareem CHAPLIN 11

    3.  Drug and Cash Seizure from Tarik MUHAMMAD .......................................... 12

    4.  Drug Seizure from Jarmina KALLON ............................................................ 14

    5.  Drug and Firearm Seizure from MCGHEE ...................................................... 16

    6.  K. DRAYTON and COATES Coordinate Firearm Deal Resulting in Firearm Seizure from D.E. .......................................................................................... 16

III.    PROBABLE CAUSE .................................................................................................. 18

  A.  KENJI DRAYTON and HASSAN MONROE ......................................................... 18

    1.  K. DRAYTON and H. MONROE Negotiate a Drug Deal and Meet at K. DRAYTON's Residence ................................................................................ 18

    2.  K. DRAYTON and H. MONROE Meet at Burger King After K. DRAYTON Orders Drugs from H. MONROE .................................................................... 22

    3.  K. DRAYTON Orders Drugs from H. MONROE Who Travels to K. DRAYTON's Residence ................................................................................ 23

  B.  HASSAN MONROE and KAREEM CHAPLIN ..................................................... 24

    1.  Surveillance Sees H. MONROE at Stash House Before Drug Deal with TOUSSAINT and Later Observes CHAPLIN's Car at Stash House ................................................ 24

    2.  H. MONROE and CHAPLIN Discuss the Stash House ...................................... 26

    3.  CHAPLIN Calls H. MONROE About Pricing for a Top Mix Drug Deal ............. 28

    4.  CHAPLIN Goes to Top Mix, Calls H. MONROE About Law Enforcement Run In, and CHAPLIN and H. MONROE Agree to Meet at Stash House ................................ 28

    5.  H. MONROE and CHAPLIN Strategize About Avoiding Criminal Charges ......... 30

  C.  HASSAN MONROE and ERIC DAVIS ................................................................. 32

    1.  H. MONROE Tells DAVIS About Having Quality Cocaine for Sale ................... 32

    2.  H. MONROE and DAVIS Coordinate a Drug Transaction ............................... 34

    3.  Before Meeting with DAVIS, H. MONROE Goes to Stash House for Drugs and Complains to CHAPLIN About Stash House Access ............................................ 35

**4.    H. MONROE Distributes Drugs to DAVIS** .................................................... 37

**5.    H. MONROE and DAVIS Meet After Discussing Drug Order** ............................ 38

**D.   KENJI DRAYTON and ERIC DAVIS** ................................................................ 39

**1.    DAVIS Asks K. DRAYTON for Feedback on Supplied Drugs** ......................... 39

**2.    K. DRAYTON Asks DAVIS To Prepare Cocaine Base** .................................... 41

**E.   HASSAN MONROE AND RUSSELL HANKERSON** ........................................ 42

**1.    HANKERSON and H. MONROE Meet in a Car after HANKERSON Orders Cocaine from H. MONROE** ............................................................................................. 42

**2.    HANKERSON Orders a Doob from H. MONROE** .......................................... 48

**3.    H. MONROE and HANKERSON Coordinate a Drug Deal** .............................. 49

**F.   KENJI DRAYTON and DEREK HART** ........................................................... 51

**1.    K. DRAYTON Orders Cocaine and Cocaine Base from HART** ....................... 52

**2.    K. DRAYTON Expresses Frustration Over Pandemic Drug Supply, Discusses Drug Supply Issues, and Orders Drugs from HART** ............................................... 53

**G.   KENJI DRAYTON, DEREK HART, and TATIANA MORRISSEY** ..................... 57

**1.    HART Coordinates a Kilogram Drug Sale with K. DRAYTON through MORRISSEY** .. 57

**2.    MORRISSEY Collects Drug Proceeds from K. DRAYTON on HART's Behalf** .............. 60

**3.    K. DRAYTON Orders 125 Grams of Cocaine from HART, Who Sends MORRISSEY** ... 61

**H.   MAURICE COATES and KENJI DRAYTON** ................................................... 61

**1.    K. DRAYTON Orders Drugs From COATES** ................................................. 61

**2.    K. DRAYTON Seeks Intel from COATES on Kilogram Quantities of Cocaine and Pricing** .............................................................................................................. 63

**3.    K. DRAYTON Does a Drug Deal with COATES and then Supplies KALLON** ............. 64

**I.    MAURICE COATES, DERRICK HOBSON, and KENJI DRAYTON** ................... 65

**1.    COATES Orders Two Ounces of Cocaine from HOBSON** ............................. 65

**2.    COATES Middles a Deal Between K. DRAYTON and HOBSON, and also, Secures His Two Ounces of Cocaine from HOBSON** ................................................ 66

**3.    After COATES Orders Drugs from HOBSON, COATES and HOBSON Meet** .............. 75

**J.    WINSTON MCGHEE, KENJI DRAYTON, DEREK HART, and ERIC DAVIS** ............. 79

**1.    MCGHEE Agrees to Supply Drugs to K. DRAYTON While K. DRAYTON Awaits Drugs from HART** ......................................................................................... 79

**2.    MCGHEE and K. DRAYTON Discuss Drug Supply, and MCGHEE Meets with DAVIS** 82

**3.    MCGHEE and K. DRAYTON Discuss Drug Supply, and DAVIS Travels to California to Obtain Cocaine** .............................................................................................. 83

**K.  ANDRE ECHEVARRIA, DEREK HART, and WINSTON MCGHEE** .................................. 84

   **1.   ECHEVARRIA Orders Cocaine from HART** ....................................................... 84

   **2.   ECHEVARRIA Orders Cocaine from MCGHEE** ................................................. 87

   **3.   ECHEVARRIA Complains about MCGHEE's Cocaine, and MCGHEE Gives a "Cooking Class"** ......................................................................................................................... 90

**L.  ANTONE JEREMIAH and WINSTON MCGHEE** .................................................... 94

   **1.   JEREMIAH Orders Cocaine from MCGHEE** ..................................................... 94

   **2.   JEREMIAH Does a Drug Deal with MCGHEE** ................................................... 95

   **3.   JEREMIAH Orders Cocaine from MCGHEE, Which Results in a Payment Dispute** ...... 99

**M.  MICHAEL TOUSSAINT and HASSAN MONROE** .................................................. 102

   **1.   TOUSSAINT Does a Drug Deal with H. MONROE** .......................................... 102

   **2.   TOUSSAINT Orders a Doobie from H. MONROE** ........................................... 104

**N.  MICHAEL STOKES, KENJI DRAYTON, and DEREK HART** ......................................... 108

   **1.   K. DRAYTON Middles a Drug Deal Between STOKES and HART** .............................. 108

   **2.   STOKES Orders Drugs From K. DRAYTON** ..................................................... 111

   **3.   STOKES Attempts to Order Drugs From K. DRAYTON, Who Agrees to Supply STOKES Once He Has Drugs** ............................................................................................................... 113

**IV.   CONCLUSION** ............................................................................................... 114

# AFFIDAVIT

I, James Peters, Task Force Officer, U.S. Drug Enforcement Administration ("DEA"), being sworn, depose and state as follows in support of my application for the issuance of a criminal complaint for **KENJI DRAYTON, WINSTON MCGHEE, HASSAN MONROE, DEREK HART, ERIC DAVIS, MAURICE COATES, DERRICK HOBSON, ANDRE ECHEVARRIA, ANTONE JEREMIAH, MICHAEL STOKES**, **MICHAEL TOUSSAINT, KAREEM CHAPLIN, TATIANA MORRISSEY**, **RUSSELL HANKERSON, JARMINA KALLON, RENARDO WILLIAMS,** and **TARIK MUHAMMAD** (collectively, the "Target Subjects"). As set forth below, I believe there is probable cause to believe the Target Subjects have conspired to possess with intent to distribute and distribute controlled substances, including cocaine and cocaine base, Schedule II controlled substances, in violation of Title 21, United States Code, Section 846 ("the Target Offense").

## I.    INTRODUCTION

1.      I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516, Title 18, United States Code.

2.      I have been assigned as a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA") since 2016.  I am dually assigned as a Detective with the Braintree Police Department Drug Control Unit since February 2014 and to the Boston Office of the New England Division of the DEA since June 2016, where I am currently assigned to Task Force Group 5.

3.      As a DEA TFO, I am authorized to investigate violations of the laws of the United States, including violations of Title 21 and Title 18 of the United Stated Code.  I received training

regarding narcotics investigations while attending the DEA Basic Narcotics School and attended additional specialized training courses in furtherance of my past and current assignments.

4.    I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, introduction of undercover agents, execution of search warrants, effecting arrests, and debriefing defendants, informants, and witnesses who had personal knowledge regarding major narcotics trafficking organizations.  I also have reviewed recorded conversations and telephone, financial, and drug records.  Through my training and experience, I became familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.  I also became familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity to protect their operations, members, narcotics, and narcotics proceeds.

5.    Based on my training and experience, I know that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities and are aware of law enforcement's use of electronic surveillance.  Thus, drug traffickers frequently change cellular telephone numbers and/or cellular telephones, use multiple cellular telephones simultaneously, use prepaid cellular telephones (where a phone's subscriber is not required to provide personal identifying information), and use cellular telephones subscribed under a different person's identifying information to thwart law enforcement's use of electronic surveillance.  I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business to prevent detection and often use text messages in lieu of phone calls to avoid speaking over the telephone.

6.    The facts in this Affidavit have come from my personal observations, my training

and experience, and information obtained from other agents, task force officers, and state and local law enforcement officers. The word "agent" or "investigator" is used in this Affidavit for all federal, state, and local law enforcement officers. This affidavit is submitted for the limited purpose of establishing probable cause for the issuance of a criminal complaint for **KENJI DRAYTON, WINSTON MCGHEE, HASSAN MONROE, DEREK HART, ERIC DAVIS, MAURICE COATES, DERRICK HOBSON, ANDRE ECHEVARRIA, ANTONE JEREMIAH, MICHAEL STOKES, MICHAEL TOUSSAINT, KAREEM CHAPLIN, TATIANA MORRISSEY, RUSSELL HANKERSON, JARMINA KALLON, RENARDO WILLIAMS,** and **TARIK MUHAMMAD,** for their conspiring to distribute and to possess with intent to distribute cocaine and cocaine base, Schedule II controlled substances, in violation of Title 21, United States Code, Section 846.

7.      Since this affidavit is being submitted for the limited purpose of securing the requested criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for the issuance of the requested arrest warrants.

## II.      SUMMARY OF THE EVIDENCE

### A.  Background of the Investigation

8.      This case involves an approximate 20-month investigation by the Drug Enforcement Administration (DEA), working with other state and local agencies, including the Boston Police Department (BPD), between approximately November 2018 and June 2020. That investigation focused on the drug-trafficking activities of a drug-trafficking organization ("DTO") that Kenji DRAYTON, along with his co-conspirators, operated within the Boston area. The investigation involved controlled purchases of narcotics, physical surveillance, pole camera

surveillance, review of subscriber data, review of pen register and trap and trace information, analysis of telephone records, and obtaining and executing search warrants, including precise location information from cellular telephones.  The investigation also involved the interception of wire and/or electronic communications from over twenty cellular telephones belonging to various Target Subjects over an approximate thirteen-month period.  Regarding the latter form of evidence, below is a brief overview of common drug code that the Target Subjects employed during their communications to further their drug-trafficking activities:

| Name | Amount | Weight in Grams |
|---|---|---|
| Key, Joint | Kilogram | 1,000 |
| Eight, Nine, Nina, Nin | Nine ounces<br><br>¼ of a kilogram | 250 (252 exactly) |
| Four way, four play, four time, four runner | Four and one half ounces<br><br>1/8 of a kilogram | 125 grams |
| Dookie, Dook, Dube, Dubie, Sixty-two | One half of a "fourway"<br><br>1/16 of a kilogram | 62 grams |
| Thirty-one | One half of a dookie<br><br>1/32 of a kilogram | 31 grams |
| Zip, Zone, Rope, Zap | One ounce | 28 grams |
| Eight Ball, Basket | 1/8 of an ounce | 3.5 grams |

9.      Investigators initially identified K. DRAYTON from an investigation into the drug-trafficking activities of his brother, Matthew Drayton.  During that investigation, which involved a number of controlled purchases with M. Drayton and a wire investigation, investigators intercepted K. DRAYTON discussing narcotics activity with M. Drayton.  Physical and electronic surveillance further corroborated K. DRAYTON and M. Drayton's drug-dealing business

relationship and resulted in the identification of their drug suppliers, drug runners, drug distributors, and drug customers.  That investigation resulted in a separate and complementary drug-trafficking conspiracy (which has been charged by a separate complaint).  In particular, as a result of the investigation into M. Drayton, investigators identified K. DRAYTON as one of M. Drayton's main suppliers.

10.      As a result, agents began investigating K. DRAYTON and his respective sources of supply.   That investigation has resulted in the identification of up-the-chain drug suppliers, including Derek HART, Hassan MONROE, Eric DAVIS, and Winston MCGHEE, as well as other suppliers, including Maurice COATES and Derrick HOBSON.   That investigation also has identified a number of the K. DRAYTON DTO's members, including Tatiana MORRISSEY, who assisted suppliers like HART in distributing drugs, collecting drug proceeds, and other responsibilities.   The K. DRAYTON DTO mainly supplies customers with cocaine or cocaine base, as well as wholesalers and distributors like Andre ECHEVARRIA, Antone JEREMIAH, Michael STOKES, Michael TOUSSAINT, Jarmina KALLON, Russell HANKERSON, Renardo WILLIAMS, and Tarik MUHAMMAD.  The K. DRAYTON DTO has a number of stash house locations, that is, locations used for purposes of storing, preparing, and packaging drugs for distribution.  One such location includes 55 Woodhaven Street, which the investigation has shown is shared by H. MONROE and his fellow distributor, Kareem CHAPLIN.

11.      Below, I describe numerous intercepted calls and identify the participants in those calls.  Those identifications are based on a combination of several factors, including the following: (1) intercepted statements concerning the user's location or activity that were consistent with ongoing physical or electronic surveillance; (2) identification, by name, of the users of the telephones during the intercepted communications; and (3) cell phone subscriber information.  I

base my interpretations of these communications upon my training and experience, the training and experience of other investigators, and my involvement in this investigation.  Quotations from telephone conversations are based on preliminary transcripts and/or synopses ("line sheets") that are subject to revision.  All times referenced herein are approximate.

### B.  Drugs, Firearms, and Money Seizures

12.     Over the course of this investigation, federal agents and task force officers have participated in a number of wall-off arrests and search warrants, which have resulted in the seizure of nearly a kilogram of cocaine, over $10,000 in cash, approximately ten firearms, and over 100 rounds of ammunition.   These seizures, along with related intercepted communications and surveillance observations, are described herein.

### 1.  **Drug and Gun Seizure after R. WILLIAMS Meets with K. DRAYTON, Who Obtains Drugs from HART via MORRISSEY**

13.     On July 30, 2019, investigators recovered approximately 125 grams of cocaine and a loaded firearm from Renardo WILLIAMS ("R. WILLIAMS").   In the hours preceding R. WILLIAM'S arrest, investigators had intercepted calls between K. DRAYTON and R. WILLIAMS indicating that R. WILLIAMS wanted to purchase drugs from K. DRAYTON. Investigators also intercepted calls between K. DRAYTON and HART, who used drug runner Tatiana MORRISSEY to supply drugs to K. DRAYTON for purposes of his subsequent sale to R. WILLIAMS.

14.     On July 30, 2019, at 8:27 a.m., K. DRAYTON received a call on Target Telephone 8 from (857) 329-1212 and spoke to R. WILLIAMS.[1]  R. WILLIAMS asked, "What, you said 19

---

[1] On July 27, 2019, K. DRAYTON spoke with an individual on this same telephone number who identified himself as "Boobie," which investigators know from their work on this and other investigations to be a nickname for R. WILLIAMS.  Additionally, through intercepted calls, investigators became familiar

Harrison Ave?"  K. DRAYTON replied, "I said 519."  R. WILLIAMS said, "519, yeah I'm out

here, but I don't see 519."  K. DRAYTON replied, "Okay, I'm coming downstairs."  Based on the

call, agents believed that K. DRAYTON and R. WILLIAMS were going to meet at 519 Harrison

Avenue, Boston, Massachusetts, one of K. DRAYTON's identified residences.

15.    Two hours later, at about 10:26 a.m., HART (on telephone number (617) 712-

9167)[2] called K. DRAYTON on Target Telephone 8).  K. DRAYTON asked, "Hey yo, you ain't

gone right?"  HART replied, "Nah."  K. DRAYTON said, "Oh word, yeah, I need to umm… I'm

trying to see you ASAP."  HART responded, "…ok."  K. DRAYTON added, "Aight, just hit me

when you get up."  HART confirmed, "Aight, no doubt, what you doing?"  K. DRAYTON said,

"Uh, definitely the four time, but I think it's gonna be the nin mo."  HART responded, "Yeah, I

think that's what I got left.  Like a nin shit."  K. DRAYTON asked, "Like a what?"  HART said,

"Like nin."  K. DRAYTON responded, "Yeah, yeah, well definitely don't do nothing with that."

HART replied, "Aight, I'mma call you in a few."  K. DRAYTON said, "Aight."

16.    Based on this call and my work on this case, I believe that K. DRAYTON told

HART he needed four and a half ounces of cocaine ("definitely the four time," which I know is a

common amount of illegal drugs) and that he also anticipated needing as much as nine ounces of

cocaine ("I think it's gonna be the nin mo").  Based on training and experience, I know that terms

like "four-play," "four-way," and "four time" are all coded language referring to four and a half

---

with R. WILLIAMS's voice and recognized the same voice consistently speaking on (857) 329-1212 with
K. DRAYTON before subsequently seeing the same individual (R. WILLIAMS) meeting up with K.
DRAYTON in the same manner as referenced on the calls.

    [2] Investigators intercepted HART, who continuously changed cellphones during this investigation
nearly every thirty days, on prior calls with K. DRAYTON.  Investigators compared the voice on (617)
712-9167 with HART's identified voice on prior intercepted calls and confirmed his identity.

ounces, which is roughly 125 grams of cocaine (or one-eighth of a kilogram).  HART told K.

DRAYTON that he thought he only had nine ounces left ("I think that's what I got left.  Like a nin

shit.").  From my training and experience, I know that "nin" is code for nine ounces of cocaine (or

one quarter kilogram).  Based on the sequence of calls, I believe that K. DRAYTON ordered 125

grams of cocaine from HART for R. WILLIAMS, and also indicated that he might need nine

ounces total (i.e., 125 grams for R. WILLIAMS and 125 grams for himself).

17.     Minutes after K. DRAYTON and HART spoke, R. WILLIAMS called K.

DRAYTON on Target Telephone 8 at 10:32 a.m.  K. DRAYTON said, "Yeah, so, he just hit me

back and he's just getting up.  Give him a little second."  R. WILLIAMS replied, "Aight."  K.

DRAYTON said, "I'll keep you posted."  R. WILLIAMS asked, "What was I going to say, this is

going to be like four, no six bands all together, what can you do with six?"  K. DRAYTON

responded, "Uhm, I don't know, I got to wait til he gets in front of me," and "Cause he's going to

leave you locked and loaded, to what we already said.  So that's going to be on def."  R.

WILLIAMS replied, "Aight, cool.  Let me hit him back and tell him to bring it.  Hey, what time?"

K. DRAYTON replied, "Say an hour."  R. WILLIAMS replied, "Alright, 1 o'clock."  Based on

the call, I believe that R. WILLIAMS indicated he was going to purchase $6,000 worth ("six

bands") of drugs from K. DRAYTON.  This price is consistent with the street value of 125 grams

of cocaine.  Additionally, based on the sequence of calls, I believe that K. DRAYTON contacted

HART to obtain the drugs to then sell to R. WILLIAMS.

18.     About an hour later, at 11:29 a.m., K. DRAYTON received a call on Target

Telephone 8 from HART on telephone number (617) 712-9167.  HART said, "Yeah, where you,

down to you?" and "I said, I mean you in the South End?"  K. DRAYTON responded, "Yeah, I

was saying if you could see me before 1:00."  HART replied, "She's putting clothes on now she's

about to come towards you." K. DRAYTON said, "Aight, word." I believe that HART confirmed the meeting location for his drug deal with K. DRAYTON, which he was going to have a female do on his behalf ("she's about to come towards you"). I believe that the meeting location was to be K. DRAYTON's residence at 519 Harrison Avenue ("you in the South End?").

19.     About ten minutes later, at 11:41 a.m., K. DRAYTON on Target Telephone 8 called HART on telephone number (617) 712-9167. K. DRAYTON said, "See if she can meet me at Moreland because there's a lot of people, the people, the doctors, they're all walking around." HART replied, "Yeah, yeah." K. DRAYTON reiterated, "See if she can meet me… I'm gonna go to Moreland right now." HART said, "Aight, so she probably is gonna take, she probably, she probably gonna take like thirty minutes." K. DRAYTON responded, "Alright, that's cool." I believe that K. DRAYTON told HART that he would meet the female drug runner at another residence associated with K. DRAYTON, 117 Moreland Street ("Moreland").[3] HART estimated the female runner would arrive in about 30 minutes.

20.     On July 30, 2020, at 11:56 a.m., surveillance saw a blue 2008 BMW with Massachusetts registration 335X1, registered to Tatiana MORRISSEY (the "blue BMW"), park across the street from 117 Moreland Street's driveway. Surveillance identified the female driver as MORRISSEY based on her RMV photograph and their familiarity with this case. Surveillance also saw a black 2014 Honda CRV parked on Moreland Street. Surveillance saw MORRISSEY exit the blue BMW and then, after she had left, saw K. DRAYTON enter the car's passenger side. Within seconds, K. DRAYTON exited the car and appeared to place an object into his front right

---

[3] From my work on this investigation, I know that K. DRAYTON's brother (and co-conspirator in a complementary investigation) resides at this location.

pocket.  K. DRAYTON then entered the previously-observed black 2014 Honda CRV with

Massachusetts registration 2SAF21, registered to his girlfriend (the "black Honda CRV").  At

about 12:01 p.m., MORRISSEY re-entered the blue 2008 BMW and left the area.

21.     Based on surveillance's observations and my training and experience, I believe that

MORRISSEY (on HART's behalf) and K. DRAYTON participated in a "dead drop."  That is, I

believe MORRISSEY left drugs inside of the car, exited it, and then K. DRAYTON entered the

car to obtain the drugs and leave the area.  Once K. DRAYTON left the car, MORRISSEY got

back into it and left.  That surveillance is consistent with the previously intercepted calls, which

indicated that K. DRAYTON had ordered cocaine from HART, who had instructed a female drug

runner (MORRISSEY) to deliver the drugs to K. DRAYTON at 117 Moreland Street.  Surveillance

followed K. DRAYTON after the "dead drop" to his other residence at 519 Harrison Avenue,

where he arrived at about 12:21 p.m. in the black Honda CRV.

22.     Just before his arrival at 519 Harrison Avenue, K. DRAYTON used Target

Telephone 8 to call R. WILLIAMS at 12:10 p.m.  K. DRAYTON asked, "Bro, you meet me at my

crib?"  R. WILLIAMS replied, "What's up?"  K. DRAYTON repeated, "Can you meet me at my

crib?"  R. WILLIAMS said, "I got the piece."  K. DRAYTON replied, "Aight."  Based on the call

and my work on this case, I believe that R. WILLIAMS indicated – in code – that he had a firearm

("the piece").  Further, based on this call's timing, I believe that K. DRAYTON called R.

WILLIAMS to tell him he had the cocaine – that HART supplied – for R. WILLIAMS.

23.     Approximately fifteen minutes later, agents observed K. DRAYTON enter 519

Harrison Avenue with a black male whom surveillance subsequently confirmed to be R.

WILLIAMS (after reviewing the driver's license on his person during his arrest).  At 12:33 p.m.,

surveillance saw R. WILLIAMS exit 519 Harrison Avenue, enter a blue 2016 Chrysler 300 with

Maine registration 997ATN (the "blue Chrysler"), and leave the area. Surveillance followed the blue Chrysler until it parked on Costello Circle in South Boston, Massachusetts. Once the car parked and R. WILLIAMS exited, investigators approached R. WILLIAMS on foot. During their stop, investigators recovered 125 grams of cocaine from R. WILLIAMS's pants pocket and a Ruger LCP .380 semi-automatic firearm, which was loaded with five rounds of Winchester .380 ammunition. Agents seized the drugs, firearm, and ammunition evidence and arrested R. WILLIAMS on firearm possession and drug-trafficking charges. The Boston Police Department's subsequent analysis of the firearm resulted in the recovery of latent fingerprints from the magazine inside of the firearm. A comparison of those prints with the Massachusetts AFIS database confirmed a match for R. WILLIAMS.

## 2. Guns, Ammunition, and Drug Seizure from Hassan MONROE and Kareem CHAPLIN

24. On February 27, 2020, investigators attempted to conduct a motor vehicle stop on an unknown male from Maine who was supposed to obtain 250 grams of cocaine from H. MONROE via Russell HANKERSON. HANKERSON and H. MONROE had previously been intercepted arranging for H. MONROE to deliver 250 grams of cocaine to HANKERSON to then distribute to an unknown male, discussed further *infra*. H. MONROE's 250 grams of cocaine, however, never made it to HANKERSON. The night of the anticipated deal, investigators attempted to surveil the meeting to stop the buyer from Maine, but H. MONROE identified over intercepted calls multiple surveillance units then present in the meet locations. When H. MONROE "made" or identified surveillance, he spoke with his girlfriend over Target Telephone 14 and told her that he had observed surveillance and that he had left his black Audi on Lithgow Street in Dorchester, Massachusetts. H. MONROE further stated that he was going to change at

least one of his telephone numbers and that he had a gun ("hammer") and drugs ("work") in his car, which investigators previously had identified as a black 2008 Audi A8.

25.     Pending search warrants, law enforcement towed H. MONROE's black Audi and secured H. MONROE's identified stash house located at 55 Woodhaven Street, Mattapan, Massachusetts.  On February 28, 2020, investigators executed search warrants at 55 Woodhaven Street, Mattapan, Massachusetts, and on H. MONROE's black Audi.  At 55 Woodhaven Street, investigators seized six handguns, approximately 417 grams of cocaine, large amounts of ammunition, and paperwork in the name of Kareem CHAPLIN.  Inside H. MONROE'S black Audi, investigators found a loaded handgun and approximately 250 grams of cocaine, as well as paperwork in the name of Hassan MONROE.  Based on intercepted calls that H. MONROE made over Target Telephone 14, investigators know that H. MONROE was aware of the search warrants' executions as he discussed the police having secured his residence and vehicle.

### 3. Drug and Cash Seizure from Tarik MUHAMMAD

26.     On April 8, 2020, at 4:25 p.m., K. DRAYTON (on Target Telephone 20) spoke with a person whom investigators identified as Tarik MUHAMMAD (on telephone number (954) 683-9613).[4]  They agreed to meet at "50 Malden," which investigators understood to mean 50 Malden Street in Boston, Massachusetts.  Surveillance set up around that address and, soon after the above 4:25 p.m. call, observed K. DRAYTON and MUHAMMAD meet and subsequently enter a vehicle to conduct a suspected narcotics transaction.  Investigators identified the car's

---

[4] Investigators identified MUHAMMAD as the caller on (954) 683-9613 because, after speaking with K. DRAYTON about meeting at a specific location, investigators surveilled Muhammad present at the same location.  Additionally, the address MUHAMMAD and K. DRAYTON discussed – 50 Malden – is the residence of MUHAMMAD's mother.  Lastly, after MUHAMMAD's arrest, K. DRAYTON spoke with MUHAMMAD's mother and brother about MUHAMMAD having been stopped by the police.  Based on the surveillance activity that occurred as a result of calls over (954) 683-9613, I believe that MUHAMMAD was the user of that phone.

driver as K.K.  After a brief drive, the vehicle parked, the suspected deal ended, and K. DRAYTON

exited the car and left the area.  Investigators then stopped Muhammad and K.K. – the car's driver

who was with MUHAMMAD during the suspected drug deal with K. DRAYTON – and searched

MUHAMMAD and K.K.

27.     Specifically, investigators removed MUHAMMAD from the car and attempted to

conduct a pat-frisk, but MUHAMMAD tensed up and pulled away multiple times.  Investigators

felt a hard object in MUHAMMAD's rear waistline, believed he had contraband concealed in his

buttocks, and decided to transport him to the police station to perform a proper search in a private

location.  Officers handcuffed MUHAMMAD and placed him into the back of a BPD patrol

wagon, which had a camera that allowed officers to view the cabin area.  During the transport, law

enforcement saw via camera that MUHAMMAD was attempting to block the camera's view with

his body, namely, by standing in front of it.  Law enforcement then saw MUHAMMAD throw

himself to the ground and move in a manner that suggested he was trying to ingest something.

28.     As investigators opened the wagon door, they saw MUHAMMAD attempting to

ingest a white substance (that they believed to be cocaine) on the wagon's floor.  MUHAMMAD

also was covered in white powder with a dazed look upon his face.  As he was removed from the

wagon and placed on the ground, MUHAMMAD began spitting out a white-colored substance that

appeared to be cocaine, based on the officers' training and experience.  Officers recovered that

same white-colored powdered substance from MUHAMMAD's outer clothing and from the floor

of the BPD patrol wagon.  Additionally, while at the Area B-2 Boston Police station, law

enforcement officers recovered a clear, ripped, plastic bag with white residue from

MUHAMMAD's underwear.  Law enforcement recovered 29 grams of suspected cocaine and

$3,665 from MUHAMMAD.  Law enforcement transported MUHAMMAD to the hospital by ambulance for evaluation.

### 4.  **Drug Seizure from Jarmina KALLON**

29.     On April 18, 2020, investigators intercepted Jarmina KALLON speaking with K. DRAYTON (on Target Telephone 20).  Based on the call (as well as prior intercepts between KALLON and K. DRAYTON on other occasions), I believe that KALLON arranged to pick up drugs from K. DRAYTON at his residence at 519 Harrison Avenue.  Although no specific language was used on the call addressing the particular quantity of drugs KALLON wanted to collect, prior intercepted calls between KALLON and K. DRAYTON caused investigators to believe that KALLON was going to meet with K. DRAYTON to obtain cocaine (e.g., on August 9, 2019, KALLON told K. DRAYTON, "The little bag you gave me of soft was only 5.8 grams," referring to 5.8 grams of powdered cocaine, and "you gave me 28 grams of hard," referring to 28 grams of crack cocaine).

30.     Specifically, on April 18, 2020, at 4:53 p.m., K. DRAYTON, on Target Telephone 20, called KALLON on telephone number (339) 218-0871.[5]  K. DRAYTON asked, "Yo, yo, I'm, saying how long, how long will it take you to get to my crib?"  K. DRAYTON added, "Don't tell me Kallon time, tell me real time, because I gotta go to work at 7:00."  KALLON replied, "No bullshit, I'll come there right now."  Based on this call and my prior work on the case, I believe that KALLON was going to meet with K. DRAYTON at 519 Harrison Avenue to purchase a quantity of cocaine.

---

[5] KALLON used telephone number (339) 218-0871 to speak with K. DRAYTON on Target Telephone 20 to purchase cocaine.  After contacting K. DRAYTON on Target Telephone 20 to arrange a meet, surveillance then saw KALLON meeting with K. DRAYTON in the same manner as referenced on the intercepted calls.  Additionally, during his arrest in April 2020, officers called phone number (339) 218-0871, and a phone on KALLON's person rang.

31.     At 5:20 p.m. that same day, surveillance saw KALLON and his girlfriend exit the side door of his residence at 45 Highland Avenue and drive away in a white 2015 Acura ILX sedan with Massachusetts registration 7FT629 (the "white Acura"). Surveillance followed the Acura until it turned onto the highway.   At 5:30 p.m., KALLON called K. DRAYTON on Target Telephone 20 and said, "I'm about to be, I'm about to be there in like three minutes."   K. DRAYTON replied, "Alright, I got the baby just um ring the bell and I'll be right with you." (Incidentally, I believe that K. DRAYTON's reference to "baby" was to his actual child).

32.     A short time later, surveillance in the area of K. DRAYTON's residence saw the white Acura arrive at 519 Harrison Avenue.  Surveillance saw KALLON exit the vehicle and enter K. DRAYTON's residence.  A few minutes later, KALLON exited 519 Harrison Avenue, got back into the white Acura, and drove away.  Surveillance followed KALLON back to Randolph.  The white Acura exited Route 24 and turned onto Route 139 (i.e., Mazzeo Drive).  Once the car was on Mazzeo Drive, Randolph Police officers conducted a motor vehicle stop on the Acura based on information received from this investigation, and also, the fact that the vehicle had a defective tail light.

33.     Once stopped, officers asked KALLON and his girlfriend to exit the white Acura. Officers did a pat-down frisk on KALLON and discovered an object in his waistband.  As the officer felt the object, KALLON took off on foot and, after a short foot chase, officers successfully apprehended KALLON.  He was then found to be in possession of a plastic baggie containing a white powdery substance.  Investigators subsequently field tested the substance, which tested positive for cocaine with an estimated weight of 62 grams.  Officers arrested KALLON, and he was charged in state court with cocaine trafficking.

34.     About an hour before KALLON's meeting with K. DRAYTON, investigators intercepted calls between K. DRAYTON and COATES indicating that COATES was going to supply K. DRAYTON with cocaine.  Based on the intercepted calls and the location discussed on the call, investigators set up surveillance on Walk Hill Street in Mattapan, Massachusetts. Investigators saw COATES walk up to a car's passenger side door, where surveillance saw K. DRAYTON seated, briefly reach inside the car, and then walk away.  I know from training and experience that such a brief, car-side transaction is consistent with a drug deal.

### 5.  Drug and Firearm Seizure from MCGHEE

35.     Investigators arrested MCGHEE on April 27, 2020, on a state warrant issued for his alleged involvement in a shooting incident that occurred on April 17, 2020.   During MCGHEE's arrest, he fled from law enforcement, discarded a backpack (which contained marijuana), and appeared to discard a firearm that officers recovered in the area of his flight. Officers arrested MCGHEE a short distance away.  A search of MCGHEE revealed that he also was in possession of a small quantity of cocaine and a small amount of marijuana.

### 6.  K. DRAYTON and COATES Coordinate Firearm Deal Resulting in Firearm Seizure from D.E.

36.     Law enforcement officers arrested D.E. on April 28, 2020, after intercepting calls between K. DRAYTON on Target Telephone 20 and COATES indicating that K. DRAYTON was trying to obtain a firearm.  COATES told K. DRAYTON to call the number he had given him ("I sent you the digits that you need to go through") and to speak with a female who would "accommodate" him.  In particular, COATES instructed K. DRAYTON to tell the female that he needed "the thing they left over there . . . I need to come grab that."  After the initial conversation between K. DRAYTON and COATES, K. DRAYTON had conversations on Target Telephone 20 with M.B.  During one of the conversations, M.B. said, "Umm… so what do you want me to do?

You wanna come here?"  K. DRAYTON replied, "Yeah, I was gonna come there and grab it."  On a follow-up call, M.B. told K. DRAYTON, "I stepped out, but umm… I left it, and my boyfriend is gonna give it to you, just I'll call him when you're outside." M.B. added, "Alright, he cleaned it and everything."  Based on the conversation, I believe that M.B. indicated her boyfriend was then in possession of the firearm and that he had cleaned it for K. DRAYTON.

37.      Surveillance units set up at 519 Harrison Avenue (K. DRAYTON's residence) and 717 Walk Hill Street (the address of the suspected firearm seller) to intercept the firearm. Surveillance observed K. DRAYTON leave his house and enter the back seat of a gray Ford Edge with Virginia registration UMK9536 (the "gray Ford Edge") at 519 Harrison Avenue.  Officers followed the car as it travelled to 717 Walk Hill Street, the location of the suspected gun deal. Based on intercepted calls over Target Telephone 20, investigators believed that K. DRAYTON would retrieve the firearm from a female's boyfriend, who resided on the second floor of 717 Walk Hill Street.  Surveillance observed the Ford Edge's rear seat passenger (K. DRAYTON) walk to 717 Walk Hill Street, stand in the front entrance for about one minute, and then return to the car. Although surveillance could not see whom K. DRAYTON met with at the front door, the intercepted calls, coupled with K. DRAYTON's brief visit at 717 Walk Hill Street's entrance, caused agents to believe that K. DRAYTON had obtained a firearm.  K. DRAYTON entered the rear passenger seat of the vehicle.  Once the vehicle pulled away from the house, officers conducted a traffic stop.  On searching the vehicle, officers located a firearm in a bag at the front passenger's feet.  The front passenger was D.E., who was placed under arrest.  K. DRAYTON was seated behind D.E. in the vehicle.  D.E. was released pending further investigation.

### III.      PROBABLE CAUSE

**A. <u>KENJI DRAYTON and HASSAN MONROE</u>**

38.     During the investigation into K. DRAYTON, investigators identified H. MONROE as one of K. DRAYTON's cocaine suppliers.

**1. <u>K. DRAYTON and H. MONROE Negotiate a Drug Deal and Meet at K. DRAYTON's Residence</u>**

39.     On August 18, 2019, at 10:54 p.m., K. DRAYTON (on Target Telephone 8) received a call from H. MONROE (on Target Telephone 14).  H. MONROE asked, "So what you, what you, you was still trying to the rest of, the rest of the, the rest of that, four, ah, thing or, or...." K. DRAYTON responded, "I'm saying we gonna straighten out that thing and then we can take it from there.  If you're on deck then that's beautiful."  H. MONROE replied, "Huh?"  K. DRAYTON said, "I said we're gonna take care of the last thing, and then if you're on deck after I check it out it's all beautiful.  I didn't check it out last night."  H. MONROE replied, "Alright cool.  So give me a couple, give me like an hour."  K. DRAYTON said, "Aight."

40.     Based on the call and my work on this case, I believe that H. MONROE called K. DRAYTON to confirm whether K. DRAYTON still wanted four ounces of cocaine ("you was still trying to the rest of, the rest of the, the rest of that, four, ah, thing, or").  I believe that K. DRAYTON told H. MONROE that he was going to pay him for previously obtained narcotics ("We gonna straighten out that last thing and then we can take it from there," and "I said we're gonna take care of the last thing…").  I also believe that K. DRAYTON told H. MONROE that he was going to test ("check out") the cocaine before ultimately obtaining more from H. MONROE ("if you're on deck after I check it out it's all beautiful.").

41.     Later that day, at 12:24 p.m., K. DRAYTON (on Target Telephone 8) received a call from H. MONROE on Target Telephone 14.  H. MONROE asked, "Where you at?  I'm

coming to you now." K. DRAYTON replied, "Aight." H. MONROE continued, "You have to wait right down here?" K. DRAYTON said, "Yeah, yeah, I'm right around the corner from my crib, so it's like 2 seconds." H. MONROE replied, "Alright, all the way down there damn. Aight, I'm gonna shoot down there." K. DRAYTON asked, "I'm saying, how long you gonna be?" H. MONROE replied, "I'm in Roslindale, I'll be there probably in like twenty minutes." The call then ended.

42.     Minutes later, at 12:38 p.m., K. DRAYTON used Target Telephone 8 to call H. MONROE on Target Telephone 14. K. DRAYTON said, "So, yeah I want to do the four. So how long is that gonna take?" H. MONROE asked, "You said you want to do the four?" K. DRAYTON replied, "Yes, the four way meaning the four and a hizzy." H. MONROE said, "I know what that means." K. DRAYTON replied, "Oh aight." H. MONROE responded, "Shit, but I already got the dookie on me, so I'mma need to add another dookie. I got a dookie on me and a 19. And then you want me to, I can tell my man to bring me an additional one of them." K. DRAYTON said, "No, no, no. Listen, listen, listen. This we are going to do. Just get to me, cause I don't want to take, this to be a two hour thing. So get to me." H. MONROE replied, "No, no, no. It would, yeah it might." K. DRAYTON said, "Nah, check it out. When you get to me, I'll work with what you got on you and then we'll figure it out." H. MONROE agreed saying, "Aight, bet." K. DRAYTON replied, "Just get to me, and then you know." H. MONROE said, "We bust that." K. DRAYTON replied, "Makes sense." H. MONROE responded, "I got you bro."

43.     Based on the call and my experience and training, I believe that K. DRAYTON ordered 125 grams of cocaine from H. MONROE ("Yes, the four way meaning the four and a hizzy."). I know that "four way" is code for 125 grams of cocaine, with "four" meaning four ounces and "hizzy" being slang for half (an ounce, or 14 grams). Thus, I believe K. DRAYTON

ordered four-and-a-half ounces of cocaine from H. MONROE ("four way"), which amounts to about 125 grams (or exactly 126 grams).  H. MONROE told K. DRAYTON that he already had both 62 grams of cocaine ("a dookie") and an additional 19 grams of cocaine (a random quantity) on his person ("I got a dookie on me and a 19") and that he would have to contact his supplier to get additional drugs ("I can tell my man to bring me an additional one of them").  K. DRAYTON, however, told H. MONROE that he did not want to wait for H. MONROE to coordinate with his supplier ("I don't want to take, this to be a two hour thing").  Instead, K. DRAYTON proposed that H. MONROE provide him with whatever H. MONROE then had on his person ("when you get to me, I'll work with what you got on you").  From the call, I believe that H. MONROE and K. DRAYTON ultimately agreed that H. MONROE would provide K. DRAYTON with 62 grams of cocaine ("dookie") and 19 grams of cocaine, with a possible four ounces ("the four") to follow at a later time.

44.    Minutes later, at 12:55 p.m., K. DRAYTON (on Target Telephone 8) called H. MONROE on telephone number Target Telephone 14.  H. MONROE said, "Yo, I'm have the other four thing for you, too, just so I ain't gotta make excess runs.  My man is gonna bring it."  K. DRAYTON replied, "I'm saying, but I kinda, I'm in a, that's why I didn't want you to stop.  That's why I didn't wanna tell you it.  So I'm saying.  So how long we talking now?"  H. MONROE responded, "We ain't, we ain't talking long.  He's about to meet me in the barber shop at Dorchester Ave.  Slide me that and then I'm coming right to you."  K. DRAYTON said, "Alright."  H. MONROE stated, "I'm right here on Woodrow Ave.  Just so I didn't have to come back and forth to your spot."  K. DRAYTON replied, "Nah, nah because I would've, I'm saying after that I would have probably just came up there to you.  I was kind of on a timetable that's why I didn't really wanna say anything.  I didn't want you to do what you just did, but fuck it, we're gonna

make it work."  H. MONROE said, "Alright."  K. DRAYTON advised, "Be on time."  H.

MONROE replied, "Alright, one."

45.     During this call, I believe that H. MONROE told K. DRAYTON that he would be

able to obtain K. DRAYTON's initially-requested four ounces of cocaine from his supplier after

all ("I'm have the other four thing for you, too"; "my man is gonna bring it").  That would simplify

matters for H. MONROE as he would not have to go back and forth to K. DRAYTON's residence

multiple times ("just so I ain't gotta make excess runs"; "just so I didn't have to come back and

forth to your spot").  That news frustrated K. DRAYTON, who was pressed for time ("I didn't

want you to stop"; "so how long we talking now?"; "I was kind of on a timetable").  H. MONROE

assured K. DRAYTON his meeting with the supplier would not take long and that he would meet

with K. DRAYTON immediately thereafter ("slide me that and then I'm coming right to you").

K. DRAYTON, frustrated ("I didn't want you to do what you just did, but fuck it, we're gonna

make it work"), agreed to meet with H. MONROE and advised him to "be on time."

46.     That same day, at 2:02 p.m., K. DRAYTON (on Target Telephone 8) received a

call from H. MONROE on Target Telephone 14.  H. MONROE said, "Bro, I'm about to pull up

outside.  I'm at the light, a minute.  Ya think we can step inside?"  K. DRAYTON replied, "Yeah,

absolutely."  H. MONROE explained, "I got to break something in half."  K. DRAYTON replied,

"Yeah, don't worry about that. You can definitely do that."  H. MONROE asked, "Where can I

park?  It's mad traffic out here."  K. DRAYTON said, "You can probably park anywhere, it's

Sunday."  H. MONROE replied, "Just right in front."  K. DRAYTON said, "I'm saying, I'm about

to come outside anyway."  After intercepting that call, surveillance units used cell site location

information for K. DRAYTON's Target Telephone 8 and identified his location as 519 Harrison

Avenue in Boston, Massachusetts (K. DRAYTON's residence).  While conducting surveillance,

units observed a 2009 black Audi A8 with Massachusetts registration 5YCD20 (the "black Audi") pull up to 519 Harrison Avenue.  Units saw a black male, approximately 5'8" with a husky build, exit the black Audi and walk to the front of 519 Harrison Avenue.  The male entered the building after someone opened the door for him.  Surveillance later identified the black male from the black Audi as H. MONROE based on an RMV photograph of H. MONROE.  Based on the intercepted calls and surveillance of H. MONROE meeting at K. DRAYTON's residence, agents believe that H. MONROE and K. DRAYTON did a drug deal involving 62 grams of cocaine ("dookie"), 19 grams of cocaine, and four ounces ("four") of cocaine, the latter of which H. MONROE had just obtained from his supplier.

### 2. **K. DRAYTON and H. MONROE Meet at Burger King After K. DRAYTON Orders Drugs from H. MONROE**

47.    On September 28, 2019, at 6:23 p.m., K. DRAYTON (on Target Telephone 8) called H. MONROE on Target Telephone 14.  K. DRAYTON asked H. MONROE, "I can dig it…where you at?"  H. MONROE told K. DRAYTON to meet him in Roslindale at the "Burger King, going past the Beech Street Projects."  K. DRAYTON replied that he "was trying um…do 31."  Based on my training, experience, and work on this case, I know that "31" is code for 31 grams of narcotics, which is a common wholesale quantity of drugs (and half of a "dookie," or 62 grams, which is in turn half of a "four-way," which is 125 grams or one eighth of a kilogram, so a 31 is roughly one thirty-second of a kilogram).  Based on the intercepted call, I believe that H. MONROE agreed to supply K. DRAYTON with drugs, with K. DRAYTON requesting the specific quantity of 31 grams of cocaine.  H. MONROE and K. DRAYTON agreed to meet at the Roslindale "Burger King, going past the Beech Street Projects."

48.    That same date, surveillance set up at 185 Grove Street in West Roxbury, Massachusetts, an identified stash house location for H. MONROE.  About thirty minutes after K.

DRAYTON and H. MONROE's call, at about 6:55 p.m. surveillance saw H. MONROE's black Audi leave 185 Grove Street's parking lot.  H. MONROE was driving and was accompanied by a male passenger with long dread-locked hair.  Surveillance followed H. MONROE to a Burger King at 4594 Washington Street in Roslindale, Massachusetts – the same location where investigators intercepted H. MONROE and K. DRAYTON agreeing to meet in the above-referenced call ("Burger King, going past the Beech Street Projects").  Surveillance saw H. MONROE park, and soon thereafter, at about 7:06 p.m., saw K. DRAYTON exit the Burger King.  Surveillance could not see whether H. MONROE entered the Burger King.  Based on the intercepted calls, K. DRAYTON and H. MONROE's mutual presence at a Burger King (as agreed upon in an intercepted call,) and H. MONROE's prior visit to a known stash location before the meetup, I believe that H. MONROE and K. DRAYTON met at Burger King to do a drug deal.

### 3.  K. DRAYTON Orders Drugs from H. MONROE Who Travels to K. DRAYTON's Residence

49.    On October 11, 2019, at 6:30 p.m., H. MONROE received a call on Target Telephone 14 from K. DRAYTON on telephone number (617) 637-7619.  Investigators, who had previously intercepted K. DRAYTON speaking on other phones, compared the voice on (617) 637-7619 to prior intercepted calls and confirmed the voice as K. DRAYTON's.  K. DRAYTON asked, "Are you around?"  H. MONROE replied, "Who's this?"  K. DRAYTON said, "Huh? Who's this? . . . This snacks?"  H. MONROE replied, "Yeah."  K. DRAYTON said, "Come on, I got the same phone number."  H. MONROE responded, "Oh nah, shit you, nah, every time, nah ain't the same phone, you be calling from the 652" (K. DRAYTON's Target Telephone 8 is 617-652-4271).  K. DRAYTON replied, "Oh, you got both?"  H. MONROE replied, "Yeah I was, you know I got the other shit, I'd be, what's good though bro?  I ain't heard from you."  K. DRAYTON replied, "Yeah, nah, I've been motherfucking working and doing things, I'm saying, do you want

to do a 31 real quick?"  H. MONROE responded, "Shit, uh, I got to go to the, I got to go to the

spot, it's going to take me like a good forty minutes."  K. DRAYTON replied, "Aight."  H.

MONROE responded, "Where you at?  Same crib?"  K. DRAYTON replied, "Yeah."

50.     Based on my training and experience, I believe that K. DRAYTON confirmed (617)

637-7619 as a new phone number of his.  I also believe that K. DRAYTON called H. MONROE

to arrange for the purchase of 31 grams of cocaine ("you want to do a 31 real quick?"), which H.

MONROE needed to get from his stash house ("I got to go to the spot").  K. DRAYTON and H.

MONROE agreed to meet and do the purchase at K. DRAYTON's residence ("[s]ame crib").

51.     That same day, surveillance set up at K. DRAYTON's residence at 519 Harrison

Avenue.  At 8:51 p.m., investigators saw K. DRAYTON exit 519 Harrison Avenue.  At about 9:10

p.m., video surveillance saw K. DRAYTON enter the passenger side of H. MONROE's black

Audi.  Due to the nighttime hour and inclement weather, video surveillance could not observe

anything within the car.  Based on the intercepted calls and my training and experience, I believe

that K. DRAYTON and H. MONROE did a drug deal in H. MONROE's car outside of K.

DRAYTON's residence.

**B.  HASSAN MONROE and KAREEM CHAPLIN**

52.     During this investigation, investigators have intercepted Kareem CHAPLIN

speaking with H. MONROE about narcotics-related activity.  Investigators believe that H.

MONROE and CHAPLIN share the stash house located at 55 Woodhaven Street, Mattapan,

Massachusetts, as referenced *infra*.

**1.  Surveillance Sees H. MONROE at Stash House Before Drug Deal with TOUSSAINT and Later Observes CHAPLIN's Car at Stash House**

53.     On February 10, 2020, surveillance in the area of 55 Woodhaven Street – the stash

house believed to be shared by H. MONROE and CHAPLIN – saw both H. MONROE and

24

CHAPLIN's vehicles at that location.  Investigators also intercepted calls between H. MONROE and wholesale drug customer Michael TOUSSAINT (discussed further *infra*) that further corroborate my belief that H. MONROE stores drugs at 55 Woodhaven Street.  Specifically, at 5:58 p.m., H. MONROE (on Target Telephone 14) spoke with TOUSSAINT (on (857) 312-2610)[6] about supplying TOUSSAINT with narcotics.  TOUSSAINT told H. MONROE, "Aight, bring that (u/i), I need like an hour."   H. MONROE responded, "Aight, bet, I gotcha."   Based on my experience, work on this case, and the brief and vague nature of the call, I believe that H. MONROE agreed to bring cocaine to TOUSSAINT.  Soon after the call, surveillance set up in the area of 55 Woodhaven Street to observe H. MONROE.

54.     At 6:19 p.m., surveillance saw H. MONROE enter 55 Woodhaven Street's driveway in his black Audi and pull to the rear of the residence.  At 6:24 p.m., cell site location data for H. MONROE's Target Telephone 14 and Target Telephone 17 were pinging in the area of 55 Woodhaven Street, with one of the pings occurring eight meters from the residence.  At 7:55 p.m., surveillance saw H. MONROE exit the driveway of 55 Woodhaven Street in the black Audi. Surveillance followed H. MONROE to 185 Ruskindale Road, Boston, Massachusetts (TOUSSAINT's identified residence), where he arrived at 7:58 p.m.   At about 8:03 p.m., surveillance saw TOUSSAINT exit 185 Ruskindale Road, enter the passenger side of H. MONROE's car for a short period, and then exit the car and return to the residence.  Based on the

---

[6] During the investigation into H. MONROE, investigators intercepted telephone number (857) 312-2610 speaking with H. MONROE about purchasing cocaine on multiple occasions.  Based on those intercepted telephone calls, surveillance units covered multiple in-person drug transactions between H. MONROE and TOUSSAINT (whom investigators identified from his RMV photograph).  Those meetings commonly occurred at 185 Ruskindale Road in Boston, Massachusetts, TOUSSAINT's RMV address.  During these meetings at TOUSSAINT's address, H. MONROE called telephone number (857) 312-2610 and told TOUSSAINT that he was outside.  Surveillance subsequently saw TOUSSAINT exit the residence.

intercepted calls between H. MONROE and TOUSSAINT, as well as the surveillance, I believe

that H. MONROE left 55 Woodhaven Street to sell TOUSSAINT cocaine at 185 Ruskindale Road.

At 9:04 p.m. that same night, video surveillance observed CHAPLIN's car, a white Audi, exit the

driveway of 55 Woodhaven Street.

### 2.  **H. MONROE and CHAPLIN Discuss the Stash House**

55.     On February 16, 2020, at 12:10 p.m., H. MONROE used Target Telephone 17 to

contact CHAPLIN on phone number (857) 312-7175.  H. MONROE advised CHAPLIN to contact

him on "face time audio, cause they're trying to be smart nowadays."  CHAPLIN confirmed,

stating "dope."  I believe that H. MONROE advised CHAPLIN to contact him via "face time

audio" so as to avoid law enforcement's detection ("they're trying to be smart nowadays").  I know

that drug dealers are increasingly using social media and smart phone applications, which are

harder to intercept, to communicate to thwart law enforcement detection.

56.     Later in the conversation, I believe that H. MONROE and CHAPLIN discussed

firearms.  Specifically, CHAPLIN stated, "I want shit everywhere."  H. MONROE replied, "That's

how I got it in my crib."  CHAPLIN continued, "As soon as you come to the door, in the bin, under

the bed, go to the next room and shut the door…boom…and then in a bag.  Boom…but, I won't

argue…I want one in the fucking bathroom, so matter where niggas is at, niggas can come out

like… 'what's good.'"  H. MONROE replied, "[e]xactly," as CHAPLIN further explained, "Nigga,

you might be taking a shit.  Nigga kicking the door in…what happens… you got to try to get out

to the living room, get out to my room, to the room…nah Nigga, this shit is everywhere."  H.

MONROE answered stating, "That nigga is tripping…this is the nigga that got a gun…a strap in

Cambridge.  Fucking fuck…I'm of that mind set."  CHAPLIN said, "we should have an extra one"

and "bring it over to the honeycomb."

57.     Based on training and experience, I know that the term, "strap" means a firearm.  I believe that CHAPLIN and H. MONROE were discussing the importance of having a gun or guns readily available and easily accessible at multiple locations within their respective domain(s) to protect themselves.  To emphasize the seriousness of their conversation, CHAPLIN provided an example to H. MONROE, "Nigga, you might be taking a shit…"  During this intercepted call, CHAPLIN also told H. MONROE that "we should have an extra one" to bring over to the "honeycomb."  From my work on this case, I know that "honeycomb" is code for "stash house," i.e., where illicit narcotics are manufactured, weighed, and packaged in preparation for distribution.   In this case, investigators have identified 55 Woodhaven Street, Hyde Park, Massachusetts, as a stash house shared by CHAPLIN and H. MONROE.  Specifically, surveillance units have observed H. MONROE enter and exit that location before participating in suspected drug transactions on multiple occasions.  Investigators also seized six firearms and over 400 grams of suspected cocaine from that location on February 28, 2020.  On the same date as the above call (February 16, 2020), a review of cell site location data for Target Telephone 17 showed it pinging at 55 Woodhaven Street at 7:39 p.m., 8:24 p.m., 8:39 p.m., 11:09 p.m., and 11:24 p.m.

58.     On February 17, 2020, H. MONROE used Target Telephone 17 to contact CHAPLIN on cellular telephone number (857) 312-7175.  CHAPLIN asked H. MONROE, "You are trying to get in the kitchen?"  H. MONROE replied affirmatively.  I know that the term, "kitchen," is code for a location for "cooking," that is, turning powdered cocaine into crack cocaine.  CHAPLIN told H. MONROE, "So, I'll meet you at the honeycomb in like an hour."  As previously noted, I know that "honeycomb" refers to the stash house at 55 Woodhaven Street.  On this same date, H. MONROE's Target Telephone 14 pinged in close proximity to 55 Woodhaven Street at approximately 5:54 p.m., 6:09 p.m., and 6:39 p.m.

27

### 3. **CHAPLIN Calls H. MONROE About Pricing for a Top Mix Drug Deal**

59.     On February 21, 2020 at 5:33 p.m., H. MONROE received a call on Target Telephone 17 from CHAPLIN on telephone number (857) 312-7175.  CHAPLIN said, "Yo, that nigga finally called me yo."  H. MONROE responded, "Oh, what's up with him?"  CHAPLIN said, "He was just like 'Yo, bro I meet you at Top Mix, I got to talk to you.'  So you know what's going to be about right?"  H. MONROE responded, "Yeah…"  CHAPLIN stated, "Yeah, so you know…I got…can you refresh my memory though?"  H. MONROE replied, "I don't even remember what?"  CHAPLIN said, "I'm talking about prices regardless, what the eight for the nine."  H. MONROE replied, "Uh…shit yeah basically if you want to do them at that…."  Later in the conversation, H. MONROE told CHAPLIN, "Eighty-two, I will tell that nigga eighty-two for that."  CHAPLIN repeated, "Eighty-two?"  H. MONROE replied, "But he will probably is like…'Damn, I get it for eight cause eight,' I am not going to lie when I told Stevie J, when I told Stevie J that eight, he was hot right on it nigga, I was like 'Damn I am doing justice, that was some justice league shit I just did.'"  Based on this conversation, I believe that CHAPLIN planned to meet with an unknown male at a bar called Top Mix, which is located in Boston, Massachusetts, to discuss his purchase of nine ounces of cocaine for $8,000 ("eight for nine") from CHAPLIN.  CHAPLIN called H. MONROE to confirm pricing, and H. MONROE advised him to try and sell the cocaine for $8,200 ("Eighty-two, I will tell that nigga eighty-two for that").  Furthermore, I know from the investigation that "Stevie J" is the nickname for Russell HANKERSON, who (as set forth herein) obtains wholesale quantities of cocaine from H. MONROE.

### 4. **CHAPLIN Goes to Top Mix, Calls H. MONROE About Law Enforcement Run In, and CHAPLIN and H. MONROE Agree to Meet at Stash House**

60.     That same date, at 7:06 p.m., surveillance set up in the area of Top Mix and saw CHAPLIN's vehicle, a white Audi with Massachusetts registration 1AMP68 (the "white Audi"),

parked on Burrell Street.  At 7:10 p.m., surveillance saw CHAPLIN outside of the bar speaking with a second male.  CHAPLIN then re-entered the bar.  Surveillance attempted to follow the second male, but could not without risking exposure.  When surveillance returned to Top Mix, they could not physically see CHAPLIN, but saw his car still parked on Burrell Street.

61.     Later that night, at 9:37 p.m., H. MONROE (on Target Telephone 17) received a call from CHAPLIN from telephone number (857) 312-7175.  CHAPLIN said, "Yo, but before…the reason why I want to meet you…I don't really want to talk about this over the phone, but I'm say it anyway.  I met some niggas from my job…"  H. MONROE replied, "Yeah." CHAPLIN continued, "At Top Mix."  H. MONROE said, "Yeah." CHAPLIN then provided the following narration: "So with that being said, um, after we leave the Lee School, he gets in the car and he says, 'Yo Reem, you know I don't really know you or I just met you, so I don't know what you into….' He said, 'But whatever you're into, you need to be easy bro.'  I said 'What?'  This is a job ass nigga, like at my job.  He said 'Yo, I'mma let you know right now, my brother…is the…my brother is a Sergeant from Boston Police, and he runs with this one fed...' and he said his name.  'And he runs with this umm,' he said it, hold on, it was three of them.  Sergeant of the police… (voices overlap)."  H. MONROE replied, "Yo cuz, hold on!  I didn't think you was talking about no shit like this, I, you totally caught me off guard."  CHAPLIN replied, "Fuck it.  Where you at?  I mean, meet me at the crib.  One."  H. MONROE replied, "Yeah, let me pull up. Yeah…aight, one."  CHAPLIN responded, "Meet me at the crib.  Fuck all that."

62.     Based on the context of the call, I believe that CHAPLIN called H. MONROE concerned about a law enforcement officer's (coincidental) presence at two of CHAPLIN's same locations in a given day.  CHAPLIN initially expressed nervousness about speaking over the phone about the incident, but then proceeded to describe his meetup at Top Mix with friends from work.

CHAPLIN noted that in addition to passing time with work friends at Top Mix, he also went to the Lee School that day with one of his work friends ("[A]fter we leave the Lee School, he gets in the car . . . This is a job ass nigga, like at my job").  From my work on this case, I know that a member of the investigative team was observed at the Lee School and Top Mix Bar by one of CHAPLIN's friends who had met up with CHAPLIN at Top Mix (an individual unrelated to the suspected Top Mix drug deal).  CHAPLIN's work friend and the investigative team member were familiar with one another through youth basketball coaching.  CHAPLIN's work friend recognized the investigative team member, and also knew that he worked in a specialized law enforcement unit ("'Yo Reem, you know I don't really know you or I just met you, so I don't know what you into…' He said, 'But whatever you're into, you need to be easy bro.' I said 'What?'… He said 'Yo, I'mma let you know right now, my brother…is the…my brother is a Sergeant from Boston Police, and he runs with this one fed...'").  Based on the intercepted call, I believe that CHAPLIN's friend relayed that knowledge to CHAPLIN, which made CHAPLIN extremely nervous – particularly because the investigative team member was present at both Top Mix and the Lee School during the same times as CHAPLIN.  CHAPLIN called H. MONROE to relay the news.  They both agreed to stop communicating over the phone and to meet at "the crib," which I believe is their shared stash house at 55 Woodhaven Street.

### 5.  H. MONROE and CHAPLIN Strategize About Avoiding Criminal Charges

63.     On February 28, 2020 (the date when investigators executed a search warrant at H. MONROE's residence), H. MONROE spoke with a male on telephone number (857) 320-9438 at 10:04 a.m. and 10:10 a.m.  Through voice recognition and comparison techniques, investigators identified CHAPLIN as the user of that cellular phone.  Based on their experience in drug investigations, investigators know that drug traffickers commonly discontinue using a cellular

telephone and change to a new number to avoid law enforcement detection. During the conversation, H. MONROE and CHAPLIN referred to the search warrant executed at 55 Woodhaven Street. They discussed how investigators now had CHAPLIN's (but not H. MONROE's) name as paperwork with CHAPLIN's name found at the stash house.

64.     H. MONROE's black Audi, on which the police also executed a search warrant, is registered to his girlfriend at 422 Granite Street, Quincy, Massachusetts (the same address where investigators have observed H. MONROE living). During the previously-referenced conversation with CHAPLIN on (857) 320-9438, H. MONROE told CHAPLIN that he had spoken to a "lawyer" and that the attorney wanted to charge H. MONROE "5Gs" so that "they" do not "put a warrant on her." H. MONROE further advised CHAPLIN that the attorney "is about to do what we came out with yesterday nigga, the…You know, the um…The stolen car shit, a day later." CHAPLIN replied, "If it works it works…fuck it." Based on this portion of the intercepted phone conversation, I believe that H. MONROE was planning to have his girlfriend report his black Audi stolen in an effort to avoid criminal charges for the 250 grams of suspected cocaine and the firearm police seized from his vehicle. CHAPLIN also told H. MONROE that "the only way you won't be able to move around if they know your name." H. MONROE responded to CHAPLIN, "They won't know my name." Because the black Audi is not registered in H. MONROE's name, and investigators did not find his name listed on anything during a search of the stash house at 55 Woodhaven Street, I believe that H. MONROE thought that law enforcement would not be able to identify him as the black Audi's operator or as a co-owner of the firearms and narcotics at 55 Woodhaven Street.

65.     Later in the conversation, CHAPLIN asked H. MONROE, "They have a search warrant for Woodhaven, but do I have a warrant?" H. MONROE stated that he would "call her"

and ask for information on CHAPLIN'S disposition.  H. MONROE informed CHAPLIN that he

was going to "get another phone; if you need me to get you…I can tell her to buy two phones."

CHAPLIN and H. MONROE briefly discussed CHAPLIN's indecision to withdraw money from

the bank.  CHAPLIN stated, "But I'm cool with that, I mean I got a place to go hide, you already

know, but just wanna know if I got a warrant."  I believe that H. MONROE and CHAPLIN were

discussing their options as to how to avoid criminal charges.

### C.  HASSAN MONROE and ERIC DAVIS

66.     Investigators have identified Eric DAVIS as one of Hassan MONROE's cocaine

distributors.

#### 1.  H. MONROE Tells DAVIS About Having Quality Cocaine for Sale

67.     On October 5, 2019, at 9:56 p.m., H. MONROE used Target Telephone 14 to call

DAVIS on telephone number (781) 971-2973.  Investigators, who had previously intercepted

DAVIS speaking on other phones, compared the voice on (781) 971-2973 to prior intercepted calls

and confirmed the voice as DAVIS's.[7]  H. MONROE said, "Yo, what's the word my nigga?"

DAVIS replied, "What's the word?"  H. MONROE responded, "Yo trust me.  That shit.  That shit

is back bro."  DAVIS asked, "What shit?"  H. MONROE responded, "The real stuff my nigga.

The black (u/i) the fire."  DAVIS responded, "The jumper?"  H. MONROE replied, "Yeah, the

real jumper.  You know I don't call you with the weird shit.  You know what I'm saying.  Just to

---

[7] Throughout this investigation, investigators have intercepted calls between DAVIS (on phones, including (781) 971-2973) and Target Subjects, like H. MONROE and K. DRAYTON, discussing meetups. Subsequently, surveillance has identified (through a review of RMV photographs and/or work on this case) DAVIS arriving to meet with the Target Subject in a manner consistent with the intercepted calls's discussion. Further, in June 2020, investigators intercepted calls over (781) 971-2973 between DAVIS (whose voice investigators recognized from prior intercepts) and another male.  Subsequent surveillance identified DAVIS (from his RMV photograph) meeting with that male in the location described on the call.

let you know whenever you get your shit.  You know what I'm saying?"  DAVIS said, "Yeah, yeah.  I got that shit.  I got to get with you.  I've been doing some moving shit."  H. MONROE responded, "Nah, shit bro.  I ain't worried about that.  I'm telling you your jumper is here.  Like look.  If we get drizzy, we get that out of the way.  I can't even (u/i)."  DAVIS responded, "Yeah, I know what you are saying?  What are you tonight?"  H. MONROE replied, "I'm probably going to slide Darnold's.  I got to do this little (u/i).  I'm going to hop in the rain right now and be ready for Darnold's from 11-2."  DAVIS asked, "What's happening at Darnold's?"  H. MONROE replied, "Cape Verdean (u/i) is having his little gig there."  DAVIS repeated, "Cape Verdean (u/i)."  H. MONROE later said, "The jumper, the pineapple slices."  DAVIS noted, "These are nice pineapple slices."  H. MONROE said, "For real.  You know."

68.     Based on the conversation, I believe that H. MONROE called DAVIS to tell him that he had new cocaine for sale ("that shit is back" and "the real stuff my nigga.  The black (u/i) the fire").  Based on my experience and work on this case, I know that "fire" may refer to especially good or potent drugs.  While I also know that "fire" may be code for other drugs, like fentanyl, the conversation's subsequent reference to "jumper" confirms my belief that H. MONROE was not referring to fentanyl.  Specifically, H. MONROE and DAVIS discussed "jumper," which is code for an "upper"; drugs like fentanyl are not uppers.  Based on the coded language and the conversation's context, I believe that H. MONROE told DAVIS that he had obtained particularly good cocaine and that it was the same quality product as he had had before ("that shit is back bro").  H. MONROE also confirmed for DAVIS that he would not call DAVIS if he had bad product ("I don't call you with the weird shit").  DAVIS told H. MONROE that he had been selling drugs ("I've been doing some moving shit.").  After DAVIS and H. MONROE discussed their social plans, H. MONROE again referred in code to his product as the "jumper, the pineapple slices."

**2.  H. MONROE and DAVIS Coordinate a Drug Transaction**

69.     On February 8, 2020, at 4:10 p.m., DAVIS used cellular telephone number (781)

971-2973 to contact H. MONROE on Target Telephone 14.  During the conversation, DAVIS

explained to H. MONROE that he "got a little move right now."  From training and experience, I

know that "move" in this capacity refers to a drug transaction.  H. MONROE responded, "What's

it looking like?  You want me to talk to you about it when I get there or you need…."  DAVIS

replied, "Um..."  H. MONROE responded inaudibly and then DAVIS stated, "It's gonna be, it's

gonna come out to be three trey-ones, 'cause I'mma need, this nigga wants one. I need one but I

got a jug for the um...."  H. MONROE asked, "The other one?"  DAVIS replied, "Well no, one of

them going, just add this on top.  My man from Wednesday keep telling me he wants one soft and

one done up.  You know what I mean?"  H. MONROE responded, "I ain't got one done up?"

DAVIS said, "I'm doing it up for me to get my extras."  H. MONROE replied, "Oh okay-okay."

DAVIS continued, "And then I need... but after I sell them I'mma need another one for me again,

'cause I'm gonna do that one and serve him that one and grab another one; you know what I'm

saying?"  H. MONROE asked, "Alright, so you need three of them?"  DAVIS responded, "Uh?"

H. MONROE repeated, "You want three of them?"  DAVIS confirmed, "That's what I'm saying.

So, it's gonna end up being three but it's gonna be...."  H. MONROE asked, "Two?"  DAVIS

responded, "Yeah, two for now and then I'm definitely get another one 'cause when he comes from

Lynn, all that's going to him."  H. MONROE replied, "Aight...let me go grab it."  DAVIS

responded, "Just grab me three of them but I need you to get to me cause I gotta put that together,

have it ready."  H. MONROE replied, "Yep, I got you."

70.     Based on the call, I believe that DAVIS called H. MONROE to obtain three

packages, each containing 31 grams of cocaine and cocaine base ("three trey-ones").  DAVIS

asked for one of the 31 grams to be cocaine ("soft") and one to be cocaine base ("done up"). DAVIS also noted that he would need to do a drug deal ("jug") involving some of the drugs ("I need one but I got a jug for the um"). H. MONROE told DAVIS that he did not have cocaine base ("I ain't got one done up"), to which DAVIS responded that he would do it himself to get the "extras," which meant the extra weight attributable to added ingredients used to create cocaine base from cocaine. DAVIS also clarified for H. MONROE that while he needed three packages, he needed "two for now" and "another one" later. Ultimately, DAVIS instructed H. MONROE to bring all three packages at once ("grab me three of them"). The intercepted call further supports my belief that DAVIS obtains product from H. MONROE for distribution.

71. Provided with this information, investigators began conducting physical and electronic CSLI surveillance in the area of MONROE's residence at 422 Granite Street, Quincy, Massachusetts. Upon doing so, surveillance observed H. MONROE leave his residence and travel into the Boston area where he subsequently met with DAVIS, as described below.

### 3. Before Meeting with DAVIS, H. MONROE Goes to Stash House for Drugs and Complains to CHAPLIN About Stash House Access

72. That same day (February 8, 2020), at 4:54 p.m. (less than an hour after H. MONROE's prior call with DAVIS), CHAPLIN (on telephone (857) 312-7175) called H. MONROE on Target Telephone 17. H. MONROE complained to CHAPLIN about an unknown male who was in H. MONROE's and CHAPLIN's stash house, located at 55 Woodhaven Street in Mattapan, Massachusetts. Cellular site location information for H. MONROE's Target Telephone 14 and Target Telephone 17 showed that H. MONROE was pinging in close proximity to 55 Woodhaven Street. H. MONROE asked CHAPLIN, "Who is this dude over here? I'm at the crib right now and this nigga is taking out clothes and all this shit." CHAPLIN replied, "Oh, out da, out da dresser?" H. MONROE answered, "Yeah, so I'm just sitting in the driveway."

CHAPLIN asked, "Why?  You don't want to go in?"  H. MONROE responded, "Not with him

there, with the key."  H. MONROE further explained to CHAPLIN that he was "sitting in the

driveway . . . sitting in his car right now."  H. MONROE told CHAPLIN that he "gotta slip in here

and break something in real quick."

73.     Based on my work on the investigation, I believe that H. MONROE was using the

stash house to store and prepare narcotics for distribution.  I believe that H. MONROE's statement

that he wanted to "slip in here and break something real quick" meant that he wanted to take a

larger quantity of drugs and break them into smaller packages for redistribution.  CHAPLIN told

H. MONROE that he would go to H. MONROE's location so that "you don't gotta be sitting there

doing shit like that.  What if you got to be in and out cuz?"  H. MONROE replied, "I do gotta be

out right now, honestly."  CHAPLIN reiterated, "I'm just saying, like what about if it's like a dying

need?  'Oh, let me grab the hammer,' or whatever, and…You sit and wait for this nigga?  Man,

fuck that."  I believe that CHAPLIN told H. MONROE he should feel comfortable entering and

exiting the premises quickly in case it were an urgent matter ("dying need") or he had to obtain his

firearm ("grab the hammer").

74.     Provided with this information, units began to conduct surveillance in the area in

which H. MONROE's cellular telephones were then electronically "pinging," i.e., the stash house

at 55 Woodhaven Street.  Investigators observed H. MONROE's motor vehicle (the black Audi)

parked in the driveway of 55 Woodhaven Street, Mattapan, Massachusetts.  Additionally, the

electronic ping showed that H. MONROE's cellular telephones were pinging within eight meters

of 55 Woodhaven Street, Mattapan, Massachusetts.  Further surveillance resulted in law

enforcement observing H. MONROE walk from the rear driveway of 55 Woodhaven Street,

Mattapan, Massachusetts, and enter his car.   As H. MONROE left the area, law enforcement followed him.

### 4.  <u>H. MONROE Distributes Drugs to DAVIS</u>

75.    A short time later that same day (February 8, 2020), surveillance observed H. MONROE's vehicle on 40 Ballou Avenue in Dorchester, Massachusetts.  From their work on this investigation, investigators knew that DAVIS's parents reside at 40 Ballou Avenue, Dorchester, Massachusetts.   During the period where surveillance followed H. MONROE, investigators intercepted a call between H. MONROE and DAVIS.  Specifically, on February 8, 2020, at 5:33 p.m., H. MONROE used Target Telephone 14 to call DAVIS on cellular telephone number (781) 971-2973.  H. MONROE told DAVIS, "Yo, I'm outside."  DAVIS replied, "Alright, I'm coming." Surveillance then observed a black male, believed to be DAVIS, meet with H. MONROE at the passenger side door of his (MONROE's) vehicle.   Surveillance believed the black male was DAVIS based on both the intercepted calls and the meeting occurring directly outside of DAVIS's parents' residence at 40 Ballou Avenue.   I believe that H. MONROE initially went to the stash house at 55 Woodhaven Street, Mattapan, Massachusetts, to obtain and prepare a quantity of cocaine for subsequent distribution to DAVIS, who had requested on an earlier intercepted call (referenced above) "trey-ones" – or thirty-one grams of cocaine – from H. MONROE.  Based on the below intercepted conversation, I believe that H. MONROE delivered the requested cocaine to DAVIS.

76.    Also on February 8, 2020, at 8:10 p.m., hours after DAVIS and H. MONROE's meetup, DAVIS (on telephone number (781) 971-2973) called H. MONROE on Target Telephone 14.  H. MONROE asked DAVIS, "What do you want?  You wanna do the same shit you were talking about earlier or you're good?"  DAVIS replied, "Um…Yeah, nah, I still, I still need that."

H. MONROE told DAVIS that he had just gotten out of the shower and was preparing to leave his residence and go to DAVIS's location. DAVIS stated, "Yeah, I'm just rolling this blunt, I'mma just shoot over there, um, shoot down here and grab this change from this weird nigga and shoot over to my aunt's."

77.    Based on this call and the prior intercepted calls, I believe that H. MONROE ultimately was only able to provide DAVIS with two of the three ounces of cocaine during their surveilled meeting. DAVIS initially had requested three packages, noting "two for now" and "another one" for later. From training, experience, and my work on this investigation, I know that references to numbers like "one," "two," or "three" in this context are to ounces. Although DAVIS ultimately instructed H. MONROE to bring all three packages at once ("grab me three of them"), I believe that H. MONROE and DAVIS were now coordinating a meetup for the final ounce's delivery. I also believe that DAVIS told H. MONROE that he was going to collect money ("grab some change") so that he could pay H. MONROE for the third ounce of cocaine that DAVIS had previously requested on a prior call.

### 5. H. MONROE and DAVIS Meet After Discussing Drug Order

78.    On February 18, 2020, at 6:06 p.m., DAVIS used cellular telephone number (781) 971-2973 to contact H. MONROE on Target Telephone 14. During the intercepted conversation, DAVIS asked H. MONROE, "What time you gonna be around?" H. MONROE replied, "Whenever you want me to slide through." DAVIS stated, "Nah, I need a trey-weezey real quick." Based on my training, experience and work on this case, I know that "trey-weezey" is drug code for 31 grams of cocaine, a common weight for wholesale distribution.

79.    In the intercepted communication, DAVIS asked H. MONROE, "You coming out now, or…" H. MONROE responded, "Yeah, I'll come right to you now." Based on this

intercepted communication, investigators began to surveil the area of DAVIS's residence of 40 Ballou Avenue, Dorchester, Massachusetts.  At 6:39 p.m., H. MONROE used Target Telephone 14 to contact DAVIS on cellular telephone (781) 971-2973.  During the intercepted call, DAVIS instructed H. MONROE, "meet me in front of the park around my way."

80.     A short time later, physical surveillance observed H. MONROE's black Audi arrive at the entrance to Almont Park, a park located on Almont Street, Mattapan, Massachusetts.  Just as H. MONROE arrived, surveillance saw DAVIS (whom they recognized from their work on the investigation and previous review of his RMV photograph) pull into the area in a white Audi A6 with Massachusetts registration 1BYE19, registered to DAVIS at 40 Ballou Avenue, Dorchester, Massachusetts (the "white Audi A6").  Investigators saw DAVIS exit the car and enter H. MONROE's black Audi.  After a brief time, DAVIS left H. MONROE's motor vehicle and re-entered his white Audi A6.  Investigators then followed DAVIS for a brief period before discontinuing surveillance.  Based on my experience, the surveillance, and intercepted calls, I believe that DAVIS and H. MONROE met for a drug deal.

### D.  **KENJI DRAYTON and ERIC DAVIS**

81.     Investigators also have identified Eric DAVIS as one of K. DRAYTON's conspirators in the DTO.

#### 1.  **DAVIS Asks K. DRAYTON for Feedback on Supplied Drugs**

82.     On August 18, 2019, at approximately 10:40 a.m., K. DRAYTON used Target Telephone 8 to call DAVIS on Target Telephone 25.  K. DRAYTON said, "I said things a little crazy, but I wanted to run a couple of things by you."  DAVIS asked, "Oh, you in the neighborhood?"  K. DRAYTON replied, "Yeah, well South End."  DAVIS responded, "By the spizzot?"  K. DRAYTON said, "Nah, nah, you ain't never been here?"  DAVIS responded, "Shit,

you wanna talk face to face?"  K. DRAYTON said, "Yeah, yeah, and, and I've seen your man right…"  DAVIS asked, "Who?"  K. DRAYTON responded, "Yeah I'll rather talk face to face, I'm saying.  How far, how far are you?"  DAVIS replied, "I'm, I'm South Bay."  Based on the call's context, I believe that K. DRAYTON wanted to avoid speaking by telephone with DAVIS and preferred to speak in person.  I know from training and experience that this is a common practice of those in the drug business to avoid possible law enforcement detection.  During the call, K. DRAYTON and DAVIS discussed where they would meet, with DAVIS referencing "the spizzot" (which is slang for "the spot"), and K. DRAYTON responding that they would meet elsewhere ("nah, nah, you ain't never been here").  I believe that K. DRAYTON was referring to his residence at 519 Harrison Avenue, which is in the South End area of Boston ("Yeah, well South End").  K. DRAYTON's request to speak in person, the vague and guarded nature of the call, and my experience in this and other drug investigations, causes me to believe that K. DRAYTON wanted to speak with DAVIS about an illegal matter likely involving narcotics.

83.    On August 19, 2019, at 1:36 p.m., K. DRAYTON received a call on Target Telephone 8 from DAVIS on Target Telephone 25.  DAVIS told K. DRAYTON, "You didn't give me the feedback."  K. DRAYTON responded, "About what?"  DAVIS replied, "You didn't give me the one to ten.  You heard me?"  K. DRAYTON responded, "Say that again?"  DAVIS replied, "I said you didn't give me the review.  You did not let me know what the review was."  K. DRAYTON responded, "On…what your man was talking about?"  DAVIS replied, "Yesterday, I made spaghetti for you."  K. DRAYTON responded, "Oh yeah, yeah! That thing was all the way! Drinking, chilling, ripping, running.  Kidding me."  Based on the conversation, as well as K. DRAYTON and DAVIS's communication from the day before where K. DRAYTON pressed to speak in person, I believe that DAVIS met up with K. DRAYTON to cook cocaine base for K.

DRAYTON ("I had made spaghetti for you").   Based on my training, experience, and the intercepted call, I believe that DAVIS wanted a review on the product on a scale of "one to ten," with K. DRAYTON initially being confused by DAVIS's inquiry.

### 2.   K. DRAYTON Asks DAVIS To Prepare Cocaine Base

84.   On October 1, 2019, at 4:10 p.m., K. DRAYTON received a call on Target Telephone 8 from DAVIS on Target Telephone 25.   DAVIS asked K. DRAYTON, "Big bro, is it something like major important or do you want me to come up to shoot the shit?"  K. DRAYTON responded, "Nah, it's kinda important, I just need you to work your magic like you did last time." DAVIS replied, "Okay, okay, okay."  K. DRAYTON added, "And that didn't take you real long. So, that didn't take you long last time so I just thought you was gonna, you know what I'm saying, come through and make your magic."  DAVIS replied, "Okay, okay, okay, fucking uh, I was saying that 'cause I was watching this traffic."  K. DRAYTON responded, "Oh aight, I'm saying just hit me when you good."  DAVIS replied, "Cause I want to grab, I just don't want to get that way trying to rush back (u/i) school traffic."  K. DRAYTON responded, "Yeah, nah, do your thing, nah, nah, it ain't no emergency or nothing."  DAVIS replied, "Aight, so I'll pull up on you, I'll take care of you after."  K. DRAYTON responded, "Aight." DAVIS replied, "Yo!"  K. DRAYTON responded, "Yo."  DAVIS replied, "If you catch a spot like on this way, you follow me?"  K. DRAYTON responded, "Oh, okay, I don't want, yeah yeah."  DAVIS replied, "A spot up this way I'll knock it off pretty soon."  K. DRAYTON responded, "Aight, let me try to think about it.  Let me try and see if I can make that happen."  DAVIS replied, "Aight. I'll try to knock it off for you, I got you."

85.   Based on this conversation, I believe that K. DRAYTON asked DAVIS to convert cocaine to cocaine base for K. DRAYTON ("I just need you to work your magic real quick like you did last time").  DAVIS agreed to do so, but did not want to drive in traffic.  DAVIS asked K.

DRAYTON if he could find a "spot" closer to DAVIS, to which K. DRAYTON agreed.  DAVIS

told K. DRAYTON if he could find a spot closer to him ("a spot up this way"), DAVIS could

prepare the cocaine base quickly ("knock it off pretty soon").

86.     On October 5, 2019, at 10:44 p.m., K. DRAYTON used Target Telephone 8 to call

DAVIS on Target Telephone 25.  DAVIS said, "What's the word folio?  I'm about to come about.

Hey yo, whatcha want, like a half a zip or something?"  K. DRAYTON responded, "Yeah, yeah.

That's what I was thinking."  DAVIS responded, "I got you brother."  Based on the conversation

and my work on this case, I believe that DAVIS told K. DRAYTON that he was going to supply

K. DRAYTON with half an ounce of narcotics ("half zip").  DAVIS and K. DRAYTON did not

specify the type of narcotic, but K. DRAYTON agreed to the sale.

### E.   HASSAN MONROE AND RUSSELL HANKERSON

87.     Investigators have identified Russell HANKERSON as a drug customer and

distributor for Hassan MONROE who purchases wholesale quantities of cocaine for subsequent

distribution.

#### 1.   HANKERSON and H. MONROE Meet in a Car after HANKERSON Orders Cocaine from H. MONROE

88.     On February 13, 2020, at 3:08 p.m., H. MONROE (on Target Telephone 17) called

HANKERSON on telephone number (857) 318-5290.[8]  HANKERSON said, "You know it's going

down right now.  I need an eight."  H. MONROE replied, "Yeah.  Shit.  It's an eight right now."

HANKERSON said, "That ain't bad, that ain't bad."  H. MONROE replied, "For you it's eight

---

[8] Investigators identified (857) 318-5290 as HANKERSON's phone after intercepting calls
between a male and H. MONROE on Target Telephone 17 in which they coordinated a meetup, which law
enforcement surveilled and saw HANKERSON attend.  Additionally, as set forth *infra*, law enforcement
stopped HANKERSON after a suspected drug deal.  Phone number (857) 318-5290 later contacted H.
MONROE on Target Telephone 17 describing the same traffic stop that law enforcement had participated
in with HANKERSON.

right now."  HANKERSON said, "Eight and the thing is like (u/i)."  H. MONROE commented, "It's dope.  It's pretty decent.  You might even be doing your bullshit to him if you want.  Just don't give him too much."  HANKERSON said, "Fucking um…yeah, so umm…about 7:00, cause he's on the highway coming from Maine right now."  H. MONROE replied, "7:00?  I'm just going to the game at 8:00."  HANKERSON responded, "Well I'm just saying he's coming from Maine right now.  So they're gonna take about four hours."  HANKERSON later added, "My cousin is gonna end up…he's gonna probably be with me, but he's gonna end up probably giving you eighty-five, right?"  H. MONROE replied, "I'mma just put the five to the cut."

89.     Based on this conversation, I believe that HANKERSON asked H. MONROE to confirm whether $8,000 was the price for nine ounces of cocaine ("I need an eight"), and H. MONROE confirmed that he could sell nine ounces to HANKERSON at that price ("For you it's eight right now").  From training and experience, I know that $8,000 is a common street price for nine ounces cocaine.  In this context, I believe that "8" refers to the price of nine ounces of cocaine (and not quantity) because H. MONROE later said that HANKERSON could charge $8,500 ("eighty-five").  HANKERSON told H. MONROE that the cocaine was for someone from Maine ("he's on the highway coming from Maine right now").  HANKERSON then asked H. MONROE if he should give H. MONROE $8,500 ("eighty-five") when they meet.  H. MONROE agreed and said that he would give HANKERSON $500 back later as his cut for making the deal happen ("I'mma just put five to the cut").  I also believe that HANKERSON's statement, "my cousin is gonna end up…he's probably gonna be with me," was a reference to HANKERSON's cousin acting as a "middler" during the deal, i.e., as a third party assisting in the purchase and delivery of drugs between two interested parties (in this case, HANKERSON and the Maine customer).  H.

MONROE and HANKERSON agreed to meet at 7:00 p.m. before H. MONROE went to a game at 8:00 p.m.

90.     That same day, at 6:10 p.m., H. MONROE received a call on Target Telephone 17 from HANKERSON on telephone number (857) 318-5290.  H. MONROE said, "Stash's?  I don't know, like Norfolkish, around Walgreens, by Morton Street, around Morton's Pizza."  Based on the intercepted call, I believe that H. MONROE and HANKERSON were discussing options for a meeting location.  H. MONROE initially proposed "Stash's," which is a pizzeria on Blue Hill Avenue, but then H. MONROE stated "Norfolkish," "by Morton Street, around Morton's Pizza."  HANKERSON agreed to the location and noted that the buyer from Maine would be there in "forty-five minutes."

91.     About twenty minutes later, at 6:34 p.m., H. MONROE received a call on Target Telephone 17 from HANKERSON on telephone number (857) 318-5290.  HANKERSON said, "He is already in the hood."  H. MONROE replied, "Aight, so go grab the bread and come meet me."  HANKERSON asked, "You gonna do shit right at the pit?"  H. MONROE said, "Yeah, it's Gucci right there ain't nothing be over there, not the pit, just right there in front of the barbershop."  HANKERSON said, "That means you gotta double park, ain't gonna be no parking over there."  H. MONROE responded, "Oh what's the difference, it's all the same, aight, it's whatever, we'll go to that side."  HANKERSON said, "I rather park my car, I gotta park, I don't wanna be."  H. MONROE responded, "We'll figure it out, it don't matter bro.  How long you gonna be?"  HANKERSON answered, "I'm bout to go meet him now so probably like, probably like ten minutes.  You over there now, right?"  H. MONROE stated, "I'mma about to go be over there."  Based on the conversation, I believe that H. MONROE and HANKERSON again were discussing where to meet in the Norfolk area.  Further, I know that H. MONROE's reference to "the pit" and

"the barbershop" is consistent with restaurants and stores in the area of Dorchester and Mattapan, Massachusetts.  HANKERSON also told H. MONROE that he would have the money ("bread") with him.

92.     About an hour later, at 7:34 p.m., H. MONROE called HANKERSON on telephone number (857) 318-5290 from Target Telephone 17.  H. MONROE and HANKERSON were trying to coordinate a meetup.  HANKERSON said, "I'm on Morton right by the lights."  H. MONROE told HANKERSON to "pull over" and then asked, "What you in that umm, the Pennsylvania plate?"  HANKERSON replied, "Yeah." H. MONROE said, "Ya'll might as well just pull right there, we're in and out, I gotta hop on this stage, I gotta go, some niggas behind you right now, following ya'll too."  H. MONROE also said, "I just got here" and "Y'all counting the bread up, right?"  HANKERSON replied, "yeah, I'm counting it…."  Based on the intercepted call, I believe that HANKERSON and H. MONROE each pulled over to park, with H. MONROE instructing HANKERSON to count the money ("bread").

93.     Around the same time as the above call, surveillance stationed in the area observed H. MONROE in his black Audi pull over in front of 918 Morton Street.  Surveillance then saw a maroon 2019 Dodge Challenger with Pennsylvania registration JGC9693 (the "maroon Challenger") across the street from H. MONROE's vehicle. Surveillance saw a black male, identified as HANKERSON (based on a prior review of HANKERSON's RMV photo), exit the maroon  Challenger and enter H. MONROE's black Audi at 7:44 p.m. for less than two minutes – timing that I know from experience and training to be consistent with a drug deal.  HANKERSON then exited the black Audi and returned to his maroon Challenger.  H. MONROE's black Audi then left the area.  Surveillance next saw an unknown male exit HANKERSON's vehicle and enter

a gray Chevrolet Equinox (plate not observed). HANKERSON's car then pulled into traffic and surveillance followed.

94. At 7:50 p.m., the Boston Police Department stopped HANKERSON's maroon Challenger suspecting that it contained the narcotics purchased from H. MONROE. The traffic stop confirmed HANKERSON as the car's driver and the same person seen meeting in H. MONROE's car. No drugs, however, were recovered. Based on the intercepted calls referencing a drug customer from Maine, coupled with surveillance seeing a third male exit HANKERSON's maroon Challenger after HANKERSON met with H. MONROE and returned to his car, I believe that HANKERSON obtained 250 grams of cocaine from H. MONROE in the black Audi, then returned to his car where another man, likely– as noted on a prior intercepted call – his cousin, was waiting and passed the drugs to him, who left for subsequent re-distribution to the buyer from Maine.

95. Less than an hour later, at 8:29 p.m., H. MONROE received a call on Target Telephone 17 from HANKERSON on telephone number (857) 318-5290. HANKERSON said, "You know right after I pulled off from you…on everything I love bro, you know I got jacked." H. MONROE responded, "You serious?" HANKERSON said, "You know what's so crazy how I got jacked?" H. MONROE asked, "How?" HANKERSON said, "I got so, I was so nervous, but I'm like nigga, I'm ready for whatever on my mother bro." H. MONROE then hung up to call someone else. Based on the intercepted call, I believe that HANKERSON called H. MONROE to inform him that the police had stopped him ("you know I got jacked.")

96. Two minutes later, at 8:31 p.m., H. MONROE called HANKERSON on (857) 318-5290 from Target Telephone 17. Their prior conversation continued. HANKERSON said, "You know, you know Blue Hills and like, like, you know that Citizens Bank, like Mattapan?" H.

MONROE asked, "Citizens Bank in the square?"  HANKERSON confirmed, "Yeah, Mattapan Square," and continued, "Yeah, I'm coming off that side street so you know facin it, facing Citizens Bank, like Mattapan?"  H. MONROE replied, "Yeah."  HANKERSON said, "As I'm taking a left to the Ave', the blue light is flagging me over, this light and he is already outside of his car."  H. MONROE replied, "Yeah."  HANKERSON said, "I'm like, why he flagging me over, he is pulling me over, I ain't doing nothing!"  HANKERSON then said, "He is beep beep!  He was beeping! You got your license and registration… I said 'I got no license.'  I got a registration, I said 'I got a registration, nigga my license is suspended, I ain't been in trouble in five years nigga, all I got to do is pay one ticket, what are you talking about?'  He is like, 'well let me see your ID,' I'm like, I swear to God, right?  Another white boy comes over right?"  H. MONROE responded, "Yeah." HANKERSON continued to speak about the stop and then he said, "Gave me back my shit, let me go fam, I was like what the fuck.  It was just weird how it happened. That was just weird."  H. MONROE replied, "Yeah that was crazy bro."  HANKERSON repeated, "Yeah that was crazy bro."  H. MONROE and HANKERSON then discussed their drug deal.  HANKERSON said, "You thought I was trying to jam scam them niggas?"  H. MONROE replied, "I thought you was jam scamming them no bullshit cuz, I'm like what is he doing, I'm like why he want me to leave after." HANKERSON said, "That would have been odd nigga, if I had jam scammed them nigga man." H. MONROE replied, "Nah, that's shit bro, I wouldn't have been mad at you, that would have been a free nino."  HANKERSON said, "Yeah, but I'm just saying you don't want to do that because now, they, them niggas looking for a halfie."  H. MONROE replied, "Oh, yeah, yeah, Don't do that. Nah, nah, nah, nah…I'm… bro I…."

97.    Based on the above conversation, I believe that HANKERSON told H. MONROE that when he left their drug deal, he went to Mattapan Square where the police stopped him.

HANKERSON relayed what happened to H. MONROE.  He stated that the officer was already outside of his car flagging him down.  I know from my communications with other investigators on this case and review of surveillance reports that this was true because surveillance had requested a traffic stop, and two detail officers had flagged HANKERSON over for investigation with a flashlight ("As I'm taking a left to the ave, the blue light is flagging me over, this light and he is already outside of his car").   After discussing the stop, H. MONROE and HANKERSON transitioned to discussing H. MONROE's belief that HANKERSON was going to scam ("jam scam") the Maine buyer and not deliver him the 250 grams ("free nino").   Specifically, H. MONROE had thought that HANKERSON obtained the money from the Maine buyer, provided the money to H. MONROE, and then kept the drugs without giving them to the Maine buyer, thereby resulting in free nine ounces of cocaine ("free nino").   HANKERSON explained that he would not do that because the customer wanted to buy a half of a kilogram ("halfie") of cocaine (i.e., 500 grams) at a future date ("Yeah, but I'm just saying you don't want to do that because now, they, them niggas looking for a halfie.").   H. MONROE agreed it was best not to scam the Maine buyer if he were interested in purchasing that much cocaine.

### 2.  **HANKERSON Orders a Doob from H. MONROE**

98.    On February 14, 2020, at 12:08 p.m., HANKERSON used cellular telephone number (857) 318-5290 to contact H. MONROE on Target Telephone 17.  During this call, H. MONROE asked HANKERSON, "What's up bro?"  HANKERSON responded, "What's up my guy?  Uhm…give me the number on the doob real quick, for me…"  H. MONROE replied, "22." HANKERSON asked, "I can get …I can get a doob…one?"  H. MONROE responded, "Duz one?" HANKERSON then told H. MONROE that he was in the "Fenway" area and that "it's gonna be

in a little bit."  H. MONROE advised HANKERSON, "Aight, just hit me.  Cause I'm about to do a couple of things."

99.     When HANKERSON asked H. MONROE, "give me the number on the doob," I believe that HANKERSON was inquiring about the cost of 62 grams of cocaine.  H. MONROE replied, "22," meaning $2,200, which, based on training and experience, is the current price for 62 grams of cocaine in the Boston area.

### 3.  <u>H. MONROE and HANKERSON Coordinate a Drug Deal</u>

100.    On February 26, 2020, at 7:19 p.m., H. MONROE received a call on Target Telephone 17 from HANKERSON on telephone number (857) 318-5290.  HANKERSON said, "Ain't nothing, right now, but you know.  Friday, I'll go back down… same from earlier." H. MONROE replied, "Alright, aight.  Bet, got you."  Based on this conversation, I believe that HANKERSON called H. MONROE to tell him that he would need to meet with him again on Friday (i.e., February 28, 2020) to obtain more cocaine.  I also believe that HANKERSON's reference to "same from earlier" meant that he wanted the same quantity of cocaine as he had obtained during his prior deal with H. MONROE on February 13, 2020 (i.e., 250 grams) and that the deal again would involve the Maine buyer.  H. MONROE agreed to the deal, and the call ended.

101.    On February 27, 2020, at 12:37 p.m., H. MONROE received a telephone call on Target Telephone 17 from HANKERSON on telephone number (857) 318-5290.  HANKERSON said, "Shit, shit… fucking um…ah… it's gonna have to be today."  H. MONROE replied, "Huh?" HANKERSON responded, "It's gonna have to be today or something."  H. MONROE said, "Aight, cool.  So, we gonna just link up on the back side, and um… just get with me later.  I'm stuck… I'm jammed up until late anyway."  HANKERSON responded, "Aight.  I'mma call you when the money get over here, as always."  Based on this conversation, as well as HANKERSON

and H. MONROE's prior conversation on February 26, 2020, I believe that HANKERSON told H. MONROE that the deal would have to happen on February 27, 2020 ("it's gonna have to be today"). Based on this and prior intercepted calls between H. MONROE and HANKERSON, as well as investigators' subsequent seizure of approximately 250 grams of cocaine from H. MONROE's black Audi, I believe that HANKERSON ordered 250 grams of cocaine from H. MONROE for distribution to his Maine buyer again.

102.    That same day, at 6:28 p.m, H. MONROE used Target Telephone 17 to contact HANKERSON on cellular telephone number (857) 318-5290. During the call, H. MONROE asked HANKERSON, "where you at?" HANKERSON told H. MONROE, "I'm right here by Boston Bowl, Stop & Shop." H. MONROE told HANKERSON that he would "head over there." Based on this information, investigators began conducting surveillance in the area of Boston Bowl, which is located at 820 Morrissey Boulevard, Dorchester, Massachusetts.

103.    At 6:53 p.m., HANKERSON (using cellular telephone number (857) 318-5290) contacted H. MONROE on Target Telephone 17, who said, "Yo bro, get the fuck away from here bro. It's dumb hot. I don't know what's going on. It's crazy." HANKERSON replied, "Where you at? Are you good?" H. MONROE said, "Bro, I'm getting the fuck out of there, bro. I don't know, we might have to cancel this." HANKERSON asked H. MONROE where he was, and H. MONROE replied, "Nigga, there was police pulling up everywhere. I'm gone. I don't know what the fuck is going on bro…" H. MONROE added, "I've been doing this shit a long…bro, soon as I get off the highway…soon as I pass through, State is fly 'boom, boom, boom.' Then…they bust a Uee. Then after that…shit got crazy. Meet me around the park."

104.    Around the same time as H. MONROE and HANKERSON's call, investigators attempted to surveil the meeting, intending a traffic stop on the suspected buyer from Maine. H.

MONROE, however, identified multiple surveillance units then present in the meet locations. When H. MONROE identified surveillance, he called a female, whom investigators identified as his girlfriend, over Target Telephone 14 and told her that he had seen surveillance and that he had left his black Audi on Lithgow Street in Dorchester, Massachusetts.  H. MONROE also told her that he was going to change at least one of his telephone numbers and that he had a "hammer" and drugs in his car.

105.    Based on the call and experience on other drug investigations, investigators believed that H. MONROE was referencing a gun ("hammer") and drugs in his black Audi. Pending search warrants, law enforcement towed H. MONROE's vehicle and secured H. MONROE's "stash house" located at 55 Woodhaven Street, Mattapan, Massachusetts.   On February 28, 2020, investigators executed search warrants at 55 Woodhaven Street, Mattapan, Massachusetts, and on H. MONROE's black Audi.  During the search warrant's execution at 55 Woodhaven Street, investigators seized six handguns, approximately 417 grams of cocaine, large amounts of ammunition, and paperwork in the name of Kareem CHAPLIN.  Inside H. MONROE's car, investigators found a loaded handgun and approximately 250 grams of cocaine, as well as paperwork in H. MONROE's name.

**F.  KENJI DRAYTON and DEREK HART**

106.    Investigators have identified Derek HART as a wholesale supplier of cocaine to K. DRAYTON.

### 1. **K. DRAYTON Orders Cocaine and Cocaine Base from HART**

107.    On August 11, 2019, at 2:01 p.m., K. DRAYTON (on Target Telephone 8) received a call from HART on (617) 712-9167.[9]  During the conversation, K. DRAYTON stated, "Hey bro, I forgot to ask you too right."  HART responded, "Yeah."  K. DRAYTON asked, "Yo, out of the same thing you could take a rope out of it and make it and make it a southern way?"  HART asked, "You said out of what?  Out of what?"  K. DRAYTON replied, "If you could out of the doob, right?"  HART said, "Yeah."  K. DRAYTON repeated, "Could you make a rope of that the southern way?"  HART replied, "The other way?"  K. DRAYTON said, "A rope of that (voice overlap)."  HART responded, "Oh the southern way, yeah, yeah."  K. DRAYTON confirmed, "Yeah, the southern way."  HART responded, "Yeah, yeah, I'll do it."

108.    Based on my training, experience, and work on this case, I believe that K. DRAYTON ordered a "doob" from HART, which is street slang for 62 grams of cocaine.  I also believe that K. DRAYTON asked HART to "take a rope out," which is street slang for an ounce, and "make it that southern way," which is street slang for cooking cocaine into cocaine base.

109.    That same day, at 7:23 p.m., K. DRAYTON (on Target Telephone 8) received a telephone call from HART on (617) 712-9167.  During the conversation, K. DRAYTON stated, "Nah, I was going to say, you know only a zone out of the doob, right?"  HART replied, "A zone? No, you said…"  K. DRAYTON responded, "Ah?"  HART asked, "You want me to bring another doob?  Or you want me to bring a zone?"  K. DRAYTON replied, "No, no, no. I want you to bring a doob, but out of the doob, a zone, do it the southern way."  HART replied, "Alright."

---

[9] As noted previously herein, HART continuously changed cellphones during this investigation nearly every thirty days.  Investigators compared the voice on (617) 712-9167 with HART's identified voice on prior intercepted calls and confirmed his identity.

110.    This call, as well as my training and experience, causes me to believe that K. DRAYTON and HART were confirming the quantity of cocaine and cocaine base that K. DRAYTON wanted.  Specifically, K. DRAYTON still wanted a total of 62 grams ("doob") of cocaine, and he wanted one ounce ("zone") of the 62 grams to be converted to cocaine base.

111.    After the above intercepted call, investigators intercepted communications between K. DRAYTON (on Target Telephone 8) and HART (on 617-712-9167) at 8:18 p.m.   K. DRAYTON and HART agreed to meet in Charlestown, Massachusetts ("Charles").   From my work on this investigation, I know that K. DRAYTON had a drug distributor whom he used in Charlestown at the address 161 Bunker Hill Street.  Based on the intercepted call and investigators' familiarity with K. DRAYTON's Charlestown-based drug distributor, surveillance set up in the area of 161 Bunker Hill Street.   At 9:33 p.m., surveillance observed HART's white Ford F-150 parked in front of Sanchez Market, at 160 Bunker Hill Street.   Surveillance saw K. DRAYTON (whom they knew and recognized from work on the investigation and prior review of his RMV photograph) walk towards HART's white Ford F-150 and enter the truck.   At 9:36 p.m., K. DRAYTON exited the Ford F-150 and walked away.   The prior intercepted calls, coupled with the brief surveilled meetup between K. DRAYTON and HART's car, supports my belief that they participated in a drug deal.

## 2.   K. DRAYTON Expresses Frustration Over Pandemic Drug Supply, Discusses Drug Supply Issues, and Orders Drugs from HART

112.    On April 12, 2020, at 6:04 p.m., HART used cellular telephone number (617) 580-6024 to call K. DRAYTON on Target Telephone 20.   During the intercepted conversation, K. DRAYTON asked HART, "What's the dealie, Bro?"  HART said, "Ain't shit, nigga been nowhere for a little second trying to figure it out."   K. DRAYTON responded, "Damn, yo, no bullshit.  I was so nonchalant right?  You heard niggas was telling you that right?  I was like…"  HART

replied, "Yeah, bro told me that, you was like, I'mma fall back for a second."  K. DRAYTON said,

"Hey yo, I didn't even yo… what?  I didn't even believe niggas, I'm like, watch this, nigga said

I'm about to call bro."  Based on this portion of the intercepted call, I believe there was still a

cocaine shortage in the Boston area due to the coronavirus pandemic.  I know that HART had

supplied K. DRAYTON with trafficking amounts of cocaine in the past and believe that K.

DRAYTON contacted HART to try to obtain cocaine ("what's the dealie, Bro?"), which HART

did not have ("Ain't shit, nigga been nowhere for a little second trying to figure it out.").

113.    HART further told K. DRAYTON, "You know what's crazy?  I probably been on

the most, but it's been spotchy like, nigga I go four days without, I come through four joints, that

shit's gone in two days, I go five days without, come through three joints, that shit's gone two

days, you know what I'm saying?  We gonna be on it in a second, but you might not get that shit

when you want it."  From training and experience, I know that the term, "joint" or "joints," is drug

nomenclature for a kilogram or kilograms of cocaine.  When HART told K. DRAYTON that he

had been "on the most but it has been spotchy," I believe that HART told K. DRAYTON that

despite cocaine's general unavailability, HART had been able periodically to acquire kilogram

amounts ("I've been on the most"), but that it had been sporadic ("spotchy").  HART also noted

that as quickly as he had acquired cocaine, he re-distributed it ("I go four days without, I come

through four joints, that shits gone in two days.  I go five days without, come through with three

joints, that shits gone in two days.").

114.    K. DRAYTON next stated, "Hey yo, I'm saying, but um, so listen, nah listen check

it out."  HART replied, "Yup."  K. DRAYTON continued, "I been working like a motherfucker

cause I'm working in the Expo Center, that that homeless shit boom boom, so I want, you can stop

through before I go to work?"  Based on my knowledge of this investigation, I believe that K.

54

DRAYTON had been working at the Convention Center ("the Expo Center") during night shifts to assist with sterilizing the facility during the coronavirus pandemic. HART replied, "Yeah. Okay," and "When, today?" K. DRAYTON responded, "Yeah." HART replied, "What time you going to work?" K. DRAYTON answered, "I'm going to work at seven." HART replied, "Ummm what time is it now? Six, oh nah, I'm at my crib, um, I'm watching my little one right now, so probably tomorrow will be better, I be out there, what time you get off?" K. DRAYTON said, "But nah what I'm saying, oh nah, I get off at four you, why you come through in the morning." HART replied, "Yeah I'll come through in the a.m." K. DRAYTON responded, "Aight yeah, nah I just wanted to umm, chop it with you." HART replied, "Nah, no doubt yeah, a.m.'s better, I be up to six a.m., so when you get off I'll meet you at your crib real quick, come back, then I'll go to sleep at six a.m." K. DRAYTON replied, "Aight, word, that makes sense."

115.    Based on this portion of the call, I believe that K. DRAYTON and HART planned to meet to discuss narcotics further in person and that K. DRAYTON was requesting narcotics from HART, who has remained a consistent supplier for K. DRAYTON. Based on the investigation, I believe that HART and K. DRAYTON have not hung out with one another except for purposes of HART supplying K. DRAYTON with cocaine or discussing supplying him with cocaine.

116.    On April 24, 2020, at 12:50 p.m., K. DRAYTON used Target Telephone 20 to call HART on Target Telephone 23. K. DRAYTON said, "Just wanted to be a pain in the ass and ask you shit that I already know the answer to." HART replied, "Word, yeah, you know it. Fucking, um… it should be within the week though." K. DRAYTON replied, "Oh, that's… word! I'm glad you said that at least man." HART responded, "Yeah, yeah. It should be um… I know the map is empty." K. DRAYTON replied, "I ain't gonna like, man. I hope… I hope, I hope you get first,

man.  No bullshit."  HART responded, "Word."  K. DRAYTON said, "And that's all I've been

hoping.  I'm like, 'Nigga, word.'"  HART responded, "My peoples umm… were supposed to get

something today, like two different people, but they mapping in the air.  Like forty something."

K. DRAYTON replied, "Damn."  HART commented, "Yeah, but we're gonna figure something

out.  We're gonna make something work, man.  What's up with you?"  K. DRAYTON replied,

"Man, I gotta keep that shit afloat someway somehow, man."  HART responded, "Yeah.  Yup,

yup."  K. DRAYTON replied, "Nigga, when I just seen your number I'm like, 'Oh, yes!'"  HART

laughed, and K. DRAYTON said, "Nigga says 'Oh yes!'  I was about to be like, 'Nigga, I'm in

the car right now, nigga.'"  HART laughed again and said, "Yeah, word.  It's going to be sometime

this week I believe man."  K. DRAYTON said, "Aight."  HART responded, "Or sometime within

the week."  K. DRAYTON said, "That is what's up."  HART remarked, "I got you first thing,

dawg."  K. DRAYTON replied, "Aight, definitely, hit me, man."  HART responded, "Aight, big

bro."  K. DRAYTON said, "Aight."

117.    Based on this call, I believe that K. DRAYTON called HART to check the status

of his supply, and HART told K. DRAYTON that he should have cocaine within the next week

("It should be within the week though").  HART indicated that he was supposed to receive

something "today," but that it was "40 something."  I know that $40,000 for a kilogram of cocaine

is expensive and believe that HART was saying that he did not want to pay that much ("they

mapping in the air"; "we're gonna figure something out").  HART continued to assure K.

DRAYTON that cocaine was coming "sometime this week."  I believe that the supply of cocaine

to wholesalers like HART has been interrupted by the pandemic, which has, among other things,

interfered with supply from Mexico and resulted in border closures, making it harder to move

cocaine into the United States.

### G.  **KENJI DRAYTON, DEREK HART, and TATIANA MORRISSEY**

118.    Investigators have identified Tatiana MORRISSEY as a drug runner for Derek HART, who assists HART in delivering wholesale quantities of cocaine to drug distributors, like K. DRATYON.

### 1.  **HART Coordinates a Kilogram Drug Sale with K. DRAYTON through MORRISSEY**

119.    On July 27, 2019, at 5:44 p.m., K. DRAYTON (on Target Telephone 8) called HART (on phone number (617) 712-9167).[10]   HART said, "Yeah she should be there soon. Remember that other number I had?"  K. DRAYTON responded, "Uh-huh, I think so.  Ah yo.  Just heads up, so we can line it up.  So right when I after I do that, I'm grabbing another one, and doing the same thing."  HART asked, "Another half time?"  K. DRAYTON said, "Yeah."  HART replied, "So you just gotta take the whole thing bro, cause she got to go to her family thing."  K. DRAYTON said, "Aight, but so, I'm just giving her the bread tho, right?"  HART replied, "Yeah, just yeah.  Take the whole joint and give her whatever bread you got."  K. DRAYTON said, "Aight."

120.    Based on the call and my work on this case, I believe that HART was going to have a female deliver a kilogram of cocaine to K. DRAYTON.  From training and experience, I know that "bread" is code for money, and "joint," as used in this context, refers to a kilogram of cocaine. Additionally, when HART told K. DRAYTON to "take the whole joint and give her whatever bread you got," I believe that HART instructed K. DRAYTON to accept the entire kilogram of cocaine ("joint") and give the female whatever money ("bread") K. DRAYTON then had.  K.

---

[10] As previously noted herein, investigators had intercepted HART, who routinely changed phone numbers roughly every thirty days, on prior calls with K. DRAYTON.  Investigators compared the voice on (617) 712-9167 with HART's identified voice on prior intercepted calls and confirmed his identity.

DRAYTON only wanted a half a kilogram ("half time"), but HART told K. DRAYTON he had to take the full kilogram because the drug runner ("she") had a "family thing," meaning that she did not have time to break the kilogram into pieces. Based on subsequent intercepted calls and corresponding surveillance, I believe that the female drug runner whom HART was referring to on these calls was Tatiana MORRISSEY.

121.     About two hours later, at 7:51 p.m., K. DRAYTON received a call on Target Telephone 8 from MORRISSEY on telephone number (857) 399-7953.[11] MORRISSEY said, "I just want to apologize because honestly, I was like at a family gathering, so I'm about to be there though and I'mma meet you. But he didn't initially communicate exactly…" K. DRAYTON replied, "I got a lot going on. I appreciate. I don't mean to be blowing you up like that." MORRISSEY responded, "No, no. It's okay though. Like I mean… at the end of the day I just wish he, you know. This was communicated a bit differently. I would have made different arrangements so but…(beep) hold on." K. DRAYTON said, "So you're like what?" MORRISSEY replied, "Hello." K. DRAYTON responded, "Yeah. So you're like how far?" MORRISSEY responded, "I'm literally like about to be there." K. DRAYTON replied, "Oh, aight. I don't know what numbers so I'm just at the beginning when you turn." MORRISSEY replied, "At Fabyan?" K. DRAYTON responded, "Yeah." Based on this call and the sequencing of prior calls that same day, I believe that MORRISSEY told K. DRAYTON that "he" (HART) did not correctly relay information to her for purposes of finalizing the cocaine delivery to K. DRAYTON.

---

[11] Investigators identified the same female voice calling on (857) 399-7953 during this investigation. Further, after that number contacted K. DRAYTON on Target Telephone 8 to coordinate a meetup, surveillance consistently saw MORRISSEY meeting with K. DRAYTON in the same manner as discussed on the intercepted calls.

122.     Based on intercepted calls that same day between K. DRAYTON and MAURICE COATES's girlfriend, S.B., investigators believed that S.B. was going to pick K. DRAYTON up at 21 Darlington Street, in Boston, Massachusetts (K. DRAYTON's sister's residence) and drive him to the drug deal with MORRISSEY.   Accordingly, investigators set up surveillance at 21 Darlington Street.   At 7:06 p.m., investigators saw S.B.'s gray 2007 Yukon with Massachusetts registration 8TV378 (the "gray Yukon"), arrive at 21 Darlington Street.   Surveillance followed the gray Yukon as it drove to Fabyan Street.

123.     At 7:59 p.m., K. DRATYON (on Target Telephone 8) received a call from MORRISSEY from telephone number (857) 399-7953.   K. DRAYTON asked, "Yo, you're in the same car or a different car?"   MORRISSEY replied, "I'm in the last car you've seen me in, the..." K. DRAYTON interjected, "The acac."   They further discussed their meeting location, and K. DRAYTON asked, "So you want me to go up to Harvard?"   MORRISSEY responded, "I'm walking up the street."   At 8:01 p.m., K. DRAYTON called MORRISSEY from Target Telephone 8 and said, "Yeah, I'm right here.   At the top of Fabyan and Harvard."   MORRISSEY responded, "Ok I'm coming up Harvard right now."   Investigators reviewed cell site location data for K. DRAYTON's Target Telephone 8, which showed K. DRAYTON pinging in the same area as described on the calls – the corner of Fabyan and Harvard.

124.     That same date, at 8:03 p.m., surveillance units in the area of Fabyan Street and Harvard Street saw a blue BMW with Massachusetts registration 6SD542, registered to MORRISSEY (the "blue BMW"), drive towards Fabyan Street and Harvard Street, reverse directions at Fabyan Street and Harvard Street, and park.   Surveillance then saw K. DRAYTON exit the gray Yukon, enter the blue BMW, and, within a minute, exit the blue BMW holding a large bag, which he did not have on entering the vehicle.   The blue BMW pulled away from the

area.  Surveillance followed it a short distance to the area of 29 Donald Road, where the blue BMW

parked.  Surveillance then saw a female, whom agents subsequently confirmed to be MORRISSEY

on a review of her RMV photograph, enter 29 Donald Road.

### 2.  MORRISSEY Collects Drug Proceeds from K. DRAYTON on HART's Behalf

125.    On July 28, 2019, at 1:20 p.m., K. DRAYTON (on Target Telephone 8) received a

call from HART on telephone number (617) 712-9167.  K. DRAYTON said, "Yeah, whenever

you ready."  HART responded, "Aight, I'll hit you, I'm about to take these little ones to the movies.

I'm hit you in a second."  K. DRAYTON said, "Aight."  HART asked, "Where you at, you in the

south?"  K. DRAYTON replied, "Yeah, yeah."  HART said, "Aight.  So I'll probably have baby

girl come just grab it."  K. DRAYTON said, "Alright."  Based on the call, as well as those that

occurred the day before (July 27, 2019), I believe that HART was going to obtain the payment for

the preceding day's kilogram of cocaine ("just grab it") from K. DRAYTON through

MORRISSEY ("baby girl").

126.    Less than an hour later, at 2:01 p.m., K. DRAYTON (on Target Telephone 8)

received a call from MORRISSEY on telephone number (857) 399-7953.  MORRISSEY asked,

"I'm not bringing you nothing, right?"  K. DRAYTON replied, "Nah, nah, nah."  MORRISSEY

responded, "Ok. So I'll be there in like ten minutes."  Based on this conversation, I believe that

MORRISSEY was confirming her meeting with K. DRAYTON and that she was not expected to

deliver anything from HART ("I'm not bringing you nothing, right?")

127.    Roughly fifteen minutes later, at 2:18 p.m., surveillance located at

K. DRAYTON's residence at 519 Harrison Avenue saw K. DRAYTON outside the address with

COATES.  Surveillance then saw the blue 2008 BMW arrive in the area of 519 Harrison Avenue

and park on Rollins Street.  Investigators identified the driver as MORRISSEY based on a

comparison to her RMV picture.  K. DRAYTON approached met with MORRISSEY inside her car.  After about a minute, K. DRAYTON exited the car, and the blue BMW left the area.

### 3.  K. DRAYTON Orders 125 Grams of Cocaine from HART, Who Sends MORRISSEY

128.    On August 2, 2019, at 12:01 p.m., K. DRAYTON (on Target Telephone 8) received a telephone call from HART on telephone number (617) 712-9167.  K. DRAYTON said, "Ain't shit, hey yo ah, I'm trying to do the four way as soon as possible."  HART responded, "Alright, I'm about to have that come to you right now."  K. DRAYTON said, "Alright bro."  Based on the call, I believe that K. DRAYTON ordered 125 grams of cocaine ("four way") from HART, who said that he would have it delivered to K. DRAYTON right away ("I'm about to have that come to you right now.").  That same date, at 1:16 p.m., K. DRAYTON received a telephone call on Target Telephone 8 from MORRISSEY on telephone number (857) 399-7953 (recognized by voice and telephone number).  MORRISSEY said, "I'm outside."  Surveillance, which was then in the area of 519 Harrison Avenue, saw K. DRAYTON leave his residence and go to Rollins Street – the same location where he previously had met with MORRISSEY – but did not see what vehicle K. DRAYTON met.  A review of cell site location information for Target Telephone 8 during this time period showed Target Telephone 8 pinging at 519 Harrison Avenue.

### H.  MAURICE COATES and KENJI DRAYTON

### 1.  K. DRAYTON Orders Drugs From COATES

129.    On October 14, 2019, at 12:54 p.m., K. DRAYTON used Target Telephone 8 to call COATES on telephone number (617) 735-5183.  K. DRAYTON stated, "Yo, listen, listen, listen.  I need you, listen, listen.  I need you real quick…. I said I need you."  COATES asked, "What you need me to do?"  K. DRAYTON said, "I need four."  COATES replied, "Four?" K. DRAYTON answered, "Cake. Yeah."  COATES again asked, "Four cake pieces?"  K. DRAYTON

61

then said, "Oh my god.  Aight hold on.  Let me think, let me think about this.  You know what one is, right?"  COATES replied, "What? One game?"  K. DRAYTON said, "Yeah, one right?"  COATES replied, "Yeah, one game."  K. DRAYTON confirmed, "Right."  COATES replied, "Yeah."  K. DRAYTON explained, "Now instead of the game being the score you know it would be for one, make it four, meaning instead of three and a five make four."  COATES replied, "Oh ok.  Ok, so a 40 ounce."

130.    Based on the call and my work on this case, I believe that K. DRAYTON called COATES to have COATES make four eight balls of cocaine base for him ("I need four," "cake") because "cake" is a drug term for cocaine base and that "four" refers to the eight balls.  From the conversation, I believe that K. DRAYTON and COATES were attempting to speak in code with one another, but COATES initially did not understand K. DRAYTON's statements.  In the end, COATES confirmed K. DRAYTON's coded requests for "four," "cake," and "instead of three and five make four" by stating, "Ok, so a 40 ounce."  I believe that "40 ounce," in this context, refers to four eight balls of cocaine base (i.e., 14 grams).  Specifically, both COATES and K. DRAYTON used sports code like "game" and "score" in their call.  From training and experience, I know that a "basket" is code for 3.5 grams of cocaine (i.e., an eight ball).  Thus, four "baskets" would equate to 14 grams.  I believe that K. DRAYTON's use of coded terms like "game" and "score" served as signals to COATES that he was referring to "baskets," i.e., eight balls.  My interpretation is further supported by K. DRAYTON's final statement, "Now instead of the game being the score you know it would be for one [i.e., basket], make it four [i.e., four baskets or eight balls], meaning instead of three and a five [one eight ball, or 3.5 grams] make four."

## 2. K. DRAYTON Seeks Intel from COATES on Kilogram Quantities of Cocaine and Pricing

131. On April 2, 2020, at 9:17 p.m., K. DRAYTON used Target Telephone 20 to contact COATES on Target Telephone 28. K. DRAYTON and COATES discussed obtaining supplies of illicit narcotics. COATES told K. DRAYTON that he had spoken to a person named "Chubbs" and an individual to whom he referred as "E." Based on their work on the investigation, investigators know that the individuals referred to as "E" and "Chubbs" had supplied COATES with trafficking amounts of cocaine in the past, although investigators had not confirmed their identities. K. DRAYTON asked COATES which of the two individuals could provide them with product in the shortest time: "So listen, listen what I'm asking. So, who should we see for the whole thing? Or half a thing?" COATES replied, "Either one." K. DRAYTON responded, "I get it, but who's gonna come through ASAP?" Based on my experience and familiarity with this investigation, I know that the terms "whole thing" and "half thing" refer to a "whole" and a "half" kilogram of cocaine. On that same call, K. DRAYTON also instructed COATES to negotiate the best price, stating, "I need to know the numbers, that's what I need to know." COATES replied, "They're not going to charge you nothing crazy if we talking." COATES added, "I'll figure it out, I'll get back to you." Based on the above intercepted communication, I believe that K. DRAYTON did not have product readily available for distribution and instructed COATES to negotiate the best price for a kilogram or half kilogram of cocaine.

132. On April 3, 2020, at 5:37 p.m., K. DRAYTON used Target Telephone 20 to contact COATES on Target Telephone 28. During the conversation, COATES said to K. DRAYTON, "Yeah, they named the same digits that your peoples was naming." K. DRAYTON responded, "What's that?" COATES responded, "Trey Six." From training and experience, I know that the term, "Trey Six," was coded language for the price for a kilogram of cocaine in the Boston area,

specifically, $36,000, which was within the normal range of $28,000 and $40,000. Further, I know from experience that drug dealers often refer to monetary amounts by the first two numbers. From the conversation, I believe that COATES looked into pricing on cocaine for K. DRAYTON for their drug-trafficking business.

### 3.   K. DRAYTON Does a Drug Deal with COATES and then Supplies KALLON

133.    As described *supra*, interceptions on April 18, 2020, led investigators to believe that COATES was going to supply K. DRAYTON with cocaine. Based on the communications, investigators set up surveillance on Walk Hill Street in Mattapan, Massachusetts, where investigators observed K. DRAYTON meet with COATES and S.B. Before that meeting occurred, investigators intercepted KALLON speaking with K. DRAYTON (on Target Telephone 20). During the intercepted call, investigators believed – from the call's brief language and other coded calls – that KALLON ordered a quantity of narcotics and arranged to pick them up from K. DRAYTON at K. DRAYTON's residence. Surveillance also set up at 519 Harrison Avenue. About an hour after K. DRAYTON was observed meeting up with COATES and S.B., surveillance observed KALLON arrive and enter 519 Harrison Avenue. When KALLON left, investigators followed KALLON back to Randolph, Massachusetts, and conducted a traffic stop. Officers recovered approximately 62 grams of cocaine from KALLON's waist area after a brief foot pursuit.

I. **MAURICE COATES, DERRICK HOBSON, and KENJI DRAYTON**

1. **COATES Orders Two Ounces of Cocaine from HOBSON**

134.    On May 25, 2020 at 1:49 p.m., COATES used Target Telephone 28 to contact DERRICK HOBSON on cellular telephone number (617) 901-7885.[12] COATES asked HOBSON, "Are you busy right now?" HOBSON replied, "Yeah, yeah, come through…" COATES responded, "Oh, ok" and "15 cent?" HOBSON said, "Say that again," and COATES replied, "The kid's gonna have their 15th birthday?" HOBSON said, "Everything is the exact same. The exact same." COATES ended the conversation stating, "Let me just go two times." I believe that the above intercepted communication is consistent with COATES using coded language to obtain drugs from HOBSON for redistribution purposes.

135.    For instance, when COATES asked HOBSON if he were "busy," HOBSON responded, "yeah, yeah, come through." COATES then asked, "15 cent?," on which HOBSON sought further clarification stating, "say that again," showing that even HOBSON was having trouble understanding the coded language. COATES then changed his original question to, "The kid's gonna have their 15th birthday?" HOBSON responded by confirming, "Everything is the exact same." From my experience and work on this case, I believe that COATES was using code to clarify current pricing for drugs. Specifically, based on my familiarity with drug dealers' pricing of drugs, I believe that COATES wanted to confirm whether an ounce of cocaine would cost $1,500 ("15") – a price consistent with prevalent street pricing for an ounce of cocaine. When HOBSON told COATES that everything was the "exact same," COATES responded, "Let me just

_____

[12] On both May 26, 2020 and June 6, 2020, after intercepting the same male caller speaking with COATES on (617) 901-7885 about a meetup, surveillance observed HOBSON, whom they recognized from his RMV photograph, meeting with COATES. During those calls, COATES and HOBSON arranged a meeting at 82 Julian Street, which I know is HOBSON's residence.

go two times," which I believe to be an order for two ounces of cocaine.  Thus, based on the

intercepted call, I believe that COATES contacted HOBSON to obtain two ounces of cocaine for

$1,500 each.

### 2. COATES Middles a Deal Between K. DRAYTON and HOBSON, and also, Secures His Two Ounces of Cocaine from HOBSON

136.    The next day, on May 26, 2020, at 3:34 p.m., K. DRAYTON used Target Telephone

21 to call COATES on Target Telephone 28.  COATES asked K. DRAYTON, "did you get good

with your people?"  K. DRAYTON replied, "I gotta call them.  I was fucking around, sleeping and

weird shit."  COATES responded, "My peoples…you know what I'm saying?  They, they, they

going to the 15th birthday party.  And that's what…that's what I'm…that's what I'm making

happen right now."  K. DRAYTON asked COATES to clarify what he had said, and COATES

explained, "They going to a baby girl's 15th… birthday party, like…they talking about…"  K.

DRAYTON then acknowledged he understood, saying, "Oh, oh."  COATES continued, "I just

wanted to see if you wanted to get on the bus, that's why I was calling you earlier."  K. DRAYTON

asked, "So how do I get on the bus?" COATES answered, "I got to see how far the trip.  'Cause

I'll have somebody slide through."

137.    Based on the above intercepted call, I believe that COATES wanted to know if K.

DRAYTON had been in touch with his source of supply ("did you get good with your people?").

K. DRAYTON indicated he still needed to contact his source ("I gotta call them…").  COATES

then told K. DRAYTON that he (COATES) was communicating with a source of supply, i.e.,

HOBSON, who was charging $1,500 for one ounce of cocaine ("My peoples…you know what

I'm saying?  They, they, they going to the 15th birthday party.  And that's what…that's what

I'm…that's what I'm making happen right now").  COATES inquired about K. DRAYTON's

interest, asking "I just wanted to see if you wanted to get on the bus."  K. DRAYTON confirmed

interest ("So how do I get on the bus?").  COATES explained that it would depend how much money K. DRAYTON had readily available, as that would determine how much cocaine he could purchase  ("I gotta see how far the trip.")  COATES also noted that he could send someone to K. DRAYTON's residence to collect the money ("Cause I'll have somebody slide through").  As demonstrated throughout this investigation, drug traffickers commonly speak in coded conversation to avoid detection by law enforcement, which is what I believe COATES was doing throughout his call with K. DRAYTON.

138.    At approximately 3:38 p.m., COATES used Target Telephone 28 to contact his girlfriend, S.B., on telephone number (617) 413-4398.[13]  COATES asked S.B., "Do you want to stop by the South End and grab his change?"  S.B. responded, "That's fine, I'll slide out there."  COATES also instructed S.B. to "call Big Homie in the meantime and let him know."  S.B. indicated that she would.  COATES said, "I'm on my way, I'm right down the street, let me get things together."  S.B. responded, "Okay.  And the way it will work is that I go to the South End, then go to the dead end, and then go back to the South End obviously, right?"  COATES replied, "Yeah, it's gonna be that type of action."

139.    Based on the above intercepted call, I believe that COATES instructed S.B. to go to K. DRAYTON's residence to get money for a drug deal ("Do you want to stop by the South End and grab his change?").  From my work on this case, I know that K. DRAYTON lives at 519 Harrison Avenue, which is located in the "South End" area of Boston.  I also know that "change," in this context, is slang for money.  COATES next instructed S.B. to contact HOBSON ("Call Big

---

[13] Investigators have intercepted the same female voice speaking with COATES on (617) 413-4398 during this investigation.  Surveillance on May 26, 2020, consistently saw S.B. arriving at locations, which, according to interceptions, a female on (617) 413-4398 had discussed with COATES (on Target Telephone 28).  Those locations included meetings with K. DRAYTON, M.B., and HOBSON.

Homie in the meantime and let him know") to alert him to a pending narcotics deal, so that HOBSON could have the drugs ready once S.B. arrived with K. DRAYTON's money.  At the end of the call, S.B. sought to confirm COATES's instructions ("And the way it will work is that I go to the South End, then go to the dead end, and then go back to the South End obviously, right?"). I believe that S.B. was confirming the instructions provided to her by COATES: that S.B. would travel to K. DRAYTON's residence at 519 Harrison Avenue to obtain money ("I go to the South End"), then travel to HOBSON's location ("then go to the dead end") to exchange the money for drugs, and then return to K. DRAYTON's residence to provide him with the drugs ("and then go back to the South End obviously, right?").  From my work on this case, I believe that both "dead end" and "Big Homie" mean HOBSON, because, respectively, HOBSON grew up at 8 Woodville Park, Roxbury, Massachusetts, which is a dead end street ("go to the dead end"), and is a heavy-set male, thus "Big Homie."  Further, I know that HOBSON's residence at 82 Julian Street is not located on a dead end street.  Thus, I believe that S.B.'s use of the term, "dead end," was a coded reference for HOBSON.

140.    Minutes later, at 3:43 p.m., S.B. (on telephone number (617) 413-4398) called COATES on Target Telephone 28.  S.B. told COATES, "I just called him and gave him an update on my time, and he was cool."  COATES acknowledged affirmatively.  Based on the call, I believe that S.B. called HOBSON to confirm the pending narcotics deal.  Agents subsequently set up surveillance in the area of K. DRAYTON's residence at 519 Harrison Avenue in anticipation of S.B.'s arrival.

141.    About thirty minutes later, at 4:13 p.m., surveillance saw a 2007 black Cadillac with Massachusetts registration 1HFV58 registered to S.B. at 32 Pine Avenue, Randolph, Massachusetts (the "black Cadillac), arrive opposite 519 Harrison Avenue and recognized S.B. as

the driver both from prior surveillance and prior review of her RMV photograph.  Three minutes later, at 4:16 p.m., surveillance saw K. DRAYTON exit 519 Harrison Avenue, walk across the street, and get into the front passenger seat of the black Cadillac, and which turned down Randolph Street.  From my work on this investigation, I know that K. DRAYTON is extremely surveillance conscience.  For that reason, surveillance allowed the black Cadillac to briefly drive away from the residence to avoid detection.

142.     Minutes later, at 4:18 p.m., surveillance saw that K. DRAYTON had exited the black Cadillac and was walking back in the direction of 519 Harrison Avenue.  At 4:20 p.m., electronic surveillance observed K. DRAYTON approaching his residence of 519 Harrison Avenue.  Based on the prior intercepted calls and brief nature of their meeting, I believe that K. DRAYTON provided money to S.B.

143.     About an hour later, at 5:13 p.m., COATES used Target Telephone 28 to contact S.B. on telephone number (617) 413-4398.  S.B. said, "We are just chilling at his house right now."  COATES asked, "Whose house?"  S.B. answered, "The boy at the dead end."  COATES said, "Huh?"  S.B. reiterated, "Big Homie's at the dead end."  COATES asked, "Oh…You went to see the other dude?"  S.B. said, "Yeah, yeah, yeah, that's already done, now we are just waiting."  COATES asked S.B., "How did the other homie come through as far as bread?"  S.B. replied, "Same thing."  COATES asked, "Same thing as us?"  S.B. confirmed, "Yeah."  Based on the intercepted call, I believe that COATES called S.B. to confirm the status of her delivery efforts.  S.B. confirmed that she was at HOBSON's location ("The boy at the dead end," and "Big Homie's at the dead end"), which I know from my work on this investigation to be 82 Julian Street, Dorchester, Massachusetts.  COATES asked whether S.B. had already met up with K. DRAYTON to obtain the money ("went to see the other dude?"), which she confirmed that she had ("that's

already done").  COATES also asked how much money K. DRAYTON had provided to purchase the cocaine ("How did the other homie come through as far as bread?").  S.B. indicated that K. DRAYTON – like COATES on May 25, 2020 (referenced above) – also had ordered two ounces of cocaine from HOBSON ("same thing as us).  Based on COATES and K. DRAYTON's respective cocaine orders, I believe that S.B. was to obtain four ounces of cocaine from HOBSON.

144.    At 5:27 p.m., COATES (on Target Telephone 28) called M.B. (with whom K. DRAYTON brokered a firearm deal with D.E., as summarized *supra*) on telephone number (857) 258-3540.[14]  COATES asked M.B., "Did you get yourself situated with a ton of work?"  M.B. replied, "No, I'm waiting on you."  COATES said, "Cause they came through.  They came to town."  M.B. asked, "So…it's no more…available?"  COATES replied, "Nah, it's out there.  But it's gonna make everything more difficult."  COATES explained, "You need to go meet with her and drop her the bread."  M.B. said, "Let me call her."

145.    Based on the intercepted call and my work on this case, I believe that COATES called M.B. to verify whether she had been resupplied with cocaine ("Did you get yourself situated with a ton of work?").  M.B. indicated that she had been "waiting on" COATES.  COATES confirmed that the supply had arrived ("They came through.  They came to town.").  When M.B. asked if there was any more cocaine "available," COATES responded, "it's out there."  COATES next instructed M.B. "to go meet with her and drop her the bread," which I believe meant for M.B. to contact S.B. and give her the money ("bread") to purchase cocaine.

---

[14] On June 7, 2020, surveillance identified M.B. at a pizza shop in Rhode Island after she had met with COATES at one of his suspected stash locations at 49-51 Cedar Swap Road in Smithfield, Rhode Island.  At 8:11 p.m., surveillance intercepted a telephone call to (857) 258-3540, and M.B. answered the phone call.  Investigators also recognized M.B.'s voice from prior intercepted calls in this case on that same phone number.

146.    Two minutes later, at 5:29 p.m., M.B. used telephone number (857) 258-3540 to call COATES on Target Telephone 28.  M.B. asked COATES, "Yo, you think that only enough for me?  Not for other people to grab?"  COATES replied, "Yo, if you wanna get everything together, you gotta make it happen right now."  M.B. said, "Text her and tell her to answer my call."  Based on this call, I believe that M.B. called COATES back to see if there were additional amounts of cocaine readily available for purchase so that she could "middle" a deal for others ("you think that only enough for me?  Not for other people to grab?").  COATES told M.B. that she needed to have all of the money collected for whatever quantity of cocaine she wanted to purchase ("if you wanna get everything together, you gotta make it happen right now").  Based on my training and experience, I know that it is common for drug distributors to "pool" their money to obtain a greater quantity of product.  I also know that the drug trade operates as a business, and as in many business transactions, it is more economical to purchase in bulk as opposed to buying an individual item.  Lastly, I believe that M.B. ended the call instructing COATES to tell S.B. that M.B. would be contacting her ("Text her and tell her to answer my call") to ensure that S.B. would answer, particularly before the entire supply was gone.

147.    About ten minutes later, at 5:38 p.m., S.B. (on telephone number (617) 413-4398) called COATES on Target Telephone 28.   S.B. told COATES, "So, I just spoke to her.  He gave me the okay for that.  So, he is going to stay and wait and so I'mma meet with her."  Based on this and the context of the prior intercepted calls, I believe that S.B. informed COATES that she had spoken with M.B. about obtaining her money to purchase drugs.  S.B. also noted that she had contacted HOBSON, who agreed to supply additional quantities of cocaine for redistribution onto M.B. ("He gave me the okay for that.  So, he is going to stay and wait and so I'mma meet with her").

148.    Based on the intercepted calls, surveillance stationed itself in the area of M.B.'s residence at 717 Walk Hill Street, Mattapan, Massachusetts.  At 5:57 p.m., surveillance saw S.B.'s black Cadillac pull in front of 717 Walk Hill Street.  Surveillance identified S.B., who appeared to be looking at her phone, as the driver.  At 6:04 p.m., surveillance saw M.B. exit 717 Walk Hill Street carrying a small blue bag with straps and enter the black Cadillac.  As S.B. remained in the black Cadillac with M.B., investigators intercepted the following calls.

149.    At approximately 6:18 p.m., COATES used Target Telephone 28 to call S.B. on telephone number (617) 413-4398.  COATES asked S.B., "What's the word?"  S.B. replied, "Nothing.  Meeting with her right now… and I'm gonna shoot down to him."  COATES asked, "Is he ready?"  S.B. said that she was "about to call him and tell him that I'm on my way back.  That's what he told me to do."  COATES asked, "What is she doing, same as us or half?"  S.B. answered, "Same thing."  As previously noted, I know from prior intercepted calls that COATES and K. DRAYTON each ordered two ounces of cocaine from HOBSON.  When S.B. stated that M.B. had ordered the "same thing," I believe she meant that M.B. also had ordered two ounces of cocaine from HOBSON.  Thus, based on the various orders, I believe that S.B. was going to obtain six ounces of cocaine from HOBSON – two for COATES, two for K. DRAYTON, and two for M.B.  Further, based on the call's context, I believe that COATES called S.B. to verify her status with picking up money from M.B. and then traveling to the supply source (i.e., HOBSON).  The call ended with S.B. stating that she was "about to call him right now," which I believe was a reference to HOBSON, and would provide COATES with an "update."

150.    Minutes later, at 6:22 p.m., S.B. (on telephone number (617) 413-4398) called COATES (on Target Telephone 28).  S.B. provided her update: "I just spoke to him.  He said that the guy needs about 30 minutes."  COATES replied, "Oh, yeah, yeah, yeah that's cool.  I know

his 30 is 30." S.B. added, "This turned into just like…an all-day mission, but it is what it is. It's fine, shit needed to be done." COATES responded, "At least we got something accomplished today." Based on the intercepted call, I believe that S.B. informed COATES that she had spoken to HOBSON, who confirmed that he would need an additional thirty minutes before the cocaine would be ready and available for pick up ("I just spoke to him. He said that the guy needs about 30 minutes").

151.    At 6:34 p.m., surveillance saw that M.B. was no longer in the black Cadillac, which left the area of 717 Walk Hill Street. Agents maintained a rolling surveillance on S.B. in the black Cadillac, which stopped on Brookford Street and remained stationary for a brief period before resuming motion. Surveillance briefly lost sight of S.B. and subsequently located the black Cadillac again traveling on Julian Street toward Howard Avenue.

152.    At 6:57 p.m., S.B. (on telephone number (617) 413-4398) called COATES (on Target Telephone 28). S.B. said to COATES, "Alright, so part of the mission is done. He ended up getting what you and the South End needed." S.B. continued, "I'm going to at least bring the one to the South End, since I'm still waiting." COATES responded, "What about me?" S.B. said, "That's what I'm trying to figure out, because I know that, you know, we want something." COATES said, "Oh, nah, I'm keeping mine, but…" S.B. then stated, "Yeah, so, what I'm going to do then is go to the South End, do that…I'll come back around."

153.    Based on the intercepted call, I believe that S.B. stopped at Julian Street to meet with HOBSON and succeeded in obtaining four of the six ounces of cocaine, i.e., two ounces for K. DRAYTON and two ounces for COATES ("Alright, so part of the mission is done. He ended up getting what you and the South End [i.e., K. DRAYTON] needed"). S.B. also explained that she was going to bring K. DRAYTON his two ounces of cocaine, keep two ounces for COATES

73

and herself, and then return to Julian Street to obtain the remaining two ounces for M.B. once it was available ("I'm going to at least bring the one to the South End, since I'm still waiting," and "I'm going to do then is go to the South End, do that…I'll come back around").  When COATES said that he was "keeping mine," I believe he meant that two of the four ounces that S.B. already had collected from HOBSON were for COATES and not for M.B.

154.    At 7:07 p.m., investigators observed via electronic surveillance that S.B. had arrived in her black Cadillac at 519 Harrison Avenue.  At 7:10 p.m., surveillance observed K. DRAYTON exit the front of 519 Harrison Avenue, and enter the front passenger seat of S.B.'s black Cadillac; at 7:11 p.m., exit the black Cadillac and remain standing on the sidewalk; and, three minutes later, return to 519 Harrison Avenue.  Via electronic surveillance, agents observed that the left side of K. DRAYTON's front hooded sweatshirt appeared weighed down.

155.    Surveillance again followed S.B. after her meetup with K. DRAYTON and made the following observations.  At 7:44 p.m., S.B. arrived on Julian Street, Roxbury, Massachusetts, and parked her black Cadillac.  At 7:54 p.m., S.B. exited the black Cadillac, walked over to 82 Julian Street, and met with a bald, black male wearing a green construction style shirt who was standing on the front porch and whom surveillance identified as HOBSON from his RMV photograph.  Both S.B. and HOBSON then entered 82 Julian Street, Roxbury, Massachusetts.  At 7:59 p.m., S.B. left 82 Julian Street and returned to the black Cadillac.

156.    At 8:00 p.m. S.B. (on telephone number (617) 413- 4398) called COATES (on Target Telephone 28).  S.B. said, "I'm all set.  I just gotta go and see her and then I'm shooting back to you."  I believe that S.B. called COATES to confirm that she had obtained the last two ounces of cocaine from HOBSON, that she was then en route to M.B., and that she would be going to COATES last.

157.     Starting at 8:15 p.m., surveillance made the following observations: S.B. arrived in the area of 717 Walk Hill Street and entered the residence (which I know from my work on this investigation to be M.B.'s address); at 8:38 p.m., S.B. exited 717 Walk Hill Street, entered her black Cadillac, and drove away, traveling south on Interstate 95 into Providence, Rhode Island. From my work on this investigation, I know that COATES commonly resides at hotels and, most recently, has been linked to hotels in Rhode Island. I believe COATES prefers to reside in hotels to conceal his drug-trafficking activities.

158.     At 9:21 p.m., COATES used Target Telephone 28 to contact S.B. on telephone number (617) 413-4398. S.B. told COATES, "the GPS says…9:32." COATES replied, "[t]hat's only fucking…few minutes." S.B. agreed. COATES said, "Alright. I'm glad you've done your job." I believe that S.B. called COATES to confirm she was only minutes away, which pleased COATES.

159.     At 9:32 p.m., surveillance saw S.B. arrived at The Extended Stay Hotel at 1000 Warren Avenue, East Providence, Rhode Island. From my work on this case, I believe that S.B. and COATES were staying at this address. I know that cell site location data for COATES's Target Telephone 28 pinged at this location both during the above telephone calls and when S.B. arrived at the address. I believe that S.B. brought the two ounces of cocaine from HOBSON to COATES at this address.

### 3.   After COATES Orders Drugs from HOBSON, COATES and HOBSON Meet

160.     On June 6, 2020, at 3:18 p.m., COATES used Target Telephone 28 to call HOBSON on telephone number (617) 901-7885. COATES said, "I got the touch. Can I get with you?" HOBSON responded, "I'm working. I'm here, so…come through." COATES asked, "Oh, you at the house?" HOBSON responded affirmatively. COATES said, "Alright, I'm saying… we

can do anything?  I mean, I know it's the same thing, but…"  HOBSON stated, "I'm here, playboy."  COATES said HOBSON, "Let me get this together.  I'm on my way.  I'm coming from Rhode Island."

161.    Based on the intercepted call, I believe that COATES ordered a quantity of cocaine from HOBSON ("Can I get with you?"), and HOBSON confirmed that he had a supply readily available for sale ("I'm working.  I'm here, so come through").  When COATES told HOBSON, "Let me get this together," I believe he was advising HOBSON that he was gathering money for the drug deal.  Lastly, I believe that when COATES asked HOBSON, "you at the house?," he was referring to 82 Julian Street, where investigators believe HOBSON stores cocaine.

162.    Based on this information, agents began conducting surveillance at 82 Julian Street, Dorchester, Massachusetts.  At 5:05 p.m., surveillance saw S.B. arrive in her black Cadillac, with a front seat female passenger and COATES in the rear seat, park her car, and stay where she was.  At 5:15 p.m., surveillance saw HOBSON walk down the street from an unknown location in the direction of 82 Julian Street.  COATES exited the black Cadillac and greeted HOBSON.  HOBSON and COATES then entered 82 Julian Street.

163.    Ten minutes later, at 5:35 p.m., surveillance saw COATES exit 82 Julian Street and re-enter S.B.'s black Cadillac.  Based on the prior intercepted calls and past practice, investigators believed that COATES had obtained trafficking quantities of cocaine from HOBSON.  As the black Cadillac pulled away, officers did a traffic stop on the car.  Officers subsequently searched the car and COATES, but recovered no narcotics in the Cadillac or on his person.

164.    Later that evening, at 9:10 p.m., COATES (on Target Telephone 28) called M.B. on telephone number (857) 258-3540.  COATES told her, "Um... ain't nothing. Um... I'm just gonna... I'm gonna pull up.  Yo, you gotta go get another phone.  Even if you want me to pay for it.  You

gotta go get another phone." M.B. said, "Okay, I'm gonna do it." COATES added, "Yeah, yeah, yeah...that's gonna be tomorrow, man. I'mma pull up, I'mma pull up right to the crib. Just have another phone by the time I get there so I can swap my number. Nigga, you seen... yo, when I seen your little sister, and she was asking for a ride, nigga. So, I gave her a ride. Nigga, if you seen how they jacked us, you would've been like, 'Oh, my god, nigga! This is ridiculous!'"

165.   COATES continued: "Nigga, they jacked us crazy, nigga. I'm in the middle of trying to do... you know what I'm saying, whatever I'm trying to do. And I pulled around the corner and then boom, nigga! You know what I'm saying? Like, nigga... you know what I'm saying? Like, yo... they pulled us over. Nigga, they snatched…inside the car nigga. Nigga, they patted everybody down; I got to beg them to pat me down. Oh, I got my hands in the air... 'Yo, listen, man... don't kill me, man. I got my hands in the air, just pat me down, so you know I don't don't got a weapon. And I'm giving you consent to look through the fucking car.' You know what I'm saying? Whatever. And [S.B.]... [S.B.] is fucking shit, like 'Yo, what you mean you wanna look through my car?' Whatever. Boom! They looked through the car... yo, they tear the shit apart, boom! It ain't no weapons, it ain't no nothing. They still got me say, 'Yo, that shit's gonna be on Facebook.' You know what I'm saying? Yo, poom! They got me with my hands on the fucking top, hands on the back. And I'm like, 'Yo, so what is the problem?' Like, 'What's going on?' They're like, 'Oh, we got told... we, we...' 'No, no! No *we* got you!' They're like, 'We're doing an investigation.' I'm like, 'So, what? That don't got nothing to do with me. What are you talking about?' So now, the pat down comes, and... you know what I'm saying? Whatever. No weapons. Now, they searched the car 16 times...now, boom! Like, 'Yo, listen, man... I'm just not gonna stand here with my hands on the car, man. I'm getting tired of this shit, man. I'm getting tired, man. This is enough, man.' Yo, the whole community's coming up. Everybody's videotaping it.

Everybody's videotaping it, like, 'Yo, what the fuck!'  Like, 'Damn!'  Now they're like, 'Oh!'  They start tearing all my shit... and you know, I got shit in the trunk; 'cause you know, I be going from hotel to hotel, and I got shit in the trunk.  They start tearing that shit apart.... da, da, da... da, da, da! I'm like, 'Yeah... so, yo!'"

166.    Based on my training, experience, and the call's context, I believe that COATES instructed M.B. to get a new telephone number after COATES had been stopped by the police on leaving 82 Julian Street.  From his narration and my familiarity with the traffic stop, I believe that COATES had not yet been able to complete his deal with HOBSON before the police stop occurred because COATES told M.B., "[Th]ey jacked us crazy, nigga.  I'm in the middle of trying to do... you know what I'm saying, whatever I'm trying to do."   Stated differently, I believe that COATES was indicating in code that he had been in the process of obtaining cocaine from HOBSON when the police stopped him.  I believe that the officers either could not locate the drugs in the car due to an unidentified, concealed compartment, or that COATES had dropped money off with HOBSON pending the finalization of their drug deal.

167.    COATES's concern about the police stop the night before continued into June 7, 2020.  At 1:45 p.m., COATES (on Target Telephone 28) spoke with an unidentified female on telephone number (857) 266-2782.  COATES said, "Yeah, but, but, but it's already... it's already, now it's on this phone.  And I don't know if this jack's hot; I don't know if your jack's hot.  I don't think that they was even coming for me.  I don't think that I had nothing to do with nothing, but... yo, just use this jack to call me on this number, since we already did it.  And um... we just gotta be careful, you know what I'm saying... how we kick it."  Based on this call and my knowledge of the prior evening's events, I believe that COATES was expressing concern about law enforcement

monitoring his telephone calls or even the caller's phone ("I don't know if this jack's hot; I don't know if your jack's hot").  COATES also expressed the need to be cautious when "kick[ing] it."

### J.   WINSTON MCGHEE, KENJI DRAYTON, DEREK HART, and ERIC DAVIS

#### 1.   MCGHEE Agrees to Supply Drugs to K. DRAYTON While K. DRAYTON Awaits Drugs from HART

168.    On April 4, 2020, at 5:05 p.m., MCGHEE used Target Telephone 22 to call K. DRAYTON on Target Telephone 20.  During the conversation, MCGHEE said to K. DRAYTON, "I told you what I got going on, so you are trying to wait for 'Bro'?"  K. DRAYTON responded, "Oh no, I'm saying no, no, no.  I will definitely do something, but I'm bone dry."  MCGHEE asked K. DRAYTON, "Uh, what did you want?"  K. DRAYTON answered, "I will do the four and a half."  MCGHEE ended the conversation saying, "Imma call you when I grab it."

169.    Based on the above intercepted communication and my work on this case, I believe that MCGHEE offered to supply K. DRAYTON with four and a half ounces of cocaine ("four and a half").  I also know that MCGHEE's reference to "Bro" is to Derek HART, as "Bro" is his street name.  The investigation has shown that D. HART has supplied K. DRAYTON with trafficking amounts of cocaine in the past.  When MCGHEE asked K. DRAYTON, "so you are trying to wait for 'Bro'," MCGHEE wanted to know if K. DRAYTON wanted a supply of cocaine or if he preferred to wait for D. HART's supply.  K. DRAYTON replied he would "definitely do something" with MCGHEE because he was "bone dry."  Based on training and experience, I know that "bone dry" refers to a dealer being depleted of his or her narcotics supply.  I also know that, during the time of this call, there was a rising cocaine shortage in the Boston area attributable to the coronavirus pandemic.  Further, when MCGHEE asked K. DRAYTON, "What did you want?," K. DRAYTON responded, "I will do the four and a half," which refers to 125 grams of cocaine.

170.    On April 4, 2020, at 9:22 p.m., K. DRAYTON used Target Telephone 20 to call MCGHEE on Target Telephone 22.  K. DRAYTON asked MCGHEE, "Quick question, I don't know why we didn't think of this.  How do you do it with him?  He give it to you, you come back?"  MCGHEE answered, "Nah, I'm just going to cash out."  Based on that intercepted communication, I believe that K. DRAYTON asked MCGHEE about his preferred method of payment for drugs.  I know that drug distribution at times is a cash and carry business, and at others times, drugs may be bought and sold on credit.  Thus, when K. DRAYTON asked MCGHEE, "How do you do it with him? He give it to you, you come back?," I believe that K. DRAYTON wanted to know MCGHEE's preferred manner of business, i.e., either fronting the drugs with an agreement for later payment or having K. DRAYTON pay for the drugs upon delivery.  I further believe that MCGHEE told K. DRAYTON that his preferred manner of business was for cash upfront by stating, "Nah, I'm just going to cash out."

171.    At the end of their conversation, K. DRAYTON told W. MCGHEE, "I'm gonna tell this nigga to drop 20.  I'm like, 'yo drop 20 tonight and we'll have everything situated by the then, and then we can figure it out from there.'"  I believe that K. DRAYTON was coordinating the payment of $20,000 from another individual in anticipation of his drug deal with MCGHEE, with the understanding that he would pay the remaining portion of the drug deal price upon the transaction's completion.  Based on this intercepted communication, including the large sum of money involved, I believe that K. DRAYTON coordinated the purchase of a kilogram of cocaine from MCGHEE.   Based on the prior intercepted calls, I know that K. DRAYTON and MCGHEE initially discussed K. DRAYTON needing at least 125 grams (or "four and a half" ounces) because he was "bone dry" in drug supply.  During subsequent calls, this quantity increased to a kilogram of cocaine.  I know this because "20" (i.e., $20,000) does not equate to drug pricing for 125 grams

of cocaine.  Rather, from my training and experience, I know such a large quantity of cash to principally be consistent with a down payment on part of a kilogram of cocaine.  Further, I know from other calls intercepted during this time period that K. DRAYTON was speaking with other Target Subjects, including COATES, about trying to obtain kilogram quantities of cocaine.

172.    On April 5, 2020, at 9:36 a.m., K. DRAYTON used Target Telephone 20 to call MCGHEE on Target Telephone 22.  During the conversation, MCGHEE said to K. DRAYTON, "Yeah, I'll be to you…like 25 minutes."  K. DRAYTON responded affirmatively.  Based on the intercepted communication, investigators began conducting surveillance in the area of K. DRAYTON's residence at 519 Harrison Ave, Boston, Massachusetts.  At 10:17 a.m., surveillance units observed K. DRAYTON exit 519 Harrison Avenue, Boston, Massachusetts and stand on the corner of Harrison Avenue and Savoy Street.   At 10:23 a.m., surveillance units observed MCGHEE arrive in a blue 2005 Infiniti SUV with Massachusetts registration 9HE352 (the "blue Infiniti").  K. DRAYTON entered the front passenger side of MCGHEE's vehicle.  MCGHEE then travelled down Harrison Ave and took a right turn on Rollins Street.  K. DRAYTON then exited MCGHEE's vehicle and re-entered his residence of 519 Harrison Avenue, Boston, Massachusetts.

173.    At 10:20 a.m., MCGHEE used Target Telephone 22 to call K. DRAYTON on Target Telephone 20.  During the intercepted conversation, MCGHEE asked K. DRAYTON, "Yo bro, did you jump through that?"  K. DRAYTON responded, "It was 19, right?"  MCGHEE told K. DRAYTON that it was "short."  As previously described above, K. DRAYTON had told MCGHEE that he would "drop 20 tonight and we'll have everything situated by the end."  Based on training and experience, I believe that K. DRAYTON had planned to use $20,000 (received from another individual) as a down payment for the drugs with the rest to be furnished upon the kilogram's delivery.  However, on the call, MCGHEE told K. DRAYTON that there was only

"19."   MCGHEE also stated that he "didn't thumb through it."   K. DRAYTON replied, "but…alright, I'm gonna take care of it."   I believe that K. DRAYTON confirmed that he would pay the remaining amount owed of the $20,000.

**2. MCGHEE and K. DRAYTON Discuss Drug Supply, and MCGHEE Meets with DAVIS**

174.   On April 12, 2020, at 6:02 p.m., K. DRAYTON used Target Telephone 20 to call MCGHEE on Target Telephone 22.  During the conversation, K. DRAYTON stated, "Hey yo, you didn't hear nothing on no small shit and nothing?"  MCGHEE responded, "Nothing, bro, it ain't nothing around. I been trying get everything."  K. DRAYTON replied, "Aight. I'm saying, aight." MCGHEE said, "Imma see you.  Imma ask umm, I'm ask Bags, Imma see what's up."  K. DRAYTON replied, "Aight."  MCGHEE added, "But as of right now, nothing."  Based on the conversation, I believe that K. DRAYTON asked MCGHEE if he had drugs for sale, even if in small quantities ("you didn't hear nothing on no small shit and nothing?").  MCGHEE told K. DRAYTON that there was "nothing around," meaning that no one had cocaine.  MCGHEE then said that he was going to call "Bags," which investigators know from their work on this investigation is the nickname for Eric DAVIS.  Although investigators reviewed toll records for Target Telephone 22 and Target Telephone 25 during this time period, it did not appear from the tolls that MCGHEE and DAVIS spoke by voice call.  Based on their training and experience, however, investigators know that MCGHEE and DAVIS frequently FaceTime each other. Investigators cannot intercept FaceTime calls nor would such calls be reflected on toll records.

175.   About an hour after the above conversation occurred, at 6:58 p.m., surveillance units observed a white 2015 Audi A6 with Massachusetts registration 1BYE19, registered to Eric DAVIS (the "white Audi"), parked in front of MCGHEE's residence, 430 Washington Street, Dorchester, Massachusetts.  Surveillance observed a male, whom they were unable to identify

positively based on his positioning, lean into the passenger side door of the white Audi. Investigators also were unable to see the driver of DAVIS's white Audi.  Based on the call with K. DRAYTON, however, I believe that MCGHEE was the individual leaning into the vehicle to speak with DAVIS ("Bags") about acquiring cocaine.  Based on training, experience, and the prior call, I believe that MCGHEE met with DAVIS to see if DAVIS had cocaine for MCGHEE to purchase and distribute to customers, like K. DRAYTON.  Likewise, I believe that MCGHEE likely contacted DAVIS by phone to set up that meeting.

176.     That same date, at 6:54 p.m., investigators observed that DAVIS's Target Telephone 26 was pinging on Bowdoin Street, which is located about 11 meters from 430 Washington Street (i.e., MCGHEE's residence).  At 7:09 p.m., Target Telephone 26 was pinging at 95 Nightingale Street, which is about 201 meters from 430 Washington Street.  During that time, MCGHEE's Target Telephone 22 was pinging at 430 Washington Street.  I believe that these data are consistent with DAVIS meeting with MCGHEE; however, there was no cell site location data at 6:58 p.m., the approximate time of the meeting.

### 3.   MCGHEE and K. DRAYTON Discuss Drug Supply, and DAVIS Travels to California to Obtain Cocaine

177.     On April 25, 2020, investigators learned that DAVIS had flown to California to meet with a cocaine supplier and have cocaine sent to Boston, Massachusetts.  Specifically, investigators intercepted MCGHEE (on Target Telephone 22) speaking with K. DRAYTON (on Target Telephone 20) at 12:07 p.m. that day.  During the conversation, MCGHEE stated, "This nigga ummm-mm, what you call it umm-mm Bags is over, over, over… on the west right now, you know what I mean?  He say it's something over there… I told him before he went, he's like yo… he said he trying to get two.  I was like, 'yo, if you get them, like yo if you send them over, I was like if you send them over and we're gonna cash right then and there.'  You know what I

mean?"   As previously noted, from my work on the investigation, I know that "Bags" – whom

MCGHEE references in the intercepted call – is DAVIS's nickname.   Further, investigators believe

that MCGHEE's statement that DAVIS ("Bags") was "on the west right now" referred to DAVIS

being on the west coast of the United States, specifically, California.   From my work on this

investigation, as well as MCGHEE's statements on the intercepted April 25, 2020 call, I believe

that DAVIS ("Bags") went to California ("on the west") to obtain at least two kilograms of cocaine

("he said he trying to get two"), which MCGHEE knew would be immediately profitable for them

given the cocaine shortage in the Boston area arising from the pandemic ("we're gonna cash right

then and there").   After the call occurred, investigators reviewed the authorized "ping" location

data information for Target Telephone 26.   That information showed that DAVIS was in fact then

physically present in California, corroborating MCGHEE's statements.

### K.   ANDRE ECHEVARRIA, DEREK HART, and WINSTON MCGHEE

178.   Andre ECHEVARRIA is a cocaine customer who buys cocaine in bulk from Derek

HART and from Winston MCGHEE.

#### 1.   ECHEVARRIA Orders Cocaine from HART

179.   On October 11, 2019, at 11:51 a.m., HART (on Target Telephone 15) received a

call from ECHEVARRIA on telephone number (617) 991-4188.[15]   HART said, "What's up with

you boy?"   ECHEVARRIA said, "Give me a call…when you gonna be around today?"   HART

---

[15] Investigators identified ECHEVARRIA's voice on (617) 991-4188 through voice comparison of other intercepted calls between ECHEVARRIA and other Target Subjects, including MCGHEE.   As set forth *infra*, in April 2020, surveillance saw MCGHEE meet with ECHEVARRIA (whom investigators identified through RMV photographs).   At the time, ECHEVARRIA was using telephone number (857) 308-8099.   Investigators placed a controlled call to ECHEVARRIA at (857) 308-8099 and saw him answer the phone.   Investigators subsequently compared ECHEVARRIA's voice with intercepted calls on (617) 991-4188 and confirmed his voice as the caller on that phone.

answered, "Yeah, yup.  For a little while, what time you coming to the city?"  ECHEVARRIA repeated, "What time you gonna be around there?"  HART replied, "I'm leaving, I think at like 4:00 or 5:00."  ECHEVARRIA responded, "You're going around there to 4:00 or you leaving…"  HART said, "No, no, no.  I'm leaving from around there."  ECHEVARRIA responded, "Where you at?  Aight so around what time time you think you gonna be there?"  HART replied, "I'll be there in one hour.  Like uh-huh, one o'clock."  ECHEVARRIA asked, "5:00?  Or you gonna be there at 1:00?"  HART said, "Yeah I'll be in the hood at 1:00, but I'm leaving at 4:00 or 5:00."  ECHEVARRIA responded, "Oh you about to be, so I'll just leave there right now.  I'll be there around 2:00 then."  HART replied, "Alright cool then."  ECHEVARRIA added, "I'll shoot there."  HART replied, "Alright, hit met when you're closer."  Based on this call, I believe that ECHEVARRIA and HART agreed to meet later on in Boston, Massachusetts.  The purpose of the meeting was detailed in later calls.

180.    Specifically, later that afternoon, at 3:14 p.m., HART received a call on Target Telephone 15 from ECHEVARRIA on telephone number (617) 991-4188.  ECHEVARRIA said, "I'm about to shoot down there right now, what area are you in?"  HART replied, "I'm in Grove Hall."  ECHEVARRIA asked, "Which way you headed?"  HART said, "Uh, I was right here I got my little spot over here, but uh… what, you just want to grab something or you needed to see something?"  ECHEVARRIA replied, "I want, I needed to see, I got a line a fizz, you heard?"  HART asked, "You said a sev?"  ECHEVARRIA responded, "Yeah, I got a parlay for a sev."  HART asked, "Uh sissy?  You heard me?"  ECHEVARRIA said, "I didn't hear you."  HART repeated, "Uh… sissy?"  ECHEVARRIA asked, "You said where at?"  HART responded, "Sissy, nah I said undone?"  ECHEVARRIA said, "Uh… If you got it that way, either way."  HART said, "Alright, yeah I have some uh, where are you right now?"  ECHEVARRIA answered, "I'm at my

crib." Based on this call, as well as my work on this case, I believe that ECHEVARRIA ordered seven grams ("sev") of cocaine ("sissy") from HART. HART asked whether ECHEVARRIA wanted the cocaine "undone," which I know is code for cocaine, as opposed to cocaine base (which is "cooked" or converted cocaine). ECHEVARRIA stated he would accept it "either way," which from the context, meant as cocaine or cocaine base.

181. Soon after the above conversation occurred, surveillance saw the following: HART exited from 59 Brookledge Street, the same location where his cellphone's location data was then pinging, walked to the window of a black 2015 Honda CRV, and handed something to the unidentified driver. HART then walked to his white Ford F-150, which was parked close by, entered it, and drove to the area of Stanwood Street. At 4:43 p.m., HART (on Target Telephone 15) instructed ECHEVARRIA (on 617-991-4188) to meet him on "Stanwood Street." Soon after HART arrived on Stanwood Street, surveillance saw an unidentified person enter the passenger side of HART's truck at 5:12 p.m. That person exited the truck about a minute later, which I know from training and experience to be timing consistent with a drug transaction. The unknown male then entered a gray Dodge Journey with Rhode Island registration XX973, registered to EAN Holdings, Inc. and rented by Andre ECHEVARRIA (the "gray Dodge Journey").

182. On the next day, October 12, 2019, at 12:44 p.m., surveillance saw the same gray Dodge Journey parked in front of 21 Weston Avenue, Holbrook, Massachusetts. Investigators learned that ECHEVARRIA had filed an accident claim on February 20, 2019, for a car he was renting from EAN Holdings, Inc. and in which his girlfriend had been the passenger. ECHEVARRIA's girlfriend had listed 21 Weston Avenue, Apartment 2, as her address. ECHEVARRIA's girlfriend also had that address listed on her driver's license. At 1:35 p.m., surveillance saw a male – whom they subsequently identified through an RMV photograph as

Andre ECHEVARRIA, exit from 21 Weston Avenue and enter the gray Dodge Journey after placing a black bag into the trunk.  A female was also observed entering the car.  The vehicle left the area.

### 2.   **ECHEVARRIA Orders Cocaine from MCGHEE**

183.   On April 4, 2020, at 3:36 p.m., ECHEVARRIA used cellular telephone number (857) 308-8099 to call MCGHEE on Target Telephone 22.  During the intercepted communication, ECHEVARRIA said to MCGHEE, "Hey, I was trying to do a 'Doob' and a 'four-way,' you heard?"  MCGHEE responded, "That's what I got left."  MCGHEE also told ECHEVARRIA that he needed "44 for the 'four-way,'" because he was "paying 42 right now."  ECHEVARRIA asked MCGHEE, "Can I get both for 65?"  MCGHEE responded, "Yeah, I got you."  ECHEVARRIA said, "The shit gotta be popping," and "if this shit is popping, bro, I'm be right, right, right, back at you, we can make a couple of dollars."  MCGHEE replied that he "went through two joints," and "nobody complained."

184.   As previously referenced, I know that the term, "Doob," refers to 62 grams of cocaine, and the term "four-way," refers to four and a half ounces, or 125 grams, of cocaine.  I believe that when MCGHEE said he needed "44" because he was "paying 42 right now," he was explaining to ECHEVARRIA that he had to charge him $4,400 for the four and a half ounces of cocaine because he had paid $4,200 for it.  Under those terms, MCGHEE would profit $200 from the transaction.  ECHEVARRIA then asked MCGHEE, "Can I get both for 65?," which I believe was code for whether ECHEVARRIA could buy the 62 grams along with the four and a half ounces of cocaine for $6,500.  MCGHEE agreed to that transaction.  Lastly, ECHEVARRIA said to MCGHEE, "Shit gotta be popping" and they "can make a couple of dollars" by working with each other, to which MCGHEE responded that he "went through two joints" and "nobody complained."

I know from training and experience that the term, "popping," refers to high-quality grade narcotics, and the term, "joint," refers to a kilogram of cocaine.   Thus, MCGHEE told ECHEVARRIA that his product was of high quality and that he had already sold a total of two kilograms of cocaine without any complaint.

185.   About twenty minutes later, at 3:51 p.m., MCGHEE used Target Telephone 22 to call ECHEVARRIA on telephone number (857) 308-8099.   ECHEVARRIA said, "(u/i) half hour, what are you gonna be?"   MCGHEE replied, "I'mma be in the square."   ECHEVARRIA said, "Alright, bet. It's solid, right?"   MCGHEE replied, "Yeah."   ECHEVARRIA repeated, "Alright, bet."   Based on the call and my work on this case, I believe that ECHEVARRIA and MCGHEE decided to meet in Codman Square ("the square"), which is near MCGHEE's residence, and that ECHEVARRIA asked MCGHEE if the 125 grams ("four way") and 62 grams ("Doob") were of good quality ("it's solid, right?").

186.   A minute after their prior call, MCGHEE (on Target Telephone 22) and ECHEVARRIA (on (857) 308-8099) spoke again.   MCGHEE asked, "What do you mean solid? Do you want it all cooked?" ECHEVARRIA replied, "No, nah, nah, nah, undone."   MCGHEE responded, "Oh!   Yeah, alright.   Yeah, I got you."   I believe that MCGHEE was calling ECHEVARRIA back to confirm what he meant by "solid" in their prior call.   MCGHEE also wanted to confirm whether ECHEVARRIA wanted cocaine ("undone") or cocaine base ("cooked"), to which ECHEVARRIA responded he wanted it "undone."   Minutes later, at 3:53 p.m., MCGHEE and ECHEVARRIA spoke again on their same phones.   ECHEVARRIA said, "They're separate two, you heard?"   MCGHEE replied, "Yup."   The call ended.   I believe that ECHEVARRIA called MCGHEE back to tell him that he wanted the 125 grams and the 62 grams in two separate bags ("They're separate two, you heard?").

187.    About an hour later, at 4:39 p.m., MCGHEE and ECHEVARRIA again spoke over Target Telephone 22 and (857) 308-8099, respectively.  ECHEVARRIA said, "I'm coming around the corner, where are you at now?  I'm by Ashmont."  MCGHEE replied, "So, meet me, meet me by the back lot around my way."  ECHEVARRIA asked, "Same spot?"  MCGHEE replied, "Yeah, no, pull up to the yellow, I'll meet you on that street."  I believe that MCGHEE called ECHEVARRIA to confirm their meet location.  Initially, MCGHEE instructed ECHEVARRIA to go to the "back lot," which I know from other covered meets with MCGHEE was in the area of Euclid Street and Withington Street.  MCGHEE then changed the meet location to the "yellow," which I believe from work on this case to be code for a yellow house located at 26 Mallard Street in Boston, Massachusetts.  In particular, I know that HART has met drug customers at that address.  Given that MCGHEE and ECHEVARRIA both know HART and were coordinating a meet on Mallard Street, I believe that "yellow" was code for that location.

188.    About fifteen minutes after that call, at 4:53 p.m., surveillance saw MCGHEE on Mallard Street in Boston, Massachusetts, walking away from a blue Nissan Rogue with Massachusetts registration 1NKA17 (the "blue Nissan Rogue").  Surveillance reported that a black or Hispanic male with a beard was driving the blue Nissan Rogue.  Surveillance followed the blue Nissan Rogue.  At about 5:06 p.m., investigators placed a call to (857) 308-8099 (ECHEVARRIA's identified number) while the blue Nissan Rogue and its driver were under surveillance.  As the call was being placed, surveillance saw the driver remove a telephone from a phone holder on the car's windshield.  At the same time, the officers making the call heard a male voice, which they recognized as ECHEVARRIA's from prior intercepted calls, answer the phone.  Surveillance took photos of the driver and subsequently compared those photos to ECHEVARRIA's RMV photograph.  Investigators confirmed the blue Nissan Rogue driver was

ECHEVARRIA and that the blue Nissan Rogue was registered to EAN Holdings, Inc. and rented by ECHEVARRIA.  Based on the intercepted calls and the sequence of events, I believe that MCGHEE met with ECHEVARRIA to deliver the drugs.

### 3. ECHEVARRIA Complains about MCGHEE's Cocaine, and MCGHEE Gives a "Cooking Class"

189.   On April 7, 2020, at 3:13 p.m., ECHEVARRIA (on telephone number (857) 308-8099) called MCGHEE on Target Telephone 22.  Based on the call, as well as my work on this case, I believe that ECHEVARRIA called MCGHEE to complain about the drugs he had purchased form him on April 4, 2020.

190.   ECHEVARRIA complained, "Hey yo, that shit was horrible.  You heard buddy?" MCGHEE replied, "You said it was horrible?" ECHEVARRIA responded, "Yeah my nigga.  That shit... it performs in a part, you know what I'm saying.  I dropped it full way, but I dropped... [u/i], both times they jumped and I oiled that shit all the way down, and it wasn't trying to get all the way cloud.  It still clouded up, no matter how long I kept it in there.  It jumped when I pulled it out, even when I kept in it forever, that shit still came back with like two extra... you know what I'm saying?"  MCGHEE said, "That's because it's pasty. You see how…."  ECHEVARRIA interjected, "You said what?  Yeah it's mad pasty, it's mad pasty bro."  Based on this portion of the call, I believe that ECHEVARRIA explained to MCGHEE that he had tried to "cook" or convert the purchased cocaine into cocaine base, but he was not getting good results ("it still clouded up, no matter how long I kept it in there").  They continued discussing the cocaine's quality ("it's mad pasty, it's mad pasty, bro").

191.   MCGHEE then began to explain his cooking process.  MCGHEE stated, "You see how when you look at it.  When you look at it itself, it's white and then you see the yellow?" ECHEVARRIA said, "Yup."  MCGHEE explained, "That's why in the pure fire form, this is how

I had to figure it out, 'cause I had to ask a motherfucker.  Because when they… it's goofer, and they got to purify it now.  They says that, chip the shit, the shit that didn't get purified….'' ECHEVARRIA said, "Yeah, that's when... while I oil it all the way, it just don't got no kick, no matter what you do to it... It just don't got no kick; I oil that shit all the way down, it don't got no kick to it, you know what I'm saying like.  I did full way, even my people I gave it to like the dooks, they um... even when they redo it, you know what I am saying?  Even when they do it over, it's like 'cause they... at first, they could [u/i], he just text me like 'Yo, I would never do that.' You know how I do my checks on them all the time, I'm like 'Yeah, I'm wrong'... trynna redo and redo it and it's like, 'Well, it's not you, it's the work,,' you know what I'm saying?  I still got a Doobie of that shit, I gotta got that shit off... like, I'll take 21 for that shit, you know what I'm saying?  I paid 55 for that shit, and got a play for that shit, I need to get that shit off, I didn't drop, you know what I'm saying?  I still got a Blocky uhm... a Doobie, you heard?"  MCGHEE responded, "Alright, you uhmm…"  ECHEVARRIA replied, "We gotta get better at… I can't do nothing with it.  You know what I'm saying, my people..."  MCGHEE interjected, "Yo bro listen…"  ECHEVARRIA replied, "Talk to me."  MCGHEE said, "Like I told you right."  ECHEVARRIA replied, "Yup."  MCGHEE responded, "Because I went back and spun for one dude, right?  I ran through… no bullshit… I ran through like two blocks of that shit right?"  ECHEVARRIA said, "Yo it performs bro, it performs bro."  MCGHEE responded, "Yo, but listen…"  ECHEVARRIA replied, "Talk to me…"  MCGHEE continued, "One dude told me that, right?"  ECHEVARRIA said, "Yup."  MCGHEE stated, "But when I cook that shit, this how I do it."  ECHEVARRIA then received a call on another phone, and MCGHEE told him he would call him back.  The call ended.

192.   Based on my training and experience, I believe that ECHEVARRIA was telling MCGHEE that the product he had provided to ECHEVARRIA for conversion to cocaine base was

not good quality ("It's the work.  You know what I'm saying?").  ECHEVARRIA also told MCGHEE that he had people who agreed that the product was not good even when they tried to re-cook it ("Even my people I gave it to like dooks, they um… even when they redo it, you know what I'm saying.")  MCGHEE started to tell ECHEVARRIA how to fix it, but then had to call him back.

193.    Minutes later, ECHEVARRIA ((857) 308-8099) called MCGHEE (Target Telephone 22) back.  They continued to discuss MCGHEE's cooking process.  ECHEVARRIA asked, "How was you doing it."  MCGHEE explained his cooking process stating, "I was doing it, a little water, right?"  ECHEVARRIA replied, "Yup."  MCGHEE further explained, "Like… let the cooked shit, right?"  ECHEVARRIA said, "Yup." MCGHEE continued, "With the cooked shit, in there right?  No water, no nothing…"  ECHEVERRIA again said, "Yup."  MCGHEE said, "Let that shit start to oil back down, right?"  ECHEVARRIA replied, "Yup."  MCGHEE stated, "As it's oiling, turn it….You see it's start clumping back up, right?"  ECHEVARRIA replied, "Yup."  MCGHEE said, "Than you know when it's about to go down to the goo-goo, when you can spit it and you see it about…all the shit is about to come back together."  ECHEVARRIA agreed, "Yup."  MCGHEE stated, "And you lock it right there."  ECHEVARRIA replied, "Yup."  MCGHEE stated, "That's why I was spinning it…And then I… my man, he there… he told me the same thing, he told me 'To, they saying, they saying that.'  I went right there, in front of him."  ECHEVARRIA replied, "Yup."

194.    MCGHEE continued explaining, "And he had it in the pot still, he had all rocky. I was like, 'Yo bro, that shit already, it turned back to crack you can't do nothing.  You gotta take all the water out of it."  ECHEVARRIA said, "Yup." MCGHEE added, "Then let it go to the oil like that, and don't add no water.  As soon as it starts to oil and going back up…"  ECHEVARRIA

interjected, "Rock it."  MCGHEE said, "Then you gotta go, then you put the cold water underneath it, let it hit it…put a little cold water on top and it's gonna lock them, right back up quick." ECHEVARRIA replied, "That's just redo it, just re-cooking it… just re-cook it and trynna oil it down again."  MCGHEE said, "Yeah, it's undone."  ECHEVARRIA stated, "I'mma try that with the 30 I got left, with the 30 I got left done.  This shit you got from bro, it's undone?"  MCGHEE replied, "Yeah, it's undone."  ECHEVARRIA replied, "Alright bet. Alright… I'm waiting on something right now, so… what you gonna do something at like 7:00ish, 6:00-7:00ish?" MCGHEE replied, "Bro, I'mma got you right situated.  I'mma make sure you straight." ECHEVARRIA replied, "Alright, alright, my nigga… appreciate you."

195.    I believe that MCGHEE explained to ECHEVARRIA how to convert the cocaine that ECHEVARRIA had purchased from MCGHEE on April 4, 2020, into cocaine base.  In particular, MCGHEE and ECHEVARRIA used words and phrases like, "rocky," "turned back to crack," "rock it," and "re-cooking it," which support my belief that they were discussing the conversion process of cocaine into cocaine base.  At the end of the call, ECHEVARRIA noted that he would try MCGHEE's advice with the 30 grams of cocaine he still had left ("I'mma try that with the 30 I got left, with the 30 I got left done").  MCGHEE then offered to help ECHEVARRIA cook the remaining cocaine ("I'mma got you right situated.  I'mma make sure you straight").  I also believe that ECHEVARRIA's reference to, "this shit you got from Bro, it's undone?" was ECHEVARRIA asking if MCGHEE's powdered cocaine ("undone") was from HART ("Bro"). ECHEVARRIA expressed his appreciation and noted before the call ended that he was "waiting on something right now," which I believe was code for a drug deal.

196.    Later that evening, at 8:16 p.m., MCGHEE received a call on Target Telephone 22 from ECHEVARRIA on telephone number (857) 308-8099.  MCGHEE asked, "Where you at?"

ECHEVARRIA replied, "Right now, I'm on Geneva.  I'm driving now.  Are you seeing Brody, too?"  ECHEVARRIA answered, "I already saw him."  MCGHEE said, "Damn nigga.  Alrightm 'cause I'm trying to, alright.  Let me call you one second, right back."  ECHEVARRIA replied, "Alright, okay."  Based on the call and subsequent toll records, I believe that ECHEVARRIA told MCGHEE that he had met with HART ("Brody") that evening.  I also have reviewed tolls records for ECHEVARRIA's telephone number during this period, which show that ECHEVARRIA spoke with HART that same day between 3:08 p.m. and 3:18 p.m. – the timing when ECHEVARRIA had to hop off his call with MCGHEE to answer another call.

## L.  ANTONE JEREMIAH and WINSTON MCGHEE

197.    Antone JEREMIAH is a cocaine customer who buys cocaine in bulk from Winston MCGHEE.

### 1.  JEREMIAH Orders Cocaine from MCGHEE

198.    On March 31, 2020, at 12:36 p.m., Antone JEREMIAH contacted MCGHEE on Target Telephone 22 using cellular telephone number (857) 346-6799.[16]  JEREMIAH asked MCGHEE, "You got the same thing?"  MCGHEE said, "Nah, ain't no more salt" and "only got a half of hard left."  JEREMIAH asked MCGHEE, "A half of hard?  How much you want for that?"  MCGHEE replied that he needed "at least fucking 'five-five' for that."  JEREMIAH ended the conversation saying, "Alright, I'mma get it."

199.    Based on my training and experience, I know "hard" is cocaine base, commonly referred to as "crack."  When MCGHEE told JEREMIAH that there was "no more salt," and that

---

[16] Surveillance has identified JEREMIAH arriving at meet locations discussed between Target Telephone 22 and telephone number (857) 346-6799.  During a meetup on April 1, 2020, as set forth *infra*, surveillance identified JEREMIAH at the meeting and observed him speaking on a phone at the same time as investigators intercepted calls over (857) 346-6799 with MCGHEE on Target Telephone 22.

he only had "half of hard left," I believe that MCGHEE informed JEREMIAH that he no longer had powdered cocaine for sale, only crack cocaine.  Additionally, MCGHEE told JEREMIAH that he needed "five-five for it."  Based on my work on this investigation, I know that MCGHEE was using code to quote the price of a half-ounce of crack cocaine, specifically, $550, which I know to be consistent with the prevalent wholesale price for a half ounce, or 14 grams, of crack cocaine in the Boston area.

### 2.  **JEREMIAH Does a Drug Deal with MCGHEE**

200.    On April 1, 2020, at 1:47 p.m., MCGHEE received a call on Target Telephone 22 from JEREMIAH on telephone number (857) 346-6799.  JEREMIAH said, "Let me get one of them bro."  MCGHEE asked, "Get what?"  JEREMIAH responded, "A zip."  MCGHEE replied, "It's gone."  JEREMIAH said, "Huh?"  MCGHEE explained, "I only got, I only got like a half cooked." JEREMIAH replied, "Nah, that's alright."  MCGHEE said, "I'm hit you, if you comes across it keep me in mind."  Based on the call and my work on this case, I believe that JEREMIAH called MCGHEE for one ounce ("a zip") of cocaine.  MCGHEE, however, told JEREMIAH that he only had a half ounce of cocaine base left ("got like a half cooked").  JEREMIAH did not want to purchase the half ounce of cocaine base, and MCGHEE told JEREMIAH to let him know if he found cocaine ("if you comes across it keep me in mind.").

201.    Several hours later, at 4:18 p.m., MCGHEE on Target Telephone 22 received a call from JEREMIAH on telephone number (857) 346-6799.  JEREMIAH asked, "Yo.  You still got some hard left?"  MCGHEE replied, "Nah, I got what you wanted now, but you gotta… I running somewhere right now."  JEREMIAH replied, "Alright, yup."  MCGHEE asked, "What you wanted a zipper?"  JEREMIAH said, "Yeah, yup.  Hold on, I'mma hit you right back, probably that and a half."  MCGHEE responded, "Huh?"  JEREMIAH repeated, "Probably that and a half.  Let me

count real quick."  MCGHEE said, "Alright.  Let me know I'll probably have Bags, you know

Money Bags, right?"  JEREMIAH responded, "Yeah, yup, yup."  MCGHEE replied, "Yeah, I'll

probably have him just drop it, just give it to you for me."  JEREMIAH responded, "Alright, yup."

MCGHEE said, "Let me know."

202.    Based on this call and my work on this case, I believe that JEREMIAH called

MCGHEE to order cocaine base ("You still got some hard left?").  MCGHEE indicated he only

had cocaine, which JEREMIAH had requested on their prior call that day ("Nah! I got what you

wanted now…").  MCGHEE then asked if JEREMIAH still wanted one ounce of cocaine ("What

you wanted, a zipper?").  JEREMIAH responded that he might want one ounce and a half ounce of

cocaine ("probably that and a half").  MCGHEE told JEREMIAH that he likely would have Eric

DAVIS ("Bags," "Money Bags") drop off drugs directly to JEREMIAH on MCGHEE's behalf

("I'll probably have him just drop it, just give it to you for me").

203.    Minutes later, at 4:23 p.m., MCGHEE and JEREMIAH spoke again on the same

respective phones.  MCGHEE asked, "What you want?"  JEREMIAH replied, "[t]he zip."  I know

that "zip" is drug code for one ounce of cocaine.  One minute later, at 4:24 p.m., MCGHEE and

JEREMIAH spoke again on their same phones.  MCGHEE told JEREMIAH, "Yo, go over to

Harvard Street, call me when you get there, yeah, my little homies gonna run it out.  He ain't even

there."  JEREMIAH agreed.  Based on the call and my work on this case, I believe that MCGHEE

told JEREMIAH to go to Harvard Street in Boston to meet with two males ("little homies") who

would provide him with cocaine.  I believe that MCGHEE's statement, "He ain't even there," was

a  reference  to  DAVIS  ("Bags,"  "Money  Bags")  from  their  prior  call.   I  also  believe  that

MCGHEE's reference to "Harvard Street" was to 214 Harvard Street, an identified stash location

for  MCGHEE  where  he  stores  bulk  quantities  of  cocaine  for  re-sale.   Based  on  this  call,

surveillance units responded to the area of 214 Harvard Street to try and cover a possible meet between JEREMIAH and the "little homies."

204.     At 4:51 p.m. that same day (April 1, 2020), MCGHEE received a call on Target Telephone 22 from JEREMIAH on telephone number (857) 346-6799.  JEREMIAH told MCGHEE, "Yo! I'm outside."  MCGHEE replied, "Alright, hold on."  JEREMIAH said, "Tell 'em to walk up the street a little, I'm in a Honda, blue Honda."  MCGHEE replied, "On what, on what street?  Abbott?"  JEREMIAH said, "Abbott, yeah, yup."  I believe that JEREMIAH confirmed his location to MCGHEE on this call, confirming that he was on Abbott Street – which runs perpendicular to Harvard Street – in a blue Honda.

205.     Minutes later, at about 4:54 p.m., surveillance saw a 2001 blue Honda with Massachusetts registration 229T80 (I am aware that the registration described the car as brown). Records for the car showed it was registered to JEREMIAH's sister.  The blue Honda parked on Abbott Street.  Two or three males were huddled around the car.  At about 4:56 p.m., surveillance saw two unidentified young black males, who had been standing around the blue Honda, walk away from the car and enter 214 Harvard Street.  Surveillance confirmed JEREMIAH was the driver of the blue Honda.

206.     At the same time as surveillance observed the above interaction between JEREMIAH and two unidentified black males, investigators intercepted a call between MCGHEE and JEREMIAH.  Specifically, at 4:53 p.m., MCGHEE (on Target Telephone 22) called JEREMIAH on telephone number (857) 346-6799 and said, "Yeah, my young boys should be coming out now," and "Let me know when you see them."  JEREMIAH asked, "It's two of them?" MCGHEE responded, "It might be.  Is he tall, light skin?"  JEREMIAH said, "I don't know… oh! I don't think.  One got, got a fro?"  MCGHEE responded, "Yeah, I think so."  JEREMIAH asked,

"You said that's him?"  MCGHEE said, "They're young."  JEREMIAH asked, "Young, young?"
MCGHEE answered, "They're like, they're not young young."  JEREMIAH later remarked to
someone off the call, "Hold on, damn.  Both of ya'll can't get in."  MCGHEE said, "Alright, he's
there?"  JEREMIAH replied, "Alright, yeah, yeah."  Based on the call, prior intercepts, and
surveillance, I believe that MCGHEE directed an unknown male to bring cocaine to JEREMIAH
who was parked near 214 Harvard Street.  That male met with JEREMIAH at his car and then
returned to 214 Harvard Street.

207.    Later that evening, at 7:14 p.m., MCGHEE (on Target Telephone 22) called
JEREMIAH on telephone number (857) 346-6799.  MCGHEE asked, "What that shit jump for
you?"  JEREMIAH said, "Um nothing, I was gonna, I was gonna wait to see umm, let, Andy, said
it's… my people said it ummm, wasn't right, I was gonna wait to, let someone else taste it before
I hit you back."  MCGHEE responded, "What? My people said they loved that shit."  JEREMIAH
replied, "Huh?"  MCGHEE repeated, "My people just told me they loved it and that shit jumped
good for them, that's why I was asking what it jumped for you?"  JEREMIAH said, "Yeah, nah,
that shit didn't jump nothing for me, it was. It's kind of brown, right?"  MCGHEE replied, "My
shit was like fucking…"  JEREMIAH interjected, "Like beige, tan?"  MCGHEE replied, "Yeah."
JEREMIAH said, "I'll hit you up and let you know. Yup."

208.    Based on this and previously-intercepted calls, I believe that MCGHEE called
JEREMIAH to see how much cocaine base JEREMIAH had been able to make when he cooked
the previously purchased cocaine ("What that shit jump for you?").  JEREMIAH told MCGHEE
that he did not get any more cocaine base when converting it ("that shit didn't jump nothing for
me").  MCGHEE was surprised because his other customers had expressed approval for his
cocaine and indicated it had made more cocaine base for them ("My people just told me they loved

it and that shit jumped good for them.").  I know based on training, experience, and conversations with other law enforcement officers that the process of converting or cooking cocaine into cocaine base involves adding baking soda, which produces a greater amount of cocaine base than there previously had been of cocaine (i.e., "jumps"), thereby increasing profit margins.  JEREMIAH told MCGHEE that he would call him back after others had sampled the cocaine base to let MCGHEE know how it was ("I was gonna wait to, let someone else taste it before I hit you back" and "I'll hit you up and let you know").  When JEREMIAH asked MCGHEE if it was "brown," I believe that he was referring to the color of the cocaine base after cooking, to see if the cocaine base that JEREMIAH produced was consistent in color with the cocaine base that MCGHEE produced.

### 3. **JEREMIAH Orders Cocaine from MCGHEE, Which Results in a Payment Dispute**

209.    On April 5, 2020, at 9:27 a.m., MCGHEE received a call on Target Telephone 22 from JEREMIAH on telephone number (857) 346-6799.  JEREMIAH asked, "Umm, do you, do you wanna pull up to his crib?"  MCGHEE replied, "Oh over there?"  JEREMIAH responded, "Yeah."  MCGHEE said, "Aight, I'll be there in like five minutes."  JEREMIAH replied, "Aight I'm here… ah yo, ah yo. I can get it for forty-two fifty 'cause I forgot I only be charging this nigga forty-five, so we can split the five in half?"  MCGHEE said, "Nah I can't do that. I need forty-three bro." JEREMIAH repeated, "Forty-three. Aight."  MCGHEE added, "That shit will fuck me up." JEREMIAH responded, "Aight, aight bro. Yup."  MCGHEE replied, "Yeah cause niggas it's thirteen in the streets right now."

210.    Based on my experience and work on this case, I believe that JEREMIAH asked MCGHEE if he could sell him cocaine for $4,250 ("forty-two fifty") and MCGHEE told him that he had to do it for $4,300 ("forty-three").  Based on the pricing discussed, I believe that MCGHEE

was going to supply JEREMIAH with 125 grams of cocaine that JEREMIAH was then going to

provide to a third party for $4,500 ("I only be charging this nigga forty-five").  From training and

experience, I know that $4,500 is the approximate price for 125 grams of cocaine.  Further, when

MCGHEE stated that "it's thirteen in the streets right now," I believe he was referring to one ounce

of cocaine costing $1,300 at the street level, which was an additional reason why he could not sell

JEREMIAH the cocaine for less than $4,300.

211.    Minutes later, at about 9:32 a.m., surveillance units located in the area of 430

Washington Street in Dorchester, Massachusetts (as MCGHEE's Target Telephone was pinging

there), saw MCGHEE exit 430 Washington Street and enter his blue Infiniti.  Surveillance

followed MCGHEE until he reached Shafter Street in Dorchester, Massachusetts at 9:37 a.m.  As

surveillance followed MCGHEE, investigators intercepted a call between MCGHEE and

JEREMIAH at about 9:36 a.m. on their previously identified phones.  MCGHEE asked, "It's the

street before Ripley Road, right?"  JEREMIAH responded, "Yeah it's the right."  MCGHEE said,

"Yeah before Ripley Road, aight."  JEREMIAH replied, "Yup."  MCGHEE said, "Yeah, I'm

outside."  Surveillance then observed two black males emerge from 21 Shafter Road's Shafter

Street driveway and approach MCGHEE's blue Infiniti SUV.  One black male matching

JEREMIAH's physical description entered the front seat of MCGHEE's car.  The other male

entered the rear seat at about 9:38 a.m.  One minute later, both males exited the car, walked back

down the driveway of 21 Shafter Street, and MCGHEE left the area.

212.    On April 5, 2020, at 10:23 a.m., MCGHEE on Target Telephone 22 called

JEREMIAH on telephone number (857) 346-6799.  MCGHEE said "Bro, that shit is four fifty off,

one of them fucking stacks." JEREMIAH replied, "You said what?" MCGHEE repeated, "One of

them stacks is only five fifty."  JEREMIAH replied, "Nah.  Bro you said one of them stacks is

only five fifty?"  MCGHEE said, "Yeah."  JEREMIAH commented to someone off the phone, "He said one of them stacks is only five fifty… yeah."  JEREMIAH then returned to the call and told MCGHEE, "Hold on, I'mma hit you right back bro."  Based on this call, I believe that MCGHEE had counted the money that JEREMIAH provided him an hour earlier, which MCGHEE said was $450 short ("four fifty off").  I believe JEREMIAH – while on the call with MCGHEE – spoke to the person who purchased cocaine from JEREMIAH.  JEREMIAH told MCGHEE he would call him back.

213.    About an hour later, at 11:13 a.m., MCGHEE (on Target Telephone 22) called JEREMIAH on telephone number (857) 346-6799.  MCGHEE said, "I said that shit was, fifty, you didn't hear me the first time?"  JEREMIAH replied, "You said two fifty."  MCGHEE repeated, "No, four fifty.  One of them.  There was a couple hundred stacks on the thing and the rest of that shit was like ones."  JEREMIAH replied, "Aight let me hit him right back.  How much was it all together?"  MCGHEE repeated, "I said four fifty. It was..."  JEREMIAH interrupted, "You missing?"  MCGHEE repeated, "Four fifty short all together bro.  I thought you already called him."  JEREMIAH said, "Aight.  Nah, I'm about to hit him right now."  MCGHEE stated, "Damn, I called you like half, forty-five minutes ago."  JEREMIAH responded, "Nah, yeah I was with him cooking it.  He said, he said, he said it shouldn't of been.  So you got?  What you got?  Thirty-nine something?"  MCGHEE repeated, "Yeah bro it's four fifty short."  I believe that this call was a continuation of MCGHEE and JEREMIAH's prior call where MCGHEE had informed JEREMIAH that his customer had not paid MCGHEE the correct amount for the purchased cocaine.  I also believe that JEREMIAH told MCGHEE he was then converting the cocaine to cocaine base with the unknown third party ("Nah, yeah I was with him cooking it").

214.     Three minutes later, JEREMIAH called MCGHEE back.  JEREMIAH said, "Yo he's saying it's all there bro.  I counted it."  MCGHEE replied, "Bro."  JEREMIAH repeated, "I counted it."  MCGHEE remarked, "Now you counted it?"  JEREMIAH replied, "Nah I should, I counted it in the crib though, before I gave it to you."  MCGHEE said, "Yo bro. Tell… it's all set, I don't got no more work for niggas bro. I'm not even going to take this offensively. I'm just going to cut niggas off."  JEREMIAH replied, "Nah."  MCGHEE then hung up.  Based on this call, I believe that JEREMIAH told MCGHEE that his customer had fully paid for the previously purchased cocaine while adding that he (JEREMIAH) also had counted the money before paying MCGHEE ("he's saying it's all there bro. I counted it").  MCGHEE expressed disbelief ("Now you counted it?").  As JEREMIAH continued to back up his prior story, MCGHEE responded that he was not going to sell them cocaine anymore ("I don't got no more work for niggas bro.  I'm not even going to take this offensively.  I'm just going to cut niggas off.").

## M. **MICHAEL TOUSSAINT and HASSAN MONROE**

215.     Investigators believe that TOUSSAINT is a drug customer and distributor for H. MONROE, an identified cocaine supplier for K. DRAYTON.   During this investigation, H. MONROE has provided trafficking amounts of cocaine to TOUSSAINT.

### 1. **TOUSSAINT Does a Drug Deal with H. MONROE**

216.     On September 29, 2019, at 4:35 p.m., TOUSSAINT (on phone number (857) 312-2610) called H. MONROE on Target Telephone 14.  TOUSSAINT said, "I'll be back really quick. So by the time you do whatever you got to do, I'll be back."  H. MONROE replied, "Whatcha trying to do?  A little twenty?"  TOUSSAINT responded, "Hell yeah.  That thing been working. It put me (u/i)."  H. MONROE said, "I'll meet you at Ashmont because I ain't trying to go over to the Pan and all that." TOUSSAINT replied, "Alright then.  I'll go to Randolph really quick."  H.

MONROE said, "Go to Randolph and when you come back, I'll meet you at Ashmont.  I don't feel like driving to the Pan and shit."  Based on the call and my work on this case, I believe that TOUSSAINT ordered twenty grams of cocaine ("a little twenty?" "Hell yeah, that thing been working") from H. MONROE.  H. MONROE and TOUSSIANT ultimately agreed to meet near the Ashmont area of Boston, Massachusetts because H. MONROE did not want to drive to Mattapan ("I don't feel like driving to the Pan and shit").

217.     About an hour later, at 5:38 p.m., H. MONROE on Target Telephone 14 called TOUSSAINT on telephone number (857) 312-2610.  H. MONROE asked, "Are you going to meet me at Ashmont?  I'm coming right now."  TOUSSAINT replied, "Yeah, I just got to stop at Mattapan.  Then I'm coming over there, the square."  H. MONROE responded, "Alright. I'm not going to be at the square.  I'm going to be at Ashmont."  TOUSSAINT said, "I got to stop at Mattapan Square really quick."  H. MONROE responded, "Alright cool then. Call me after you leave Mattapan Square."  TOUSSAINT said, "I'll be there in 10 minutes. Alright?"  I believe that H. MONROE and TOUSSAINT discussed the timing and location of their meeting for purposes of doing a drug deal in Ashmont.

218.     That same date, surveillance responded to the Ashmont area.  At about 6:13 p.m., surveillance saw H. MONROE parked in his black Audi on Fuller Street by Clearmont Street.  Moments later, surveillance saw a brown 2005 Nissan Altima with Massachusetts registration 7CJ275, registered to TOUSSAINT, (the "brown Nissan Altima") park behind H. MONROE.  A male – whom investigators later confirmed to be TOUSSAINT based on his RMV photograph – exited the brown Nissan Altima and entered the passenger side of H. MONROE's black Audi for about one minute before exiting it and returning to his car.  TOUSSAINT then left the area in the brown Nissan Altima.  H. MONROE stayed parked on Fuller Street.  Based on the intercepted

calls, surveillance, and the brief timing of their meeting, I believe that TOUSSAINT and H. MONROE met to do a drug deal.

### 2. **TOUSSAINT Orders a Doobie from H. MONROE**

219. On February 7, 2020, at 11:51 a.m., H. MONROE (using Target Telephone 14) contacted TOUSSAINT at cellular telephone number (857) 312-2610. H. MONROE asked TOUSSAINT what he wanted, as H. MONROE was about to go to the barber shop on Morton Street. TOUSSAINT said that he was currently "in Cape Cod" and would not be leaving for several more minutes. H. MONROE and TOUSSAINT then agreed to meet within the next hour or so. Before ending the conversation, H. MONROE asked TOUSSAINT, "So, what are you trying to do again…the Doobie again?" TOUSSAINT replied, "the Doobie." As noted previously herein, I know that, "Dookie," refers to 62 grams of cocaine – a trafficking (not personal use) quantity. Before ending the conversation, H. MONROE told TOUSSAINT, "I'm just going to keep them on me." TOUSSAINT and H. MONROE then agreed to meet on "Morton."

220. At 2:01 p.m., TOUSSAINT, using cellular telephone number (857) 312-2610, contacted H. MONROE on Target Telephone 14. TOUSSAINT told H. MONROE, "I'm going straight to my crib. My GPS says 2:45 at my crib." H. MONROE replied, "Aight, cool. Just meet uhm… I'mma meet you over there." Based on this information, investigators began to conduct surveillance at TOUSSAINT's residence, located at 185 Ruskindale Road, Hyde Park, Massachusetts. During their surveillance, investigators saw a gray Hyundai Sonata, with Massachusetts registration 1AHV89, registered to TOUSSAINT of that same address ("the gray Hyundai"), park in the driveway.

221. At 2:45 p.m., TOUSSAINT (using cellular telephone number (857) 312-2610) called H. MONROE on Target Telephone 14. H. MONROE asked TOUSSAINT, "Yo. You

there?"  TOUSSAINT replied, "yeah."  H. MONROE then informed TOUSSAINT, "Aight.  I'm about to pull up."  A short time later, surveillance saw H. MONROE arrive in the black Audi and park in front of 180 Ruskindale Road, Hyde Park, Massachusetts.  Upon observing H. MONROE's arrival, investigators saw an individual, whom they recognized as TOUSSAINT, exit the gray Hyundai and enter the passenger side of H. MONROE's motor vehicle.  Surveillance units recognized TOUISSAINT from their involvement in the investigation and from his RMV license photograph.  After approximately ten to fifteen seconds, TOUSSAINT exited the passenger side of H. MONROE's vehicle, had a brief conversation through the passenger side window, looked around in all directions, and then walked down the driveway of 185 Ruskindale Road, Hyde Park, Massachusetts.  H. MONROE then left the area, and investigators discontinued surveillance.  I believe that this exchange was consistent with a drug transaction.

222.    On February 13, 2020 at 5:36 p.m., H. MONROE called TOUSSAINT on telephone number (857) 312-2610 from Target Telephone 14.  H. MONROE asked, "What you trying to do?" TOUSSAINT replied, "Yeah umm, yeah, I'm trying to grab that Doobie, but I'm about to go get my hair twisted real quick… fucking umm…"  H. MONROE responded, "So you just wanna you do that shit tonight like 11:00, 12:00 whenever this game is over?"  TOUSSAINT replied, "What time, what time, you're going to the what's its name?"  H. MONROE responded, "At 8:00." TOUSSAINT replied, "Shit, fucking… oh yeah, fucking I'm saying do you want me to put it in the car?"  H. MONROE replied, "Oh yes, just put it in the car and I'll bring it over there… now though right?"  TOUSSAINT replied, "Yeah, I'mma about to go over there right now."  Based on this conversation, I believe that TOUSSAINT was purchasing 62 grams of cocaine from H. MONROE ("I'm trying to grab that Doobie").

223.    On February 19, 2020, at 4:19 p.m., TOUSSAINT (using cellular telephone number (857) 312-2610) contacted H. MONROE on Target Telephone 14.  During the conversation, H. MONROE told TOUSSAINT, "I must have blocked you by accident…"  TOUSSAINT stated, "I've been trying to get to work and you texted all this funny shit, nigga.  I've been trying to get to work for three days."  Based on their training and experience in conducting narcotics investigations, investigators know that the term, "work," means drug dealing.  When TOUSSAINT told H. MONROE that he had been "trying to get to work," I believe that TOUSSAINT was referring to his efforts to obtain narcotics so that he could redistribute them for profit.  H. MONROE told TOUSSAINT, "Yeah bro, I already gave you the backup number.  You shoulda hit Pete and told Pete to call me like your goofy ass always do."  TOUSSAINT replied, "You didn't give me no back up number."  Based on this portion of the conversation, I believe that H. MONROE was referring to another cellular telephone of his.  TOUSSAINT then said, "Bring me the 'zap,' you fucking my shit up nigga."  Based on my training, experience, and work on this case, I know that "zap" refers to one ounce of cocaine, which is a trafficking quantity.  H. MONROE then asked TOUSSAINT where he was located.  TOUSSAINT responded, "You know where I'm at."

224.    Based on this call, investigators began conducting surveillance in the area of TOUSSAINT'S residence at 185 Ruskindale Road, Hyde Park, Massachusetts.  A short time later, surveillance units saw H. MONROE'S black Audi A8 arrive in the area of 185 Ruskindale Road. During that same time, investigators also observed TOUSSAINT walk from the rear of 185 Ruskindale Road's driveway and onto the front porch.  TOUSSAINT then entered the front door of 185 Ruskindale and reappeared shortly thereafter.  Upon doing so, TOUSSAINT entered the front seat of H. MONROE's black Audi.  After a brief meeting, TOUSSAINT exited H.

MONROE's vehicle and walked back down the driveway of 185 Ruskindale Road, Hyde Park, Massachusetts. H. MONROE left the area.

225. On February 21, 2020, at 3:08 p.m., H. MONROE (on Target Telephone 14) called TOUSSAINT on telephone number (857) 312-2610. H. MONROE asked, "What you was trying to do the same thing? Or Doobie?" TOUSSAINT replied, "Doob." H. MONROE told TOUSSAINT, "Aight, I'm coming through right now. I am leaving in four minutes." Based on this call, I believe that TOUSSAINT ordered another 62 grams of cocaine ("Doobie") from H. MONROE.

226. Surveillance units responded to 185 Ruskindale Road, TOUSSAINT's residence, based on the call. Less than an hour later, at 3:48 p.m., H. MONROE told TOUSSAINT he was in front of his house. Surveillance then saw TOUSSAINT exit 185 Ruskindale Road and enter the passenger side of H. MONROE's black Audi at 3:56 p.m. A minute later, TOUSSAINT exited the vehicle and walked back into 185 Ruskindale Road. Based on my experience and work on this investigation, I believe that TOUSSAINT acquired 62 grams of cocaine from H. MONROE during the meeting.

### N.  **MICHAEL STOKES, KENJI DRAYTON, and DEREK HART**

227.     Investigators believe that Michael STOKES is a drug customer and distributor for K. DRAYTON.  During this investigation, K. DRAYTON has provided trafficking amounts of cocaine to STOKES, which K. DRAYTON (at times) has obtained from HART.

#### 1.  **K. DRAYTON Middles a Drug Deal Between STOKES and HART**

228.     On October 16, 2019, at 3:52 p.m., K. DRAYTON used Target Telephone 8 to call DEREK HART on telephone number (857) 269-4768.[17]  During the conversation, K. DRAYTON said to HART, "somebody needs a Doob," and "I need a thirty-one done up."  I know from my training and experience that the term, "Doob," is drug nomenclature for 62 grams of cocaine, a "thirty-one" means 31 grams, and "done up" means the cocaine base form of cocaine, commonly known as "crack."  HART replied, "ten minutes." Before the call ended, K. DRAYTON advised HART, "The Doob is like ASAP if you could." HART said, "I got you."  The call then ended.  I believe that HART agreed to supply 62 grams of cocaine and 31 grams of cocaine base to K. DRAYTON.

229.     At 3:53 p.m., one minute after the call with HART, K. DRAYTON used Target Telephone 8 to call STOKES on telephone number (857) 261-3811.  K. DRAYTON said to STOKES, "I'm ready whenever you are."   STOKES replied that he would arrive at K.

---

[17] At the time of the October 16, 2019 call, investigators were intercepting HART communicating on Target Telephone 15 ((857) 269-4210) and were familiar with his voice.  Investigators compared the voice on (857) 261-3811 with prior intercepted calls on Target Telephone 15 and confirmed the caller as HART.  Additionally, as investigators have learned throughout this investigation, HART routinely drops his phones about every thirty days, which I know to be conduct consistent with drug-trafficking as a means to evade law enforcement detection.  As of October 16, 2019 – the same date as the above-referenced call – investigators noted that HART stopped using Target Telephone 15.  Accordingly, I believe that (857) 269-4768 was one of HART's new phones that he was transitioning to after having dropped Target Telephone 15.

DRAYTON's location in "five minutes."  K. DRAYTON asked STOKES to "hit me in like thirty minutes cause I'll be back at the crib."  STOKES agreed to do so.  I am aware that the term, "crib," means a residence, in this case, K. DRAYTON's, which is located at 519 Harrison Avenue, Boston, Massachusetts.  Based on my training and experience, I believe that K. DRAYTON ordered a quantity of narcotics from HART for the purpose of redistributing a portion of it to STOKES.  Investigators began conducting surveillance in the area of 519 Harrison Avenue in anticipation of a meeting between K. DRAYTON and STOKES.

230.    At 4:19 p.m. that same day, K. DRAYTON used Target Telephone 8 to contact HART on telephone number (857) 269-4768.  During the conversation, K. DRAYTON and HART agreed to meet by K. DRAYTON's "sister's" residence.  From my experience in this investigation, I know that K. DRAYTON's sister lives at 21 Darlington Street, Boston Massachusetts, which is the area where investigators began conducting surveillance.

231.    At 4:58 p.m. that same day (October 16, 2019), surveillance saw K. DRAYTON arrive at 21 Darlington Street, Boston, Massachusetts.  K. DRAYTON was the passenger in a gray GMC Yukon with Massachusetts registration 8TV378.  A review of registration records for the GMC Yukon showed that it is registered to S.B.  Surveillance identified S.B. as the driver of the gray Yukon based on a review of her driver's license photograph, as well as their familiarity with this case.  After K. DRAYTON arrived in the gray Yukon, he continued communicating on Target Telephone 8 with HART on telephone number (857) 269-4768.   Specifically, at 4:55 p.m., K. DRAYTON (on Target Telephone 8) called HART on telephone number (857) 269-4768.  During the conversation, K. DRAYTON advised HART that he was at the Darlington Street location.

232.    At 5:15 p.m., STOKES used cellular telephone number (857) 261-3811 to contact K. DRAYTON on Target Telephone 8.   STOKES said to K. DRAYTON, "I'm here man."

Simultaneously, agents observed STOKES operating a white colored 2011 X3 BMW with Massachusetts registration 45J950 (the "white BMW") (registered to STOKES at 547 Massachusetts Avenue, Apt. B1,).   STOKES parked the BMW near 21 Darlington Street.   K. DRAYTON responded, "Alright, I'm coming right now."

233.   Surveillance units located at 21 Darlington Street then saw K. DRAYTON exit the gray Yukon, walk over to STOKES's white BMW, and enter the front passenger seat.   At approximately 5:54 p.m., HART arrived in the area of 21 Darlington Street operating the "white Ford F-150."   Surveillance units recognized HART as the driver of the white Ford F-150 from their work on this case and a review of HART's driver's license photograph.   Upon HART's arrival, K. DRAYTON exited the white BMW and entered the front passenger seat of HART's white Ford F-150.   This meet occurred in the area of 21 Darlington Street.   Based on the surveillance, intercepted calls, and my work on this case, I believe that STOKES provided money to K. DRAYTON so that K. DRAYTON could purchase drugs from HART.

234.   After a brief meet, K. DRAYTON exited HART's white Ford F-150 and walked back over to the driver's side of STOKES's white BMW.   Surveillance units then observed K. DRAYTON and STOKES briefly meet at the driver's window in a manner that – based on my training and experience – was consistent with a drug transaction.   Based on the quick nature of the meet, coupled with the intercepted phone calls around the time of the meeting, I believe that K. DRAYTON "middled" a drug transaction between HART and STOKES.   I know that "middled" or "middling" occurs when a third party (here, K. DRAYTON) arranges for the purchase and delivery of drugs between two interested parties (here, HART and STOKES).

235.   After K. DRAYTON and STOKES separated from each other, investigators followed the white BMW until STOKES arrived at his residence of 547 Massachusetts Avenue,

Boston, Massachusetts.  STOKES made no other stops after meeting with K. DRAYTON.  After arriving at 547 Massachusetts Avenue, he immediately went inside.  Investigators further noticed that STOKES used a key to enter the building upon arriving.  Based on my training and experience, I know that it is common for drug traffickers, who pick up bulk quantities of drugs from their suppliers, to go from a supply meeting immediately back to their residence or "stash" location.  Drug traffickers commonly return to their residence or "stash" location quickly so as to avoid having a large quantity of drugs in their vehicles, which presents a risk both in terms of police detection and seizure, and also, exposure to robbery from other dealers.

### 2. <u>STOKES Orders Drugs From K. DRAYTON</u>

236.    On April 4, 2020 at 9:11 p.m., K. DRAYTON called STOKES on telephone number (857) 261-3811 from Target Telephone 20.  K. DRAYTON said, "Yo, I just want to put it in the air, uhm, cause I already had the baby, so after like Tuesday…" STOKES replied, "Congratulations." K. DRAYTON responded, "Yeah man, I appreciate it. After Tuesday, I'mma be on the extra low. So, if you wanna holler at me, just try to holler at me before Tuesday, 'cause I'mma be on the low for like two weeks." STOKES replied, "Alright, I got you." Based on the conversation, I believe that K. DRAYTON told STOKES that he just had had his baby and that he was not going to be selling as much cocaine for two weeks ("After Tuesday, I'mma be on the extra low. So if you wanna holler at me").  From my work on this investigation, I know that K. DRAYTON supplies cocaine to STOKES.  Further, aside from meeting for suspected drug deals, I have not observed K. DRAYTON and STOKES interacting socially during the course of this investigation.  Therefore, I believe that K. DRAYTON was informing STOKES to call him before "Tuesday" (i.e., April 7, 2020) if he wanted to obtain cocaine.

237.    On April 6, 2020, at 8:10 p.m., K. DRAYTON received a call on Target Telephone 20 from STOKES on telephone number (857) 261-3811. STOKES stated, "Can you link with me tonight or early tomorrow in the morning?"  K. DRAYTON replied, "Yeah, I can meet with you tonight."  STOKES responded, "Alright, alright."  K. DRAYTON said, "Just tell me when you're on your way.  I'm with it.  I'm already at the crib."  Based on the conversation and my work on this case, I believe that STOKES called K. DRAYTON to arrange a meetup so that he could purchase cocaine ("can you link with me").  K. DRAYTON agreed to meet with STOKES, and also, confirmed that he had drugs ("Yeah, I can meet with you tonight" and "I'm with it").  Based on the brief, vague, and coded nature of the call, I believe that STOKES contacted K. DRAYTON to order a pre-determined amount of cocaine from K. DRAYTON, who confirmed he had a supply available ("I'm with it").  Based on my training and experience, I know that drug traffickers commonly participate in abbreviated and coded calls so as to avoid law enforcement detection.  K. DRAYTON ultimately advised STOKES to let him know when he was arriving at K. DRAYTON's residence ("Just tell me when you're on your way," and "I'm already at the crib"), which is 519 Harrison Avenue, Boston, Massachusetts.  Investigators began conducting surveillance at 519 Harrison Avenue Boston, Massachusetts.

238.    At 8:37 p.m., investigators saw STOKES arrive in his white BMW. Simultaneously, STOKES used cellular telephone number (857) 261-3811 to contact K. DRAYTON on Target Telephone 20.  During that conversation, STOKES advised K. DRAYTON, "I'm here," and K. DRAYTON replied that he would be "coming down."  Shortly thereafter, K. DRAYTON was observed exiting 519 Harrison Avenue and entering the passenger side of the white BMW.  After approximately one minute, investigators observed K. DRAYTON exit the white BMW, and STOKES drove away.  Surveillance units followed STOKES directly back to his

residence of 547 Massachusetts Avenue, Boston, Massachusetts.  STOKES made no other stops after meeting with K. DRAYTON, and upon arriving at 547 Massachusetts Avenue, he immediately went inside.  As mentioned previously, I know that drug traffickers commonly quickly return to their residence or "stash" location after being supplied with bulk quantities of narcotics so as to avoid exposure either to police detention or to other drug traffickers who may steal their supply.

239.    Based on my training, experience, and the intercepted communications, I believe that K. DRAYTON continues to supply cocaine to STOKES.  Based on the size of the first distribution, I believe that STOKES acquires wholesale quantities from K. DRAYTON, which he would then re-distribute to street level customers.

### 3. STOKES Attempts to Order Drugs From K. DRAYTON, Who Agrees to Supply STOKES Once He Has Drugs

240.    On April 25, 2020 at 5:08 p.m., K. DRAYTON used Target Telephone 20 to contact STOKES on cellular telephone (857) 261-3811.  In this conversation, STOKES asked K. DRAYTON, "What's good, Cuz?"  K. DRAYTON replied, "Ain't nothing right now, man."  K. DRAYTON further stated, "As soon as I figure something up, I'll …you know I'll definitely hit you."  Based on my training, experience, and knowledge of this investigation, I believe that STOKES requested cocaine, which K. DRAYTON did not have ("ain't nothing right now").  I am also aware that, as a consequence of the pandemic, many drug dealers have had trouble acquiring supplies of drugs during the past several months, particularly cocaine.  I also believe that K. DRAYTON agreed to provide additional drugs to STOKES when he had them available ("As soon as I figure something up, I'll …you know I'll definitely hit you."), which I believe is consistent with an ongoing drug-trafficking relationship between K. DRAYTON and STOKES.

## IV.    CONCLUSION

241.    Based on the information set forth above, I believe probable cause exists to conclude that the Target Subjects have conspired and continue to conspire to possess with intent to distribute, and to distribute, cocaine and cocaine base, in violation of 21 U.S.C. § 846.  In light of the evidence summarized above, I respectfully request that the Court issue the requested criminal complaint.

I, James Peters, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

Signed under the pains and penalties of perjury this 23rd day of June 2020.

_____
James A. Peters
Task Force Officer
Drug Enforcement Administration

Sworn to and subscribed before me by telephone this 23rd day of June 2020.



HON. MARIANNE B. BOWLER
United States Magistrate Judge

114